# In The Matter Of:

*COMMODITIES & MINERALS ENTERPRISE  LTD., v*
*GRETCHEN SHIPPING, INC.,*

---

*September 27, 2013*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File D9R8COMA.txt

Min-U-Script® with Word Index

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

---

D9R8COMA                                                      Page 1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    COMMODITIES & MINERALS ENTERPRISE
      LTD.,
 4
                        Plaintiff,
 5
              v.                        13 Cv. 6548 (PKC)
 6
      GRETCHEN SHIPPING, INC.,
 7
                        Defendant.
 8    ------------------------------x

 9                              September 27, 2013
10                              2:40 p.m.

11    Before:

12                  HON. P. KEVIN CASTEL

13                              District Judge

14                  APPEARANCES

15    HOLLAND & KNIGHT LLP
           Attorneys for Plaintiff
16    MICHAEL J. FREVOLA
      F. ROBERT DENIG
17
      LYONS & FLOOD LLP
18         Attorneys for Defendant
      KIRK M.H. LYONS
19

20

21

22
23
24
25
```

---

D9R8COMA                                                      Page 2

1           (Case called)

2           THE DEPUTY CLERK: Plaintiff ready.

3           MR. FREVOLA: Yes.  Michael Frevola for Holland &
4    Knight LLP.

5           MR. DENIG: Robert Denig, Holland & Knight LLP.

6           THE COURT: Good afternoon to you both.

7           MR. LYONS: Kirk Lyons, Lyons & Flood, for the
8    defendant.

9           THE COURT: Good afternoon, sir.  Good to see you all.

10          Just to set the stage, the Court issued a writ of
11   maritime attachment and garnishment on September 17, and
12   thereafter on September 19, on the defendant's application I
13   signed an order to show cause why plaintiff's maritime
14   attachment should not be vacated.  And under familiar law in
15   this circuit, including the Aqua Stoli case, the burden of
16   justifying the attachment is on the plaintiff.  And as I read
17   the papers, and I want to check this with defendant's counsel,
18   there is no dispute that the defendant cannot be found within
19   the district.

20          Is that correct?

21          MR. LYONS: That's correct, your Honor.

22          THE COURT: There is no dispute that no statutory or
23   maritime bar exists to the attachment.

24          MR. LYONS: That's correct, your Honor.

25          THE COURT: OK.  All right.  The plaintiff otherwise

---

D9R8COMA                                                      Page 3

1    bears the burden on the elements set forth in Aqua Stoli.

2           Now, to set the stage, the plaintiff has relied on
3    Grubart and the tests set forth in Grubart for invoking
4    admiralty jurisdiction, and the plaintiff asserts that there is
5    maritime jurisdiction in this case.

6           Let me hear your argument on that.

7           MR. FREVOLA: Thank you, your Honor.

8           It's plaintiff's position, your Honor, that the
9    plaintiff actually has both its legal position, which we
10   believe, as a matter of law, if you agree that we have alleged
11   sufficiently, we maybe don't even get to the factual side of
12   it.  And even if it turns out we get to having to address the
13   defendant's argument, we think factually we have alleged
14   sufficient facts that should sustain the prima facie inquiry
15   with regards to a maritime claim.

16          With regards to the law, we have dueling decisions
17   with regards to maritime tort cases here.

18          THE COURT: I have read the Fifth Circuit and the
19   Eleventh Circuit.

20          MR. FREVOLA: There is also Carroll, which is the
21   First Circuit, with the insurance company, which basically
22   tells the ship owners, don't put those sailors on your ships
23   because they're insurance hazards, and the ship owner doesn't
24   do it.

25          There is also Maritima, which was Judge Scheindlin's

---

D9R8COMA                                                      Page 4

1    decision in the Southern District as well.

2           Now, I think, your Honor, looking at these cases, each
3    one of these cases, I think you can see a common pattern.  In
4    Carroll and in Odyssey Marine Exploration, you have situations
5    where the plaintiffs had a contractual relationship with the
6    defendant, and the contractual relationship they had was
7    unquestionably a maritime contract.  So, therefore, the
8    underlying contract at issue in both of those cases was a
9    maritime contract.  And the dispute was, in Carroll's words,
10   the way Carroll used the analysis was inextricably interwoven
11   with the actual contract that we are talking about here.

12          With regards to Kuehne & Nagel, in that case, if you
13   look at the facts, you had a situation where a ship was
14   carrying cargo down to Turkey, where it was being dropped off
15   in Turkey, and then it was going to be trucked over land to
16   Iran.  The problem in that case was that, when the vessel got
17   to Turkey and discharged the cargo, what then happened was is
18   that there were problems with financing with trucking stuff
19   over to Iran, and so the land-based portion of the
20   transportation contract was where the disconnect happened.  And
21   in that case, the Fifth Circuit said, one, it's not a maritime
22   contract, and then said it's not a maritime tort.

23          Now, interestingly, with the maritime contract aspect,
24   if you look at the U.S. Supreme Court's Kirby decision, Kirby
25   was dealing with these mixed contracts, and the Kirby decision

---

1 actually was the case that leads off with Justice O'Connor
2 saying this is a maritime case about a train wreck, because the
3 tort happened in Alabama, hundreds of miles inland. But they
4 looked back at Kuehne & Nagel and said they basically disproved
5 of the decision.
6       So, in essence, Kuehne & Nagel has a Fifth Circuit
7 which is providing a very narrow view of maritime jurisdiction
8 on the contract side, which the Supreme Court later, I wouldn't
9 say criticized, but said we are not going to treat it this way.
10 And when they didn't find a maritime contract in Kuehne, then
11 they looked at the tort situation and they said, there is no
12 tort either, or there is no maritime tort.
13       In fact, what happened with Kuehne & Nagel, there may
14 have been a little cargo left in the ships, but mostly it was
15 an issue of cargo on land wasn't getting to where it needed to
16 go.
17       When you look at Maritima, the Judge Scheindlin case
18 here in Southern District, the first thing she does is she
19 analyzes under maritime contract principles, and once again,
20 it's not a maritime contract. Instead, what it is is it is a
21 contract to procure a potential maritime contract which never
22 goes to fruition. And Judge Scheindlin actually says at
23 footnote 5 of the case, if the rig is being provided out to the
24 drilling company, if that was the dispute, that would have had
25 an impact on navigable waters, but this was just all land

1 did occur when the actions were going on land. The person
2 firing the rifle that shoots out into the water and hits
3 somebody on a boat in the water. The situation where there is
4 a gyroscope that is manufactured in Texas on land, but it
5 malfunctions at sea and causes a collision. The situation
6 where there are asbestos cases with maritime ship workers
7 working on ships on land and they wind up getting injured.
8 That's a maritime tort.
9       THE COURT: Let me hear from Mr. Lyons on this issue.
10       MR. LYONS: Thank you, your Honor.
11       This case, just to clear the air, involves no shooting
12 of anybody on water. But it does involve strictly, if you look
13 at plaintiff's verified complaint, each of the acts complained
14 of occurred ashore. And it's the Kuehne & Nagel, and I
15 disagree with Mr. Frevola's interpretation of that case, as
16 well as the Maritima case, because in both of those cases, the
17 courts did look at the contract issue. But if you look at the
18 tort analysis in each of those cases, they say nothing about
19 the contract, nothing about contract jurisdiction.
20       THE COURT: Let's start with a couple of principles
21 here. The contract at issue, the charter party agreement is a
22 very salty contract, correct?
23       MR. LYONS: Yes, your Honor.
24       THE COURT: And a claim for breach of that agreement a
25 minute after it is signed on land would properly invoke the

1 based.
2       So their side of their cases have non-maritime
3 contracts and no concept of maritime tort. In our two cases,
4 Carroll and Odyssey, maritime contracts, maritime tort. And,
5 your Honor, I suggest that's the analysis that we are looking
6 at here.
7       In terms of Grubart, Grubart was an Admiralty
8 Extension Act case dealing with a tort that was committed
9 against third parties. There was no contract, and they were
10 not part of a contractual relationship with the people that
11 were injured. So they look at the Admiralty Extension Act and
12 they say, where the injury is caused by a ship or other vessel
13 in navigable water, even if such an injury occurred on land,
14 that was the inquiry under the Admiralty Extension Act.
15       Interestingly, during Grubart, the Grubart court
16 quotes Executive Jet and says, the reason why we are going away
17 from what was happening previously was, a purely mechanical
18 application of the locality test was not always sensible or
19 consonant with the purposes of maritime law.
20       So the Supreme Court was trying to get away from this
21 issue of saying, on land not maritime, at sea maritime.
22 Instead, look at what is going on. What is happening with the
23 players.
24       When you actually look at, for example, in the Kuehne
25 & Nagel case, they talk about situations where maritime torts

1 court's maritime jurisdiction, is that correct?
2       MR. LYONS: That's correct, your Honor.
3       THE COURT: Now, in such a claim for breach of
4 contract, one can assert, as a defense to enforcement of the
5 contract, fraud in the inducement, is that correct?
6       MR. LYONS: Yes.
7       THE COURT: Is that affirmative defense a tort?
8       MR. LYONS: I would say yes.
9       THE COURT: Well, if it's an affirmative defense to
10 breach a contract, how is it a tort?
11       MR. LYONS: Because it occurred before the contract
12 was signed.
13       THE COURT: So your position is, if you sued on a
14 maritime contract, a charter party, this agreement, and the
15 affirmative defense of fraud in the inducement was asserted,
16 the court would not have, within its maritime jurisdiction, the
17 ability to adjudicate the affirmative defense to breach of
18 contract. Is that your position?
19       MR. LYONS: Yes, your Honor. But I think there would
20 be supplemental jurisdiction.
21       THE COURT: But it would not be within the maritime
22 jurisdiction of the court, the affirmative defense.
23       MR. LYONS: That's correct.
24       THE COURT: What statute of limitations applies in
25 that situation to the person's ability to assert the

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

1 affirmative defense?

2          In other words, if the affirmative defense is barred
3 by the tort statute of limitations, does that bar the assertion
4 of the affirmative defense of fraud in the inducement?

5          MR. LYONS: I think an affirmative defense can be
6 raised, you can raise a time bar.

7          THE COURT: You can? I'm sorry.

8          MR. LYONS: Raise a time bar at any time.

9          THE COURT: As to the affirmative defense?

10          MR. LYONS: Yes.

11          THE COURT: I think you're going to find the law is to
12 the contrary on that. It's an affirmative defense, it's not a
13 claim for relief, and it can be raised in response to a claim
14 for breach of contract. In fact, the New York authorities seem
15 to draw that distinction, and I will see whether I can give you
16 a cite on that.

17          Take a look at U.S. Fidelity v. Delmar Development, 22
18 App.Div.3d 1017 (3d Dept. 2005). It doesn't arise in the
19 context of the statute of limitations, but it makes the
20 point -- well, actually, it does. That it is not barred by the
21 statute of limitations, and that a party may assert a claim of
22 fraud in the inducement as an affirmative defense to a claim of
23 breach of contract. And the trial court had denied defendant's
24 motion insofar as it sought to add fraud in the inducement as
25 an affirmative defense on the basis that the proposed amendment

1 would violate the prohibition against permitting a party to
2 convert a contract action into a tort action without alleging
3 any breach of a legal duty independent of those created by the
4 contract. And the court noted that the defendant does not seek
5 affirmative relief in tort, but claims fraudulent inducement as
6 a defense to plaintiff's breach of contract claim. And,
7 therefore, it was distinguishable from instances where
8 affirmative relief in tort is sought.

9          Any response?

10          MR. LYONS: Well, I haven't read the case, obviously,
11 but my response is I think the Fifth Circuit in Kuehne & Nagel
12 and the Eighth Circuit on Laretson and the Maritima decision by
13 Judge Scheindlin all point, when they analyze tort
14 jurisdiction, under very similar circumstances --

15          THE COURT: Was Judge Scheindlin's case a fraud in the
16 inducement case?

17          MR. FREVOLA: It was a fraud in the inducement case
18 along with a non-maritime contract.

19          MR. LYONS: As was Kuehne & Nagel, that was a fraud in
20 the inducement case as well. It's quite clear, and they drew a
21 fine line, that the events giving rise to the fraudulent
22 inducement all occurred ashore, and the harm caused by the
23 tort, the misrepresentation in those cases occurred when the
24 plaintiff had signed the contract. The misrepresentations
25 occurred before the contract was signed, and the harm was the

1 signing of the inducement into the contract. And under those
2 facts, and Kuehne & Nagel is very close factually to our case,
3 under those facts, the Fifth Circuit found that there is no
4 tort jurisdiction. It is an independent analysis from any
5 contract claim.

6          THE COURT: Let me hear from the plaintiff with regard
7 to whether or not there is attachable property. And,
8 specifically, I would like you to address the application of
9 Supreme Merchandise to the facts of this case. I recognize
10 it's a standby letter of credit, and in that case it happened
11 to be a negotiable letter of credit, but I have also read Judge
12 Kaye's recitation of the strong public policy of the state of
13 New York and what the New York Court of Appeals has said on the
14 construction of letters of credit.

15          MR. FREVOLA: Thank you.

16          Before I do that, I mentioned earlier that we had two
17 different positions, one was a legal position that I think our
18 interplay discussed that very well. There is a factual
19 position also that I think that right now is not clearly on the
20 record that I would like to point out to the Court.

21          Paragraph 19 of the verified complaint recites the
22 fact that the parties, representatives from the defendant and
23 the plaintiff, went on board this ship for basically the first
24 time they were getting together in terms of seeing the ship,
25 and while they were on the ship in Jacksonville, Florida,

1 taking a look at the ship and doing a walk-around, two separate
2 representations were made. One was about the hire rate, and it
3 was a reasonable hire rate, and the other one was the loading
4 rate of the vessel being 4500 metric tons an hour -- I'm sorry,
5 the discharging rate.

6          Your Honor, if you look at Exhibit 7 to the complaint,
7 there is a spreadsheet of discharging rates showing the ship
8 has never gotten close to 4500 metric tons an hour. In fact,
9 it only broke 2,000 metric tons an hour once. That
10 representation was made on board a ship in navigable waters
11 before the contract was signed.

12          On top of that, your Honor, the harm is that every
13 time the ship goes into a port to discharge, if there are time
14 limits for discharging, it's going to be assessed demurrage if
15 it takes too much time. It's in a shuttle service of iron ore
16 coming out of Venezuela. Every time it comes out and is
17 discharging it, it's slowing things up. If my client wanted to
18 re-let the vessel, it's not going to happen. We are going to
19 re-tender it or tendering back because of the rescission
20 element. But if they wanted to re-tender the vessel, the
21 vessel's loading rate is not what was represented to them, they
22 are stuck with a vessel that has got a slower loading rate.

23          So on the facts, your Honor, we very, very clearly, I
24 think, fall within the Grubart test. I don't think we have to
25 get there because the law says with fraudulent inducement

D9R8COMA                                                          Page 13

1   claims you don't have to do that.  But, nevertheless, the
2   complaint has allegations, if you look at Exhibit 2, which is
3   also mentioned in paragraph 19 of the complaint, it's an e-mail
4   from defendant's president that is a recap of the visit two
5   days earlier to Jacksonville, and he talks about the loading
6   rate representations he made on board the ship.
7        THE COURT: Are you seeking relief beyond rescission?
8        MR. FREVOLA: In terms of the arbitration, we are
9   going to actually have several other claims.  The only reason
10  why the fraudulent inducement claim is here with your Honor was
11  that this is really the maritime claim and rather than putting
12  them all in --
13       THE COURT: But before me on this writ of attachment,
14  you rely on the rescission claim and not on any claim for which
15  you seek affirmative relief, is that correct?
16       MR. FREVOLA: Yes, your Honor.  There is no breach of
17  a charter party or anything in this claim.
18       That was the facts in issues.
19       Now, in terms of the letter of credit issue --
20       THE COURT: No.  Now I am going to give Mr. Lyons an
21  opportunity to respond to your argument.
22       MR. LYONS: In terms of the representations, again,
23  your Honor, those e-mails that were attached to the complaint
24  and referenced in paragraph 14 were sent from a shore location
25  to another shore location.  So the representations themselves,

D9R8COMA                                                          Page 14

1   again, occurred ashore.  And the harm is not the alleged fact
2   that the ship was not meeting, which we contend to be a
3   nonexistent discharge rate, but the harm, again, here is the
4   inducement into the contract.  The failure to reach a certain
5   discharge rate, in our claim under the contract in arbitration,
6   is not before your Honor, only fraudulent inducement.  There is
7   no breach of contract claim in the verified complaint.  So I
8   would again say that whatever alleged misrepresentations took
9   place, again, took place ashore.
10       THE COURT: Thank you.
11       MR. FREVOLA: I am telling you that we have actually
12  investigated this, and if you would like a declaration, I
13  wasn't going to sandbag Mr. Lyons with a declaration today, but
14  if you would like a declaration, or if you would even like to
15  have the witness testify this coming week with regards to him
16  talking with Mr. Katsoufis on board the ship and the
17  representations being made on the ship.  The e-mail was a recap
18  of what was discussed on the ship two days earlier.
19       THE COURT: Today is the return date of the motion to
20  vacate.
21       MR. FREVOLA: I was only going to say also this.  With
22  regards to this type of a hearing, we are not supposed to have
23  to put on full-fledged evidence.  There is no declaration
24  saying from Mr. Katsoufis we didn't go on the ship, I didn't
25  write that e-mail, or anything like that.  And in terms of when

D9R8COMA                                                          Page 15

1   you're looking at a motion to dismiss for lack of subject
2   matter jurisdiction, the well-pleaded complaint and the
3   inferences in favor of the plaintiff are supposed to be in our
4   favor in that regard because they are saying it is not a
5   maritime claim, this is not subject matter jurisdiction under
6   maritime law.
7        So the point I am trying to make is that our complaint
8   does have allegations of being on the ship.  It does have an
9   e-mail that recaps what was said on the ship.  Your Honor, like
10  I said, I think that's enough even on the fact argument, not
11  the legal argument but the fact argument, which is our backup
12  argument, but we are also offering, if your Honor has any
13  qualms about that, that we could buttress it with actual
14  witness testimony if you would like.
15       THE COURT: You want to call a witness, I haven't
16  stopped anybody from calling anybody they want.  I didn't stop
17  Mr. Lyons.  I am not stopping you.  You can call anybody you
18  want.
19       MR. FREVOLA: Thank you, your Honor.
20       THE COURT: Do you have a witness you're going to
21  call?
22       MR. FREVOLA: No, your Honor.
23       THE COURT: Do you want to proceed on the letter of
24  credit issue?
25       MR. FREVOLA: Yes, your Honor.

D9R8COMA                                                          Page 16

1        With regards to the letter of credit issue, there is
2   another area of negotiable instruments that actually I think is
3   helpful in this area.  The concerns with a negotiable letter of
4   credit are that if somebody has a block of money that it
5   essentially can assign out and it can be sent to multiple
6   people in commerce, if a counterparty to that person or if a
7   claimant against that person was able to lock up that credit
8   stream, you could have derivative effects on people who are
9   unrelated with the dispute around the world who wound up
10  getting affected by this.
11       THE COURT: You're not getting that out of Supreme
12  Merchandise.
13       MR. FREVOLA: I believe there is a statement in there
14  on that.
15       THE COURT: There is a reference to it being a
16  negotiable letter of credit, and there is a reference to the
17  institutions presenting the draft.  I acknowledge that.  I am
18  asking you to address Judge Kaye's statements of broader
19  concerns about how letters of credit are intended to operate.
20  And don't those broader concerns relate with equal force to a
21  standby letter of credit?
22       MR. FREVOLA: I think that, your Honor, in a bill of
23  lading context, under maritime law when you have bill of lading
24  for cargo which is moving, and it's moving under a negotiable
25  bill of lading, the reason why you're not allowed to attach

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

| D9R8COMA | Page 17 |

1 cargo, the actual physical cargo in port at that point, the
2 reason being is that there is a negotiable document that
3 actually serves as title to the goods, and, therefore, if you
4 have got a negotiable bill of lading, you have to actually hit
5 the bill of lading and seize that, because otherwise you could
6 you have third parties are influenced or hurt by this
7 fight between these two parties to the transaction.  When a
8 bill of lading is not negotiable, you don't have to hit the
9 bill of lading, you can actually hit the cargo, because no
10 third party is going to be harmed.
11        With regard to the Supreme Merchandise case, Judge
12 Kaye says, because of its unique character, it typically
13 implicates other than the immediate parties to the underlying
14 transaction.  That's the concern with a negotiable letter of
15 credit.  With the standby letter of credit, there is only one
16 person who is going to get that money, and that person is
17 demanding that money right now.  It's vested into a situation
18 where they are trying to draw down on it.
19        THE COURT: In this case, it implicates a party who is
20 not a party to the underlying transaction.
21        MR. FREVOLA: You're talking about Citibank?
22        THE COURT: It does.
23        MR. FREVOLA: With regards to that, all I would say is
24 that the Second Circuit in the Sperry case that we referred to,
25 it was a $15 million letter of credit in which, again, almost

| D9R8COMA | Page 18 |

1 exact same situation, your Honor.  You had the government of
2 Israel in Sperry with the contract.  Israel said that Sperry
3 breached the contract, wanted to draw down the 15 million.
4 Sperry was able to get an order of attachment from New York
5 supreme.  It got transferred into federal court.  And the
6 Sperry decision talks more about the injunction issued by the
7 arbitrators as opposed to the attachment issue, but it was a
8 similar situation, your Honor.  In fact, it's very similar.
9 Because here we have actually offered to the other side to put
10 the 2.5 million into an escrow account so it's there for
11 whoever wins.  They have rejected that request.  But in Sperry,
12 you did have a standby letter of credit that was supposed to go
13 to one party, and it didn't seem like the court had any problem
14 with the idea that that kind of a res could be attached, and it
15 can be attached at a time once the demand has been made because
16 at that point it becomes a debt owed by the bank to that one
17 party.
18        I definitely think there is a distinction.  I can see
19 and agree with the idea that negotiable letters of credit,
20 because they can be sent out to multiple people, that's a
21 problem.  But here when there is only one person asking for it,
22 and only one person can ask for it, different story.
23        THE COURT: Mr. Lyons.
24        MR. LYONS: Thank you, your Honor.
25        There is a sanctity to letters of credit whether it's

| D9R8COMA | Page 19 |

1 negotiable or standby, and people use letters of credit for a
2 reason, that it's money in the bank so to speak.  They know if
3 they meet the terms, they present a draft, they are going to
4 get paid now.
5        Now, if the Court were to rule here that you can
6 attach a letter of credit, think of the effect that you are
7 going to have on people that do rely on standby letters of
8 credit, and now they may say, well, it may affect our business
9 because we can't trust a letter of credit anymore.  We are
10 dealing with parties all around the world and we use letters of
11 credit, and there is very good reason to use it, because a
12 person knows that when you have a letter of credit, you know
13 you're going to get paid if certain requirements are made.
14        I think, as your Honor pointed out, the policy behind
15 the decision in Supreme Merchandise applies equally in a
16 standby letter of credit because, although at that moment it is
17 not negotiable, they are fully assignable, they are fully
18 transferable.  So readily third parties can become involved in
19 the standby letter of credit.
20        THE COURT: What is assignable and what is
21 transferable?
22        MR. LYONS: Assignment is --
23        THE COURT: Of what?
24        MR. LYONS: Assignment of the payment under the letter
25 of credit.

| D9R8COMA | Page 20 |

1        THE COURT: If payment is received by you, your client
2 can go to Las Vegas and put it on red if it wants to.  It can
3 give it away to charity.  What is assignable?  Once the
4 property is received, there is no dispute that the property is
5 alienable and assignable.  What is assignable prior to your
6 client's receipt?
7        MR. LYONS: As I understand it, your Honor, the
8 beneficiary of a standby letter of credit can assign the
9 proceeds to a third party.  So that the money will not be paid
10 to the beneficiary.  It's going to be paid to the third party.
11        THE COURT: Well, that's not the proceeds, if what
12 you're saying is correct.  That's the right to receive the
13 proceeds, which is very different than the proceeds.
14        There is no dispute here that the proceeds are
15 assignable.  That's the point I was making.  When your client
16 receives the proceeds, it may take those proceeds and do
17 whatever it wants with it.  It can hand it to the first person
18 it meets on the street.
19        MR. LYONS: I believe the assignment is that the
20 proceeds, whatever comes out of the letter of credit, does not
21 go to the beneficiary, it goes to a third party.
22        THE COURT: Well, that's different than the proceeds.
23 The right to receive the proceeds is different than the
24 proceeds.
25        MR. LYONS: The proceeds will follow to the third

1 party. The proceeds don't go to the beneficiary, they go to
2 the third party.

3        THE COURT: You don't dispute for the plaintiff that
4 proceeds are assignable?

5        MR. FREVOLA: Yes, your Honor. But I think what would
6 have to happen is I think it's inarguable that the only person
7 who can make the request to Citibank is Gretchen, with their
8 invoice and with a statement from them saying, we have earned
9 the money and now either we want it, or maybe they can say we
10 want to send it somewhere else, but in either case they are
11 asserting property interest in that and telling the bank to do
12 what Gretchen wants the bank to do with it. And once that
13 happens, that's an attachable interest, your Honor.

14        THE COURT: Is there any set of facts under which a
15 person other than Gretchen can make a demand under the letter
16 of credit?

17        MR. LYONS: No, unless the terms of the LC are
18 changed.

19        THE COURT: Let me inquire of plaintiff's counsel.
20        Is there any attachable property of the defendant
21 prior to the time that a draft is presented under the letter of
22 credit?

23        MR. FREVOLA: No, your Honor. Just as if when a
24 vessel comes into the jurisdiction, until the vessel gets here,
25 it's a similar thing. It may be an expectant situation that

1 never comes to fruition. But we do know that they have a right
2 to draw on it and that they are seeking to do it. So it's not
3 an idle concern. Under the Ninth Circuit, the case in Polar
4 Shipping, they talk about the fact that having the ability to
5 do this quickly and to have the ability to seize things quickly
6 is probably more important now than it ever was even hundreds
7 of years ago because things could be moved so quickly.

8        THE COURT: What is your evidence that they are
9 proceeding to do so now?

10        MR. FREVOLA: They wound up asking the arbitration
11 panel in the preexisting arbitration that's going on for a
12 partial final award to be able to take the entire 2.5 million.

13        THE COURT: I thought that was denied.

14        MR. FREVOLA: It was tabled, your Honor.

15        THE COURT: It was tabled.

16        MR. FREVOLA: Until this hearing is over with.

17        THE COURT: So it was not granted.

18        MR. FREVOLA: It was adjourned, is what I would say,
19 because they said we are not going to rule on it until after
20 this hearing takes place in federal court.

21        THE COURT: It doesn't sound to me like Gretchen is
22 acting unilaterally. If they were presenting a draft to
23 Citibank, they would have presented a draft to Citibank,
24 presumably.

25        MR. FREVOLA: There is only one reason they didn't

1 present a draft to Citibank, and that's because the matter we
2 filed here, which we filed openly as opposed to filing it under
3 seal, appeared on the courthouse news, and Mr. Lyons, as
4 counsel for Gretchen, saw it filed on the courthouse news and
5 told his client about it. That's the reason why they came in
6 before they drew on it.

7        THE COURT: And you know this because?

8        MR. FREVOLA: I am surmising it, your Honor. But we
9 were contacted immediately after the courthouse news report
10 came out. So just from having been around the block a few
11 times in this business, it's a pretty educated guess.

12        THE COURT: OK. At what point do you maintain the
13 proceeds of a letter of credit become the property of the
14 beneficiary?

15        MR. FREVOLA: I would say, your Honor, not until the
16 actual demand is made on Citibank. We are not aware of any
17 demand being made so, like I said, it's like the ship does not
18 come into the jurisdiction yet. Owners of ships can decide to
19 tell somebody to steam to another port and the vessel doesn't
20 come in.

21        THE COURT: Doesn't that destroy your argument here on
22 attachment? We might all say that when the ship comes in to
23 port, it is attachable. But as it's steaming towards port, if
24 it gets the high sign, somebody flags it down and says don't
25 come in, they are going to attach the ship, and they turn

1 about, there is no basis for attachment, and the fact that they
2 intended, that they planned, that it was their purpose to come
3 in to port, and they turned about because of fear of
4 attachment, would foreclose the ability to attach. Why don't
5 those same principles doom your attachment?

6        MR. FREVOLA: I don't think with the ship not coming
7 into port, I don't think it would doom it. I think we would be
8 able to continue to keep the writ in place waiting for the ship
9 to come in in case it tried sneaking in in the middle of the
10 night. I don't think that's definitely a showstopper.

11        THE COURT: Why would a court issue a writ of
12 attachment unless there was evidence that the property was in
13 or about to be in the jurisdiction of the court? Isn't that in
14 Rule H?

15        MR. FREVOLA: It might actually be in Rule B, your
16 Honor.

17        THE COURT: It may be in Rule B.

18        MR. FREVOLA: I think it's in the supplemental rules,
19 your Honor.

20        THE COURT: One second.

21        I have Rule B in front of me and there may be such a
22 provision, but I am not locating it. Can anybody help me out?
23 Does the property need to be within the jurisdiction of the
24 court?

25        MR. FREVOLA: To attach it definitely, but to get the

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

D9R8COMA                                                                    Page 25

1  order, absolutely not, your Honor.  That is definitely not a
2  requirement.  I think that you have got to make a
3  representation, and as an officer of the court it should be a
4  good faith representation, that you believe there is a
5  possibility that it is going to come in and come in soon.  And
6  that's exactly what we did when we filed these papers.
7        But right now, your Honor, I think we have the right
8  to be able to look for such property over the next 120 days.
9  And to be candid with the court, your Honor, we are in the
10 process of getting ready to file a motion to compel arbitration
11 against these various other parties to the alleged fraud, which
12 we are going to file with your Honor as a parallel case.  And
13 we are also looking at seeking injunctive relief, either from
14 your Honor or from the arbitration panel, in order to stop this
15 process as well.  But, unfortunately, because there is a 20-day
16 lag before our respondents have to appoint their arbitrators,
17 there is a gap.  So we have a right to use this rule the way we
18 have used it, and right now we are essentially trying to
19 prevent inequitable circumstances from occurring in the
20 meantime.
21       THE COURT:  Let me hear from Mr. Lyons.
22       There is no property to be attached until such time as
23 a draft is presented to Citicorp, correct?
24       MR. LYONS:  Yes, your Honor.
25       THE COURT:  So both sides are in agreement on that.

D9R8COMA                                                                    Page 26

1        If a draft is presented to Citibank, at that point
2  there is attachable property, is that correct?
3        MR. LYONS:  Yes, your Honor.
4        THE COURT:  Why then is that not an issue on this
5  application, because they need not have attachable property in
6  this jurisdiction at the time they obtained the Rule B order of
7  attachment?
8        In other words, they say, we don't have attachable
9  property.  There is nothing for us to attach.  But we believe
10 within 120 days there may be attachable property within the
11 jurisdiction.  And we will get to what is the situs of the
12 letter of credit, that's a whole separate argument, but for the
13 purpose of this discussion I want you to assume that it is New
14 York.  Where is the defect then?  There is nothing that can be
15 attached at the moment, but there may, at some future moment in
16 time, be something that could be attached at the moment of
17 presentation of a draft on the letter of credit before those
18 funds are paid.  I think, as I have read the law, once those
19 funds are paid, and they are in your hands and they are not
20 located in the district, there is nothing to be attached also.
21 But why does the fact that it's not attachable now present a
22 reason to vacate the attachment?
23       MR. LYONS:  Because it is attached.  The bank will not
24 release the funds.
25       THE COURT:  Well, the bank may not release the funds,

D9R8COMA                                                                    Page 27

1  but that's not because it's -- have you attached any property
2  pursuant to this order of attachment?
3        MR. FREVOLA:  Your Honor, if Mr. Lyons has been told
4  by a bank that something has been attached, that's news to me.
5  I think that would be an easier thing because then we would
6  know that it's attached.  But my understanding is we got no
7  report from Citibank that anything has been attached.  So right
8  now we are acting on the assumption that right now nothing
9  popped.
10       MR. LYONS:  What effect it has is an injunction
11 against the bank.  The bank is not going to release the funds
12 now with an attachment order hanging over their head.  This is,
13 in effect, an injunction.
14       THE COURT:  That's an entirely different argument
15 because it has been my experience that, for example, there
16 could be an application to stay an arbitration and a court has
17 not granted a stay of arbitration, but the arbitrating
18 authority will not schedule it.  That's not the doing of the
19 court.  That's the actions of an independent actor.  And
20 Citibank may, in its own wisdom, not want to pay on the letter
21 of credit during the pendency of the arbitration.  And if your
22 client has rights under the letter of credit, your client is
23 free to enforce those rights under the letter of credit.  But I
24 cannot be responsible for a position that Citigroup takes that
25 is not compelled by any order of mine.

D9R8COMA                                                                    Page 28

1        MR. LYONS:  Your Honor, take the ship example.  What
2  if the ship was served an attachment order?  That's like
3  holding vessel until the ownership changes.
4        THE COURT:  I will give you a better example.  I turn
5  around and I vacate the order of attachment.  I vacate it.  And
6  the plaintiff files a notice of appeal and Citibank says, I
7  ain't paying you a dime under the letter of credit.  You can
8  say, with some cause, that that's a de facto attachment.  It's
9  like there is a preliminary injunction.  As long as you use
10 words like "it's like" and "it has the same effect as," I will
11 be in agreement with you.  But it's not de jure.  No court has
12 ordered it.  It is the unilateral actions of a maybe rational,
13 maybe not rational act.  That's something else.
14       MR. LYONS:  How long does this stay in effect?  Does
15 this 120 day injunction stay in effect for 120 days?
16       THE COURT:  Well, there is no injunction.  There is a
17 maritime order of attachment.
18       MR. LYONS:  It is a de facto injunction.
19       THE COURT:  Let me ask you.  In my hypothetical when
20 Citigroup says, if there is a notice of appeal from the
21 vacating of the attachment, we will not honor the letter of
22 credit.  How long does that stay in effect?
23       MR. LYONS:  As long as the appeal stays in effect.
24       THE COURT:  Pardon me?
25       MR. LYONS:  As long as the appeal is active.

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

1    THE COURT: No, that's not accurate.  That's not
2 accurate.  It stays in effect as long as people at Citibank
3 choose to have it stay in effect.  And you have your rights and
4 remedies as well.  They could turn around and the appeal could
5 be decided and some lawyer at Citibank says, no, we are still
6 not paying it.  We are going to wait to see if there is a
7 petition for a hearing en banc.  And a petition is made and
8 then it's denied and you say, well, now can I have my money?
9 And a lawyer at Citibank says, we want to wait and see if a
10 cert petition is filed.  That's a Citibank decision, not a
11 judicial decision.  There are procedures for parties to seek
12 stays and the like from courts, but that's the unilateral
13 actions of a nonparty, is it not?
14    MR. LYONS: Yes.
15    THE COURT: Let me turn to the plaintiff with regard
16 to the issue of where the letter of credit is sited.  Are you
17 not in the wrong district?  Shouldn't this be in Tampa,
18 Florida?
19    MR. FREVOLA: Your Honor, you and I are of like minds
20 in terms of first impressions.  And that was the first place
21 I started looking.  I was about to get on a plane the morning
22 that we filed here to go to Tampa to file it.  Then our client
23 inquired with the letter of credit department about how their
24 mechanics work.  Apparently, the letter of credit department in
25 Tampa merely is the ad min processing function, but under the

1 way Citibank works, wherever the principal account of their
2 client is is where the letter of credit funds issued from.  And
3 our client's principal accounts are the private bank of
4 Citibank here in New York.  We actually started looking at the
5 Middle District of Florida for that very purpose.
6    So in terms of trying to prove it, banks are very
7 loath to give any type of a declaration with regards to
8 anything they do, as your Honor can imagine.  I think the best
9 way to test that theory would be if Mr. Lyons put in a draw on
10 the letter of credit, and if it got attached here, we would
11 know that Citibank's policy is in fact exactly what we have
12 been told it is.  But it's hard for me to give you anything
13 better than what we did in terms of our investigation and the
14 fact that I actually started looking at this in the Middle
15 District of Florida and was told by the garnishee that, no,
16 that is not the right place.
17    THE COURT: Looking at the irrevocable letter of
18 credit in this case, which is to be strictly construed, it
19 says, very simple document, three pages in length, describes
20 how to draw down on the letter of credit.  "We hereby agree
21 with you that drafts drawn in compliance with the terms and
22 conditions of this credit will be duly honored on due
23 presentation if presented on or about the expiration day or any
24 automatical" -- that's the way it appears in the original --
25 "extended expiry date."

1    Then dropping down three paragraphs below that, it
2 says, "Remit documents by courier to Citibank NA, care of its
3 servicer Citicorp North America Inc., 3800 Citibank Center,
4 Building B, third floor, Tampa, Florida  33610, attention U.S.
5 Standby Department."
6    Wouldn't Citibank be quite within its rights to reject
7 any draft presented in any manner not in compliance with that
8 provision?  And, conversely, acting in breach of the letter of
9 credit if it refused to honor a draft absent a judicial order
10 to the contrary that was presented in said manner?
11    MR. FREVOLA: I would only say, your Honor, as you
12 pointed out, the courier address goes to Citibank NA, care of
13 its servicer.  In other words, I think that goes to the issue
14 of who is running the paperwork.  But with regards to where the
15 funds actually initiate from, your Honor, like I said, my
16 understanding is it's from here.
17    I don't disagree with you in terms of the analysis,
18 and I likewise was looking at it the same way.  But with
19 regards to wherever, I guess in terms of their computers, the
20 place where the computer is going to say the funds are here,
21 and it sounds almost like it's separate account that's standing
22 by, that's kept here.
23    THE COURT: So your position is in all letters of
24 credit of any kind or character, where there is a place of
25 presentation of the draft to draw on the letter of credit, it

1 cannot be relied upon as the place of property for the purposes
2 of a Rule B maritime attachment, and that there must be in all
3 cases a further inquiry made of where, as a matter of internal
4 practice, that bank sites the account?
5    MR. FREVOLA: Your Honor, I am just acting on the
6 information I got with regards to this particular bank in terms
7 of how they carry out their particular policies.  In some
8 respects, there are times like bills of lading where the
9 property is somewhere else and you're hitting the bill of
10 lading wherever it is because it's the title to the property,
11 even though they are not in the same place.  In this particular
12 situation, under the rules as we have been advised by the bank,
13 that's why we did it here, and my understanding is they are
14 going to honor it and respect it there as opposed if we filed
15 it in the Middle District of Florida.
16    I think, your Honor, it's a case-by-case inquiry in
17 terms of how the debtor or the obligor handles where its money
18 is at.  Electronic credit servers is obviously a difficult
19 issue in this particular context.  But I can represent to the
20 Court that we went through this whole process and fully
21 expected that the Middle District of Florida was where we were
22 going to be at and the reason we came here was because of what
23 we were told by the garnishee.
24    THE COURT: One second.
25    Mr. Lyons.

Case 8:13-cv-02512-JSM-MAP   Document 12-1   Filed 10/04/13   Page 10 of 22 PageID 197
COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

D9R8COMA                                              Page 33

1      MR. LYONS: The only thing I would add, your Honor, is
2   clause 25 of the charter party provides, issuing bank, first
3   class bank with officers in Miami. I think that supports the
4   argument that we have made that the location of the letter of
5   credit is, in fact, in Florida as is indicated on the letter of
6   credit itself.
7      THE COURT: I am a little bit puzzled here. If CME
8   has an account with Citibank private bank in New York, have you
9   not attached that account or the assets in that account, or
10  sought to attach the assets in that account?
11     MR. FREVOLA: Remember, your Honor, CME is my client.
12     THE COURT: I'm sorry.
13     MR. FREVOLA: We are attaching something that is
14  nominally our client's money or is our client's letter of
15  credit that's been put --
16     THE COURT: Then I don't understand your argument at
17  all. This is an affidavit from someone employed, or a
18  declaration by somebody employed by the plaintiff, who says
19  that they had a conversation with somebody who worked in the
20  letter of credit department in Tampa, who explained that
21  Citibank funds issued to a party drawing on a letter of credit
22  would issue from the bank branch at which the customer's
23  principal account was located. I guess I thought that would
24  mean the account from which the funds originate, but apparently
25  it doesn't.

D9R8COMA                                              Page 34

1      MR. FREVOLA: It does, your Honor. CME has got its
2   accounts, my client has its principal account here in New York
3   at the private bank. The letter of credit, which is going to
4   be issued by Citibank, and which was going to turn into a
5   property interest of Gretchen's when they presented the
6   documents, was all here, and so we were presenting our
7   attachment papers so when the presentation of documents happen
8   in Citicorp, when that money wound up becoming an interest of
9   theirs, we would be there to attach it.
10     THE COURT: But it doesn't becomes theirs. Literally
11  speaking, what happens here is for them to get a dime, they
12  can't knock on the door of Citibank in New York, period. They
13  knock on the door of Citibank in New York, according to this
14  letter of credit, they get nothing. Agreed?
15     MR. FREVOLA: Yes, your Honor.
16     THE COURT: They have to go to Tampa, correct?
17     MR. FREVOLA: They have to present the documents to
18  Tampa, because that's where the bank says that's where our ad
19  min department to wind up handling U.S. standby letters of
20  credit is. I don't think they are saying that's where the
21  property is. They are saying that's where our office is that
22  handles this particular branch of our business.
23     THE COURT: How is that money to be paid then? Can
24  Gretchen stand at the bank in Tampa and say, I will have a seat
25  now, and I am going to wait while you prepare a bank draft for

D9R8COMA                                              Page 35

1   me to take with me.
2      MR. FREVOLA: I think that's the whole point. I am
3   not sure they can do that. I think that the money will be
4   wired to them and Citibank says, we will wire it to you and
5   it's going to come out of our accounts in New York.
6      THE COURT: Is that in the letter of credit?
7      MR. FREVOLA: I don't think so, your Honor. I don't
8   think it specifically says that.
9      THE COURT: Is the part that they get it by wire
10  transfer in the letter of credit?
11     MR. FREVOLA: There's two separate things that
12  derivatively mention things that could be referenced to
13  payments, your Honor. On the last page, the third paragraph
14  down says banking charges other than the issuing bank are for
15  the beneficiary's account. So other than the issuing bank of
16  Citibank, if there is more than one bank, that means that there
17  are wire transfer charges they are talking about for
18  intermediary banks.
19     THE COURT: Help me with that again. Go ahead. I am
20  on the last page and where am I looking?
21     MR. FREVOLA: Third paragraph down.
22     THE COURT: Banking charges other than the issuing
23  bank are for the beneficiary's account.
24     MR. FREVOLA: In other words, your Honor, the only way
25  there are bank charges for more than one bank is if it's wired

D9R8COMA                                              Page 36

1   and it goes through an intermediary bank where there are
2   intermediary bank wire charges.
3      In all candor, I am going to have you look at a couple
4   of paragraphs down just to say I think there is another one as
5   well. It's the fifth paragraph down. It says, upon receipt of
6   documents and order, we will pay in accordance with your
7   instructions. That doesn't say wire instructions.
8      So, your Honor, I think you do make a point that right
9   now it is vague. Could they ask for a check? I guess they
10  could. Would Citibank give it to them? I don't know. I don't
11  know.
12     THE COURT: All right. Mr. Lyons, anything you want
13  to add on this?
14     MR. LYONS: No, your Honor. Other than I don't know
15  the answer to that last question.
16     THE COURT: Let me take five minutes and then I will
17  be back. Thank you.
18     (Recess)
19     THE COURT: As noted at the outset, this Court signed
20  an order pursuant to Rule B of the supplemental maritime rules
21  permitting the issuance of a writ of maritime attachment and
22  garnishment on property of the defendant up to the amount of
23  $14,617,750, and that was on September 17, 2013, and as noted
24  by order to show cause, the defendant sought to vacate the
25  order invoking Rule E(4)(f) of the supplemental rules, and I

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

D9R8COMA                                                                Page 37

1 set today at 2:30 as the return date on the application.

2         Recognizing that a writ of attachment may impose a
3 substantial burden on the property of another, the requirement
4 to meet its burden on a motion to vacate, the plaintiff must
5 demonstrate that there is a prima facie admiralty claim against
6 the defendant, the defendant cannot be found within the
7 district, the defendant's property may be found within the
8 district, and there is no statutory or maritime bar to the
9 attachment, and the requirements have been spelled out in the
10 Aqua Stoli decision of the Second Circuit, 460 F.3d, and the
11 case law that has developed since Aqua Stoli.

12         The initial question is whether or not the plaintiff
13 has made out a prima facie admiralty claim against the
14 defendant.  The Court has examined and is bound by the Supreme
15 Court's decision in Jerome B. Grubart v. Great Lakes found at
16 513 U.S. 527 (1995).  But it is apparent to the Court that the
17 tort that the Court is describing there and the torts it's
18 describing are torts that relate to the potential at least of
19 injury on navigable waters or damage caused by a vessel, and
20 the test which the court has established suits well and fits
21 most tort claims.

22         Here there is a claim of fraudulent inducement for
23 which rescission of a maritime contract is sought.  There is no
24 dispute between the parties that a suit on the maritime
25 contract would invoke properly the maritime jurisdiction of

D9R8COMA                                                                Page 38

1 this court.  Indeed, as a matter of substantive law, a claim of
2 fraudulent inducement may be asserted as an affirmative defense
3 to a claim of breach of contract.  And I cited earlier in this
4 proceeding a New York case to that effect.

5         So the doctrine of fraudulent inducement has a hybrid
6 quality to it.  It may be asserted as a defense to a claim of
7 breach of contract where no affirmative relief is sought by the
8 party pleading the affirmative defense, or it may be asserted
9 as a basis for a claim to rescind a contract.

10        And here, where the claim is to rescind what is
11 undeniably a maritime contract, I conclude at least, or I
12 provisionally conclude, that that likely would be a claim
13 within the maritime jurisdiction of this court.  And I assume
14 that for the purposes of deciding this motion, but happily I am
15 not called upon to make a final determination of that.  I am
16 aware of the Fifth Circuit's decision in Kuehne, 874 F.2d 283,
17 and the Eleventh Circuit's decision in Odyssey Marine, 636 F.3d
18 1338.  Suffice it to note that Odyssey Marine found that there
19 was maritime jurisdiction in an action seeking fraudulent
20 inducement, or seeking rescission on the basis of fraudulent
21 inducement into a maritime contract, and the Kuehne case stands
22 for a contrary position.

23        So without deciding the issue, I assume, for the sake
24 of argument, that there is maritime jurisdiction.

25        There is no dispute in this case that there is no

D9R8COMA                                                                Page 39

1 statutory or maritime bar to the attachment, and there is no
2 dispute in this case that the defendant cannot be found within
3 the district.

4         As to the question of whether defendant's property may
5 be found in the district, or is likely to be found in the
6 district, or there is a prospect of it being found in the
7 district, there is presently no dispute between the parties
8 that I can discern that a letter of credit is not the property
9 of the debtor such that it is attachable property within a
10 district.  And the Second Circuit recognized this in the
11 Brenntag case describing the Court of Appeals decision in
12 Supreme Merchandise, the Second Circuit wrote, "Under New York
13 law, an executory letter of credit is not the property of the
14 beneficiary thereunder for purposes of attachment."  And
15 Brenntag is at 175 F.3d 245, and the quote is at page 252,
16 Second Circuit 1999.  And Judge Kaye laid out the strong policy
17 of the state of New York in the Supreme Merchandise case at 70
18 N.Y.2d 344.

19        I do not see a principled distinction open under the
20 Supreme Merchandise decision between negotiable letters of
21 credit and standby letters of credit.  I acknowledge that the
22 Supreme Merchandise case was decided in the context of a
23 negotiable letter of credit and the public policy of New York
24 was even stronger in that context.

25        But, again, there is no dispute here that a letter of

D9R8COMA                                                                Page 40

1 credit is not attachable property.  There is not a debt due and
2 owing to the beneficiary until such time as the beneficiary
3 draws on the letter of credit.

4         The letter of credit in this case provides several
5 means or circumstances that may give rise to drawing on the
6 letter of credit.  They are set forth in subdivisions A through
7 D of the letter of credit, which was issued on January 28,
8 2011.  And at this stage of the game, there is no evidence
9 before me that there has been a draft presented to Citibank
10 under the letter of credit or under any of the four provisions.
11 Indeed, I have been advised that there was an application made
12 to the arbitration panel to, in effect, permit it to make a
13 demand for the full amount of the letter of credit, and that
14 has not been acted upon by the arbitration panel.  So there is
15 no evidence before me that there has been a demand.

16        Now, is the property, which could at some point be
17 demanded by Gretchen, is that property in this district?

18        The letter of credit states that the date of issue is
19 January 28, 2011, and the date and place of expiry is January
20 28, 2012, at the office of our service provider, Citicorp North
21 America, Inc., 3800 Citibank Center, building B, third floor,
22 Tampa, Florida.

23        Now, the letter of credit does have an automatic
24 extension provision in it, and there is no claim here that the
25 letter of credit has expired, and the Court assumes for the

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

D9R8COMA                                                            Page 41

1 purposes of the present dispute that it has not expired.

2       The letter of credit further provides that remit

3 documents, the documents to be presented to draw down on the

4 letter of credit says, and I will just quote the language,

5 "Remit documents by courier to Citibank NA, care of its

6 servicer, Citicorp North America, Inc., 3800 Citibank Center,

7 building B, third floor, Tampa, Florida  33610, attention U.S.

8 Standby Department."

9       On that basis, I find that the debt, if there becomes

10 a debt which is attachable, is located in Tampa, Florida, and

11 not in this district.

12       Now, the plaintiff has pointed out that it has had

13 discussions with Citigroup, and Citigroup has explained how

14 funds that would be used to pay the letter of credit obligation

15 to the beneficiary would be drawn on the plaintiff's account

16 which is located in New York, and since it would be drawn on

17 plaintiff's account situated in New York, the plaintiff urges

18 that that property is found in New York.

19       That argument does not withstand close scrutiny.  The

20 reason is this is the plaintiff's property which is situated in

21 New York, not the property of Gretchen.  The letter of credit

22 is not conditioned upon the plaintiff having any money on

23 deposit with Citicorp.  There is no requirement in the letter

24 of credit that Commodities & Minerals Enterprise have any

25 banking relationship or any account whatsoever at Citibank.  It

D9R8COMA                                                            Page 42

1 may be that there is a private arrangement between the

2 plaintiff and Citibank which requires it to have some sum of

3 money on account.  It may even require that the sum of money be

4 on account in a particular branch of Citibank, but that is

5 extrinsic to the letter of credit.

6       One could suppose that in the private relationship and

7 the private contract between the bank issuing the letter of

8 credit and the applicant for the letter of credit, that there

9 could be a requirement that one maintain 10 percent of the

10 amount of the letter of credit, 50 percent of the letter of

11 credit, 100 percent of the letter of credit, but these are all

12 matters of private contract between the plaintiff and Citicorp.

13       So far as Gretchen is concerned, it is the beneficiary

14 of a letter of credit which can only be drawn upon by

15 presenting a draft in the manner indicated in the agreement,

16 which is remitting it to the location in Tampa.

17       We know from a reading of the Supreme Merchandise

18 decision that letters of credit must be strictly construed and

19 performed in accordance with their terms, and that's found at

20 70 N.Y.2d 352.

21       Accordingly, I conclude that there is neither property

22 of the defendant in this district, nor has the plaintiff

23 demonstrated that there is likely to be property of the

24 defendant in this district, and the order authorizing maritime

25 attachment and garnishment is vacated.

D9R8COMA                                                            Page 43

1       I have signed an order to that effect and tendered it

2 now to the clerk.

3       Anything further from the plaintiff?

4       MR. FREVOLA: May I get a stay of that order pending

5 appeal?

6       THE COURT: Let me hear Mr. Lyons on the application

7 for a stay.

8       MR. LYONS: Obviously, we would oppose it.  I am not

9 sure whether the ten day automatic stay applies or not.

10       THE COURT: Having considered the issue, and because

11 the nature of an attachment is an interference of a severe sort

12 with property interests of another, and having considered the

13 record in this matter, I decline to enter a stay.

14       Is there anything further from the plaintiff?

15       MR. FREVOLA: No, your Honor.

16       THE COURT: Anything further from the defendant?

17       MR. LYONS: No, your Honor.

18       THE COURT: Thank you both very much.  I want to

19 commend you both on very fine presentations of very interesting

20 issues, and my job here is to do the very best I can with what

21 I have, and I appreciated your presentations today.

22       Thank you.

23       MR. FREVOLA: Thank you.

24       MR. LYONS: Thank you.

25       (Adjourned)

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

**$**

**$14,617,750 (1)**
36:23
**$15 (1)**
17:25

**A**

**ability (5)**
8:17,25;22:4,5;24:4
**able (5)**
16:7;18:4;22:12;
24:8;25:8
**absent (1)**
31:9
**absolutely (1)**
25:1
**accordance (2)**
36:6;42:19
**according (1)**
34:13
**Accordingly (1)**
42:21
**account (18)**
18:10;30:1;31:21;
32:4;33:8,9,9,10,23,24;
34:2;35:15,23;41:15,
17,25;42:3,4
**accounts (3)**
30:3;34:2;35:5
**accurate (2)**
29:1,2
**acknowledge (2)**
16:17;39:21
**Act (4)**
6:8,11,14;28:13
**acted (1)**
40:14
**acting (4)**
22:22;27:8;31:8;
32:5
**action (3)**
10:2,2;38:19
**actions (4)**
7:1;27:19;28:12;
29:13
**active (1)**
28:25
**actor (1)**
27:19
**acts (1)**
7:13
**actual (4)**
4:11;15:13;17:1;
23:16
**actually (16)**
3:9;5:1,22;6:24;
9:20;13:9;14:11;16:2;
17:3,4,9;18:9;24:15;
30:4,14;31:15
**ad (2)**

29:25;34:18
**add (3)**
9:24;33:1;36:13
**address (4)**
3:12;11:8;16:18;
31:12
**adjourned (2)**
22:18;43:25
**adjudicate (1)**
8:17
**admiralty (6)**
3:4;6:7,11,14;37:5,
13
**advised (2)**
32:12;40:11
**affect (1)**
19:8
**affected (1)**
16:10
**affidavit (1)**
33:17
**affirmative (19)**
8:7,9,15,17,22;9:1,2,
4,5,9,12,22,25;10:5,8;
13:15;38:2,7,8
**afternoon (2)**
2:6,9
**again (9)**
5:19;13:22;14:1,3,8,
9;17:25;35:19;39:25
**against (7)**
6:9;10:1;16:7;25:11;
27:11;37:5,13
**ago (1)**
22:7
**agree (3)**
3:10;18:19;30:20
**Agreed (1)**
34:14
**agreement (6)**
7:21,24;8:14;25:25;
28:11;42:15
**ahead (1)**
35:19
**ain't (1)**
28:7
**air (1)**
7:11
**Alabama (1)**
5:3
**alienable (1)**
20:5
**allegations (2)**
13:2;15:8
**alleged (5)**
3:10,13;14:1,8;25:11
**alleging (1)**
10:2
**allowed (1)**
16:25
**almost (2)**
17:25;31:21
**along (1)**

10:18
**although (1)**
19:16
**always (1)**
6:18
**amendment (1)**
9:25
**America (3)**
31:3;40:21;41:6
**amount (3)**
36:22;40:13;42:10
**analysis (5)**
4:10;6:5;7:18;11:4;
31:17
**analyze (1)**
10:13
**analyzes (1)**
5:19
**anymore (1)**
19:9
**apparent (1)**
37:16
**Apparently (2)**
29:24;33:24
**AppDiv3d (1)**
9:18
**appeal (6)**
28:6,20,23,25;29:4;
43:5
**Appeals (2)**
11:13;39:11
**appeared (1)**
23:3
**appears (1)**
30:24
**applicant (1)**
42:8
**application (8)**
2:12;6:11;8:8;26:5;
27:16;37:1;40:11;43:6
**applies (3)**
8:24;19:15;43:9
**appoint (1)**
25:16
**appreciated (1)**
43:21
**Aqua (4)**
2:15;3:1;37:10,11
**arbitrating (1)**
27:17
**arbitration (11)**
13:8;14:5;22:10,11;
25:10,14;27:16,17,21;
40:12,14
**arbitrators (2)**
18:7;25:16
**area (2)**
16:2,3
**argument (14)**
3:6,13;13:21;15:10,
11,11,12;23:21;26:12;
27:14;33:4,16;38:24;
41:19

**arise (1)**
9:18
**around (5)**
16:9;19:10;23:10;
28:5;29:4
**arrangement (1)**
42:1
**asbestos (1)**
7:6
**ashore (4)**
7:14;10:22;14:1,9
**aspect (1)**
4:23
**assert (3)**
8:4,25;9:21
**asserted (4)**
8:15;38:2,6,8
**asserting (1)**
21:11
**assertion (1)**
9:3
**asserts (1)**
3:4
**assessed (1)**
12:14
**assets (2)**
33:9,10
**assign (2)**
16:5;20:8
**assignable (7)**
19:17,20;20:3,5,5,
15;21:4
**Assignment (3)**
19:22,24;20:19
**assume (3)**
26:13;38:13,23
**assumes (1)**
40:25
**assumption (1)**
27:8
**attach (8)**
16:25;19:6;23:25;
24:4,25;26:9;33:10;
34:9
**attachable (12)**
11:7;21:13,20;23:23;
26:2,5,8,10,21;39:9;
40:1;41:10
**attached (14)**
13:23;18:14,15;
25:22;26:15,16,20,23;
27:1,4,6,7;30:10;33:9
**attaching (1)**
33:13
**attachment (30)**
2:11,14,16,23;13:13;
18:4,7;23:22;24:1,4,5,
12;26:7,22;27:2,12;
28:2,5,8,17,21;32:2;
34:7;36:21;37:2,9;
39:1,14;42:25;43:11
**attention (1)**
31:4;41:7

**arise (1)**
9:18
**authorities (1)**
9:14
**authority (1)**
27:18
**authorizing (1)**
42:24
**automatic (2)**
40:23;43:9
**automatical (1)**
30:24
**award (1)**
22:12
**aware (2)**
23:16;38:16
**away (3)**
6:16,20;20:3

**B**

**back (3)**
5:4;12:19;36:17
**backup (1)**
15:11
**banc (1)**
29:7
**bank (30)**
18:16;19:2;21:11,12;
26:23,25;27:4,11,11;
30:3;32:4,6,12;33:2,3,
8,22;34:3,18,24,25;
35:14,15,16,23,25;
36:1,2;42:7
**banking (3)**
35:14,22;41:25
**banks (2)**
30:6;35:18
**bar (6)**
2:23;9:3,6,8;37:8;
39:1
**barred (2)**
9:2,20
**based (1)**
6:1
**basically (3)**
3:21;5:4;11:23
**basis (5)**
9:25;24:1;38:9,20;
41:9
**bears (1)**
3:1
**become (2)**
19:18;23:13
**becomes (3)**
18:16;34:10;41:9
**becoming (1)**
34:8
**behind (1)**
19:14
**below (1)**
31:1
**beneficiary (10)**
20:8,10,21;21:1;
23:14;39:14;40:2,2,

**SOUTHERN DISTRICT REPORTERS**
**(1) $14,617,750 - beneficiary**

41:15;42:13
**beneficiary's (2)**
35:15,23
**best (2)**
30:8;43:20
**better (2)**
28:4;30:13
**beyond (1)**
13:7
**bill (8)**
16:22,23,25;17:4,5,8,
9;32:9
**bills (1)**
32:8
**bit (1)**
33:7
**block (2)**
16:4;23:10
**board (4)**
11:23;12:10;13:6;
14:16
**boat (1)**
7:3
**both (7)**
2:6;3:9;4:8;7:16;
25:25;43:18,19
**bound (1)**
37:14
**branch (3)**
33:22;34:22;42:4
**breach (13)**
7:24;8:3,10,17;9:14,
23;10:3,6;13:16;14:7;
31:8;38:3,7
**breached (1)**
18:3
**Brenntag (2)**
39:11,15
**broader (2)**
16:18,20
**broke (1)**
12:9
**Building (3)**
31:4;40:21;41:7
**burden (4)**
2:15;3:1;37:3,4
**business (3)**
19:8;23:11;34:22
**buttress (1)**
15:13

**C**

**call (3)**
15:15,17,21
**called (2)**
2:1;38:15
**calling (1)**
15:16
**came (3)**
23:5,10;32:22
**can (36)**
4:3;8:4;9:5,6,7,13,

15;15:17;16:5,5;17:9;
18:15,18,20,22;19:5,
18;20:2,2,8,17;21:7,9,
15;23:18;24:22;26:14;
28:7;29:8;30:8;32:19;
34:23;35:3;39:8;42:14;
43:20
**candid (1)**
25:9
**candor (1)**
36:3
**care (3)**
31:2,12;41:5
**cargo (8)**
4:14,17;5:14,15;
16:24;17:1,1,9
**Carroll (4)**
3:20;4:4,10;6:4
**Carroll's (1)**
4:9
**carry (1)**
32:7
**carrying (1)**
4:14
**Case (40)**
2:1,15;3:5;4:12,16,
21;5:1,2,17,23;6:8,25;
7:11,15,16;10:10,15,
16,17,20;11:2,9,10;
17:11,19,24;21:10;
22:3;24:9;25:12;30:18;
37:11;38:4,21,25;39:2,
11,17,22;40:4
**case-by-case (1)**
32:16
**cases (11)**
3:17;4:2,3,8;6:2,3;
7:6,16,18;10:23;32:3
**cause (3)**
2:13;28:8;36:24
**caused (3)**
6:12;10:22;37:19
**causes (1)**
7:5
**Center (3)**
31:3;40:21;41:6
**cert (1)**
29:10
**certain (2)**
14:4;19:13
**changed (1)**
21:18
**changes (1)**
28:3
**character (2)**
17:12;31:24
**charges (5)**
35:14,17,22,25;36:2
**charity (1)**
20:3
**charter (4)**
7:21;8:14;13:17;
33:2

**check (2)**
2:17;36:9
**choose (1)**
29:3
**circuit (15)**
2:15;3:18,19,21;
4:21;5:6;10:11,12;
11:3;17:24;22:3;37:10;
39:10,12,16
**Circuit's (2)**
38:16,17
**circumstances (3)**
10:14;25:19;40:5
**cite (1)**
9:16
**cited (1)**
38:3
**Citibank (35)**
17:21;21:7;22:23,23;
23:1,16;26:1;27:7,20;
28:6;29:2,5,9,10;30:1,
4;31:2,3,6,12;33:8,21;
34:4,12,13;35:4,16;
36:10;40:9,21;41:5,6,
25;42:2,4
**Citibank's (1)**
30:11
**Citicorp (7)**
25:23;31:3;34:8;
40:20;41:6,23;42:12
**Citigroup (4)**
27:24;28:20;41:13,
13
**claim (27)**
3:15;7:24;8:3;9:13,
13,21,22;10:6;11:5;
13:10,11,14,14,17;
14:5,7;15:5;37:5,13,
22;38:1,3,6,9,10,12;
40:24
**claimant (1)**
16:7
**claims (4)**
10:5;13:1,9;37:21
**class (1)**
33:3
**clause (1)**
33:2
**clear (2)**
7:11;10:20
**clearly (2)**
11:19;12:23
**CLERK (2)**
2:2;43:2
**client (10)**
12:17;20:1,15;23:5;
27:22,22;29:22;30:2;
33:11;34:2
**client's (4)**
20:6;30:3;33:14,14
**close (3)**
11:2;12:8;41:19
**CME (3)**

33:7,11;34:1
**collision (1)**
7:5
**coming (3)**
12:16;14:15;24:6
**commend (1)**
43:19
**commerce (1)**
16:6
**committed (1)**
6:8
**Commodities (1)**
41:24
**common (1)**
4:3
**company (2)**
3:21;5:24
**compel (1)**
25:10
**compelled (1)**
27:25
**complained (1)**
7:13
**complaint (9)**
7:13;11:21;12:6;
13:2,3,23;14:7;15:2,7
**compliance (1)**
30:21;31:7
**computer (1)**
31:20
**computers (1)**
31:19
**concept (1)**
6:3
**concern (2)**
17:14;22:3
**concerned (1)**
42:13
**concerns (3)**
16:3,19,20
**conclude (3)**
38:11,12;42:21
**conditioned (1)**
41:22
**conditions (1)**
30:22
**considered (2)**
43:10,12
**consonant (1)**
6:19
**construction (1)**
11:14
**construed (2)**
30:18;42:18
**contacted (1)**
23:9
**contend (1)**
14:2
**context (5)**
9:19;16:23;32:19;
39:22,24
**continue (1)**
24:8

**contract (50)**
4:7,8,9,11,20,22,23;
5:8,10,19,20,21,21;6:9;
7:17,19,19,21,22;8:4,5,
10,11,14,18;9:14,23;
10:2,4,6,18,24,25;11:1,
5;12:11;14:4,5,7;18:2,
3;37:23,25;38:3,7,9,11,
21;42:7,12
**contracts (3)**
4:25;6:3,4
**contractual (3)**
4:5,6;6:10
**contrary (3)**
9:12;31:10;38:22
**conversation (1)**
33:19
**conversely (1)**
31:8
**convert (1)**
10:2
**counsel (3)**
2:17;21:19;23:4
**counterparty (1)**
16:6
**couple (2)**
7:20;36:3
**courier (3)**
31:2,12;41:5
**COURT (114)**
2:6,9,10,22,25;3:18;
5:8;6:15,20;7:9,20,24;
8:3,7,9,13,16,21,22,24;
9:7,9,11,23;10:4,15;
11:6,13,20;13:7,13,20;
14:10,19;15:15,20,23;
16:11,15;17:19,22;
18:5,13,23;19:5,20,23;
20:1,11,22,21:3,14,19;
22:8,13,15,17,20,21;
23:7,12,21;24:11,11,
13,17,20,24;25:3,9,21,
25;26:4,25;27:14,16,
19;28:4,11,16,19,24;
29:1,15;30:17;31:23;
32:20,24;33:7,12,16;
34:10,16,23;35:6,9,19,
22;36:12,16,19,19;
37:14,16,17,20;38:1,
13;39:11;40:25;43:6,
10,16,18
**courthouse (3)**
23:3,4,9
**courts (2)**
7:17;29:12
**Court's (3)**
4:24;8:1;37:15
**created (1)**
10:3
**credit (88)**
11:10,11,14;13:19;
15:24;16:1,4,7,16,19,
21;17:15,15,25;18:12,

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

19,25;19:1,6,8,9,11,12,
16,19,25;20:8,20;
21:16,22;23:13;26:12,
17;27:21,22,23;28:7,
22;29:16,23,24;30:2,
10,18,20,22;31:9,24,
25;32:18;33:5,6,15,20,
21;34:3,14,20;35:6,10;
39:8,13,21,21,23;40:1,
3,4,6,7,10,13,18,23,25;
41:2,4,14,21,24;42:5,8,
8,10,11,11,14,18
**criticized (1)**
5:9
**customer's (1)**
33:22

## D

**damage (1)**
37:19
**date (5)**
14:19;30:25;37:1;
40:18,19
**day (3)**
28:15;30:23;43:9
**days (5)**
13:5;14:18;25:8;
26:10;28:15
**de (3)**
28:8,11,18
**dealing (3)**
4:25;6:8;19:10
**debt (4)**
18:16;40:1;41:9,10
**debtor (2)**
32:17;39:9
**decide (1)**
23:18
**decided (2)**
29:5;39:22
**deciding (2)**
38:14,23
**decision (16)**
4:1,24,25;5:5;10:12;
18:6;19:15;29:10,11;
37:10,15;38:16,17;
39:11,20;42:18
**decisions (1)**
3:16
**declaration (6)**
14:12,13,14,23;30:7;
33:18
**decline (1)**
43:13
**defect (1)**
26:14
**defendant (15)**
2:8,18;4:6;10:4;
11:22;21:20;36:22,24;
37:6,6,14;39:2;42:22,
24;43:16
**defendant's (7)**

2:12,17;3:13;9:23;
13:4;37:7;39:4
**defense (18)**
8:4,7,9,15,17,22;9:1,
2,4,5,9,12,22,25;10:6;
38:2,6,8
**definitely (4)**
18:18;24:10,25;25:1
**Delmar (1)**
9:17
**demand (6)**
18:15;21:15;23:16,
17;40:13,15
**demanded (1)**
40:17
**demanding (1)**
17:17
**demonstrate (1)**
37:5
**demonstrated (1)**
42:23
**demurrage (1)**
12:14
**denied (3)**
9:23;22:13;29:8
**Denig (2)**
2:5,5
**department (6)**
29:23,24;31:5;33:20;
34:19;41:8
**deposit (1)**
41:23
**Dept (1)**
9:18
**DEPUTY (1)**
2:2
**derivative (1)**
16:8
**derivatively (1)**
35:12
**describes (1)**
30:19
**describing (3)**
37:17,18;39:11
**destroy (1)**
23:21
**determination (1)**
38:15
**developed (1)**
37:11
**Development (1)**
9:17
**different (6)**
11:17;18:22;20:13,
22,23;27:14
**difficult (1)**
32:18
**dime (2)**
28:7;34:11
**disagree (2)**
7:15;31:17
**discern (1)**
39:8

**discharge (3)**
12:13;14:3,5
**discharged (1)**
4:17
**discharging (4)**
12:5,7,14,17
**disconnect (1)**
4:20
**discussed (2)**
11:18;14:18
**discussion (1)**
26:13
**discussions (1)**
41:13
**dismiss (1)**
15:1
**disproved (1)**
5:4
**dispute (14)**
2:18,22;4:9;5:24;
16:9;20:4,14;21:3;
37:24;38:25;39:2,7,25;
41:1
**distinction (3)**
9:15;18:18;39:19
**distinguishable (1)**
10:7
**district (20)**
2:19;4:1;5:18;26:20;
29:17;30:5,15;32:15,
21;37:7,8;39:3,5,6,7,
10;40:17;41:11;42:22,
24
**doctrine (1)**
38:5
**document (2)**
17:2;30:19
**documents (8)**
31:2;34:6,7,17;36:6;
41:3,3,5
**doom (1)**
24:5,7
**door (2)**
34:12,13
**down (11)**
4:14;17:18;18:3;
23:24;30:20;31:1;
35:14,21;36:4,5;41:3
**draft (15)**
16:17;19:3;21:21;
22:22,23;23:1;25:23;
26:1,17;31:7,9,25;
34:25;40:9;42:15
**drafts (1)**
30:21
**draw (8)**
9:15;17:18;18:3;
22:2;30:9,20;31:25;
41:3
**drawing (2)**
33:21;40:5
**drawn (4)**
30:21;41:15,16;

42:14
**draws (1)**
40:3
**drew (2)**
10:20;23:6
**drilling (1)**
5:24
**dropped (1)**
4:14
**dropping (1)**
31:1
**due (2)**
30:22;40:1
**dueling (1)**
3:16
**duly (1)**
30:22
**during (2)**
6:15;27:21
**duty (1)**
10:3

## E

**E4f (1)**
36:25
**earlier (4)**
11:16;13:5;14:18;
38:3
**earned (1)**
21:8
**easier (1)**
27:5
**educated (1)**
23:11
**effect (13)**
19:6;27:10,13;28:10,
14,15,22,23;29:2,3;
38:4;40:12;43:1
**effects (1)**
16:8
**Eighth (1)**
10:12
**either (4)**
5:12;21:9,10;25:13
**Electronic (1)**
32:18
**element (1)**
12:20
**elements (1)**
3:1
**Eleventh (2)**
3:19;38:17
**else (3)**
21:10;28:13;32:9
**e-mail (4)**
13:3;14:17,25;15:9
**e-mails (1)**
13:23
**employed (2)**
33:17,18
**en (1)**
29:7

**enforce (1)**
27:23
**enforcement (1)**
8:4
**enough (1)**
15:10
**enter (1)**
43:13
**Enterprise (1)**
41:24
**entire (1)**
22:12
**entirely (1)**
27:14
**equal (1)**
16:20
**equally (1)**
19:15
**escrow (1)**
18:10
**essence (1)**
5:6
**essentially (2)**
16:5;25:18
**established (1)**
37:20
**even (9)**
3:11,12;6:13;14:14;
15:10;22:6;32:11;
39:24;42:3
**events (1)**
10:21
**evidence (5)**
14:23;22:8;24:12;
40:8,15
**exact (1)**
18:1
**exactly (2)**
25:6;30:11
**examined (1)**
37:14
**example (4)**
6:24;27:15;28:1,4
**Executive (1)**
6:16
**executory (1)**
39:13
**Exhibit (2)**
12:6;13:2
**exists (1)**
2:23
**expectant (1)**
21:25
**expected (1)**
32:21
**experience (1)**
27:15
**expiration (1)**
30:23
**expired (2)**
40:25;41:1
**expiry (2)**
30:25;40:19

**explained (2)**
33:20;41:13
**Exploration (1)**
4:4
**extended (1)**
30:25
**Extension (4)**
6:8,11,14;40:24
**extrinsic (1)**
42:5

**F**

**F2d (1)**
38:16
**F3d (3)**
37:10;38:17;39:15
**facie (3)**
3:14;37:5,13
**fact (14)**
5:13;9:14;11:22;
12:8;14:1;15:10,11;
18:8;22:4;24:1;26:21;
30:11,14;33:5
**facto (2)**
28:8,18
**facts (8)**
3:14;4:13;11:2,3,9;
12:23;13:18;21:14
**factual (2)**
3:11;11:18
**factually (2)**
3:13;11:2
**failure (1)**
14:4
**faith (1)**
25:4
**fall (1)**
12:24
**familiar (1)**
2:14
**far (1)**
42:13
**favor (2)**
15:3,4
**fear (1)**
24:3
**federal (2)**
18:5;22:20
**few (1)**
23:10
**Fidelity (1)**
9:17
**Fifth (7)**
3:18;4:21;5:6;10:11;
11:3;36:5;38:16
**fight (1)**
17:7
**file (3)**
25:10,12;29:22
**filed (7)**
23:2,2,4;25:6;29:10,
22;32:14

**files (1)**
28:6
**filing (1)**
23:2
**final (2)**
22:12;38:15
**financing (1)**
4:18
**find (3)**
5:10;9:11;41:9
**fine (2)**
10:21;43:19
**firing (1)**
7:2
**First (7)**
3:21;5:18;11:23;
20:17;29:20,20;33:2
**fits (1)**
37:20
**five (1)**
36:16
**flags (1)**
23:24
**Flood (1)**
2:7
**floor (3)**
31:4;40:21;41:7
**Florida (11)**
11:25;29:18;30:5,15;
31:4;32:15,21;33:5;
40:22;41:7,10
**follow (1)**
20:25
**footnote (1)**
5:23
**force (1)**
16:20
**foreclose (1)**
24:4
**forth (3)**
3:1,3;40:6
**found (12)**
2:18;11:3;37:6,7,15;
38:18;39:2,5,5,6;
41:18;42:19
**four (1)**
40:10
**fraud (9)**
8:5,15;9:4,22,24;
10:15,17,19;25:11
**fraudulent (10)**
10:5,21;12:25;13:10;
14:6;37:22;38:2,5,19,
20
**free (1)**
27:23
**Frevola (47)**
2:3,3;3:7,20;10:17;
11:15;13:8,16;14:11,
21;15:19,22,25;16:13,
22;17:21,23;21:5,23;
22:10,14,16,18,25;
23:8,15;24:6,15,18,25;

27:3;29:19;31:11;32:5;
33:11,13;34:1,15,17;
35:2,7,11,21,24;43:4,
15,23
**Frevola's (1)**
7:15
**front (1)**
24:21
**fruition (2)**
5:22;22:1
**full (1)**
40:13
**full-fledged (1)**
14:23
**fully (3)**
19:17,17;32:20
**function (1)**
29:25
**funds (11)**
26:18,19,24,25;
27:11;30:2;31:15,20;
33:21,24;41:14
**further (5)**
32:3;41:2;43:3,14,16
**future (1)**
26:15

**G**

**game (1)**
40:8
**gap (1)**
25:17
**garnishee (2)**
30:15;32:23
**garnishment (3)**
2:11;36:22;42:25
**gets (2)**
21:24;23:24
**giving (1)**
10:21
**goes (6)**
5:22;12:13;20:21;
31:12,13;36:1
**Good (5)**
2:6,9,9;19:11;25:4
**goods (1)**
17:3
**government (1)**
18:1
**granted (2)**
22:17;27:17
**Great (1)**
37:15
**Gretchen (9)**
21:7,12,15;22:21;
23:4;34:24;40:17;
41:21;42:13
**Gretchen's (1)**
34:5
**Grubart (8)**
3:3,3,6;7,7,15,15;
12:24;37:15

**guess (4)**
23:11;31:19;33:23;
36:9
**gyroscope (1)**
7:4

**H**

**hand (1)**
20:17
**handles (2)**
32:17;34:22
**handling (1)**
34:19
**hands (1)**
26:19
**hanging (1)**
27:12
**happen (3)**
12:18;21:6;34:7
**happened (5)**
4:17,20;5:3,13;11:10
**happening (2)**
6:17,22
**happens (2)**
21:13;34:11
**happily (1)**
38:14
**hard (1)**
30:12
**harm (5)**
10:22,25;12:12;14:1,
3
**harmed (1)**
17:10
**hazards (1)**
3:23
**head (1)**
27:12
**hear (5)**
3:6;7:9;11:6;25:21;
43:6
**hearing (4)**
14:22;22:16,20;29:7
**help (2)**
24:22;35:19
**helpful (1)**
16:3
**hereby (1)**
30:20
**high (1)**
23:24
**hire (2)**
12:2,3
**hit (3)**
17:4,8,9
**hits (1)**
7:2
**hitting (1)**
32:9
**holding (1)**
28:3
**Holland (2)**

2:3,5
**Honor (65)**
2:21,24;3:7;8;4:2;
6:5;7:10,23;8:2,19;
12:6,12,23;13:10,16,
23;14:6;15:9,12,19,22,
25;16:22;18:1,8,24;
19:14;20:7;21:5,13,23;
22:14;23:8,15;24:16,
19;25:1,7,9,12,14,24;
26:3;27:3;28:1,21;
29:19;30:8;31:9,11,15;
32:5,14,16;33:1,11;
34:1,15;35:7,13,24;
36:8,14;43:15,17
**honored (1)**
30:22
**hour (1)**
12:4,8,9
**hundreds (2)**
5:3;22:6
**hurt (1)**
17:6
**hybrid (1)**
38:5
**hypothetical (1)**
28:19

**I**

**idea (2)**
18:14,19
**idle (1)**
22:3
**imagine (1)**
30:8
**immediate (1)**
17:13
**immediately (1)**
23:9
**impact (1)**
5:25
**implicates (2)**
17:13,19
**important (1)**
22:6
**impose (1)**
37:2
**impressions (1)**
29:20
**inarguable (1)**
21:6
**Inc (3)**
31:3;40:21;41:6
**including (1)**
2:15
**Indeed (2)**
38:1;40:11
**independent (3)**
10:3;11:4;27:19
**indicated (2)**
33:5;42:15
**inducement (20)**

8:5,15;9:4,22,24;
10:5,16,17,20,22;11:1;
12:25;13:10;14:4,6;
37:22;38:2,5,20,21
**inequitable (1)**
25:19
**inextricably (1)**
4:10
**inferences (1)**
15:3
**influenced (1)**
17:6
**information (1)**
32:6
**initial (1)**
37:12
**initiate (1)**
31:15
**injunction (7)**
18:6;27:10,13;28:9,
15,16,18
**injunctive (1)**
25:13
**injured (2)**
6:11;7:7
**injury (3)**
6:12,13;37:19
**inland (1)**
5:3
**inquire (1)**
21:19
**inquired (1)**
29:23
**inquiry (4)**
3:14;6:14;32:3,16
**insofar (1)**
9:24
**instances (1)**
10:7
**Instead (2)**
5:20;6:22
**institutions (1)**
16:17
**instructions (2)**
36:7,7
**instruments (1)**
16:2
**insurance (2)**
3:21,23
**intended (2)**
16:19;24:2
**interest (4)**
21:11,13;34:5,8
**interesting (1)**
43:19
**interestingly (2)**
4:23;6:15
**interests (1)**
43:12
**interference (1)**
43:11
**intermediary (3)**
35:18;36:1,2

**internal (1)**
32:3
**interplay (1)**
11:18
**interpretation (1)**
7:15
**interwoven (1)**
4:10
**into (13)**
7:2;10:2;11:1;12:13;
14:4;17:17;18:5,10;
21:24;23:18;24:7;34:4;
38:21
**investigated (1)**
14:12
**investigation (1)**
30:13
**invoice (1)**
21:8
**invoke (2)**
7:25;37:25
**invoking (2)**
3:3;36:25
**involve (1)**
7:12
**involved (1)**
19:18
**involves (1)**
7:11
**Iran (2)**
4:16,19
**iron (1)**
12:15
**irrevocable (1)**
30:17
**Israel (2)**
18:2,2
**issuance (1)**
36:21
**issue (19)**
4:8;5:15;6:21;7:9,17,
21;13:19;15:24;16:1;
18:7;24:11;26:4;29:16;
31:13;32:19;33:22;
38:23;40:18;43:10
**issued (6)**
2:10;18:6;30:2;
33:21;34:4;40:7
**issues (2)**
13:18;43:20
**issuing (5)**
33:2;35:14,15,22;
42:7

## J

**Jacksonville (2)**
11:25;13:5
**January (3)**
40:7,19,19
**Jerome (1)**
37:15
**Jet (1)**

6:16
**job (1)**
43:20
**Judge (9)**
3:25;5:17,22;10:13,
15;11:11;16:18;17:11;
39:16
**judicial (2)**
29:11;31:9
**jure (1)**
28:11
**jurisdiction (22)**
3:4,5;5:7;7:19;8:1,
16,20,22;10:14;11:4;
15:2,5;21:24;23:18;
24:13,23;26:6,11;
37:25;38:13,19,24
**Justice (1)**
5:1
**justifying (1)**
2:16

## K

**Katsoufis (2)**
14:16,24
**Kaye (2)**
17:12;39:16
**Kaye's (2)**
11:12;16:18
**keep (1)**
24:8
**kept (1)**
31:22
**kind (2)**
18:14;31:24
**Kirby (3)**
4:24,24,25
**Kirk (1)**
2:7
**Knight (2)**
2:4,5
**knock (2)**
34:12,13
**knows (1)**
19:12
**Kuehne (12)**
4:12;5:4,6,10,13;
6:24;7:14;10:11,19;
11:2;38:16,21

## L

**lack (1)**
15:1
**lading (9)**
16:23,23,25;17:4,5,8,
9;32:8,10
**lag (1)**
25:16
**laid (1)**
39:16
**Lakes (1)**

37:15
**land (9)**
4:15;5:15,25;6:13,
21;7:1,4,7,25
**land-based (1)**
4:19
**language (1)**
41:4
**Laretson (1)**
10:12
**Las (1)**
20:2
**last (3)**
35:13,20;36:15
**later (1)**
5:8
**law (12)**
2:14;3:10,16;6:19;
9:11;12:25;15:6;16:23;
26:18;37:11;38:1;
39:13
**lawyer (2)**
29:5,9
**LC (1)**
21:17
**leads (1)**
5:1
**least (2)**
37:18;38:11
**left (1)**
5:14
**legal (4)**
3:9;10:3;11:17;
15:11
**length (1)**
30:19
**letter (73)**
11:10,11;13:19;
15:23;16:1,3,16,21;
17:14,15,25;18:12;
19:6,9,12,16,19,24;
20:8,20;21:15,21;
23:13;26:12,17;27:20,
22,23;28:7,21;29:16,
23,24;30:2,10,17,20;
31:8,25;33:4,5,14,20,
21;34:3,14;35:6,10;
39:8,13,23,25;40:3,4,6,
7,10,13,18,23,25;41:2,
4,14,21,23;42:5,7,8,10,
10,11,14
**letters (12)**
11:14;16:19;18:19,
25;19:1,7,10;31:23;
34:19;39:20,21;42:18
**likely (3)**
38:12;39:5;42:23
**likewise (1)**
31:18
**limitations (4)**
8:24;9:3,19,21
**limits (1)**
12:14

**line (1)**
10:21
**Literally (1)**
34:10
**little (2)**
5:14;33:7
**LLP (2)**
2:4,5
**loading (4)**
12:3,21,22;13:5
**loath (1)**
30:7
**locality (1)**
6:18
**located (4)**
26:20;33:23;41:10,
16
**locating (1)**
24:22
**location (4)**
13:24,25;33:4;42:16
**lock (1)**
16:7
**long (6)**
28:9,14,22,23,25;
29:2
**look (15)**
4:13,24;5:17;6:11,
22,24;7:12,17,17;9:17;
12:1,6;13:2;25:8;36:3
**looked (2)**
5:4,11
**looking (10)**
4:2;6:5;15:1;25:13;
29:21;30:4,14,17;
31:18;35:20
**Lyons (53)**
2:7,7,7,21,24;7:9,10,
23;8:2,6,8,11,19,23;
9:5,8,10;10:10,19;
13:20,22;14:13,15;17;
18:23,24;19:22,24;
20:7,19,25;21:17;23:3;
25:21,24;26:3,23;27:3,
10;28:1,14,18,23,25;
29:14;30:9;32:25;33:1;
36:12,14;43:6,8,17,24

## M

**maintain (1)**
23:12;42:9
**makes (1)**
9:19
**making (1)**
20:15
**malfunctions (1)**
7:5
**manner (3)**
31:7,10;42:15
**manufactured (1)**
7:4
**Marine (3)**

4:4;38:17,18
**Maritima (4)**
3:25;5:17;7:16;
10:12
**maritime (50)**
2:11,13,23;3:5,15,
17;4:7,9,21,22,23;5:2,
7,10,12,19,20,21;6:3,4,
4,19,21,21,25;7:6,8;
8:1,14,16,21;13:11;
15:5,6;16:23;28:17;
32:2;36:20,21;37:8,23,
24,25;38:11,13,19,21,
24;39:1;42:24
**matter (7)**
3:10;15:2,5;23:1;
32:3;38:1;43:13
**matters (1)**
42:12
**may (22)**
5:13;9:21;19:8,8;
20:16;21:25;24:17,21;
26:10,15,25;27:20;
37:2,7;38:2,6,8;39:4;
40:5;42:1,3;43:4
**maybe (4)**
3:11;21:9;28:12,13
**mean (1)**
33:24
**means (2)**
35:16;40:5
**meantime (1)**
25:20
**mechanical (1)**
6:17
**mechanics (1)**
29:24
**meet (2)**
19:3;37:4
**meeting (1)**
14:2
**meets (1)**
20:18
**mention (1)**
35:12
**mentioned (2)**
11:16;13:3
**Merchandise (9)**
11:9;16:12;17:11;
19:15;39:12,17,20,22;
42:17
**merely (1)**
29:25
**metric (3)**
12:4,8,9
**Miami (1)**
33:3
**Michael (1)**
2:3
**middle (5)**
24:9;30:5,14;32:15,
21
**might (2)**

23:22;24:15
**miles (1)**
5:3
**million (4)**
17:25;18:3,10;22:12
**min (2)**
29:25;34:19
**minds (1)**
29:19
**mine (1)**
27:25
**Minerals (1)**
41:24
**minute (1)**
7:25
**minutes (1)**
36:16
**misrepresentation (1)**
10:23
**misrepresentations (2)**
10:24;14:8
**mixed (1)**
4:25
**moment (4)**
19:16;26:15,15,16
**money (15)**
16:4;17:16,17;19:2;
20:9;21:9;29:8;32:17;
33:14;34:8,23;35:3;
41:22;42:3,3
**more (4)**
18:6;22:6;35:16,25
**morning (1)**
29:21
**most (1)**
37:21
**mostly (1)**
5:14
**motion (6)**
9:24;14:19;15:1;
25:10;37:4;38:14
**moved (1)**
22:7
**moving (2)**
16:24,24
**much (2)**
12:15;43:18
**multiple (2)**
16:5;18:20
**must (3)**
32:2;37:4;42:18

**N**

**NA (3)**
31:2,12;41:5
**Nagel (9)**
4:12;5:4,6,13;6:25;
7:14;10:11,19;11:2
**narrow (1)**
5:7
**nature (1)**
43:11

**navigable (4)**
5:25;6:13;12:10;
37:19
**need (2)**
24:23;26:5
**needed (1)**
5:15
**negotiable (14)**
11:11;16:2,3,16,24;
17:2,4,8,14;18:19;19:1,
17;39:20,23
**neither (2)**
42:21
**nevertheless (1)**
13:1
**New (19)**
9:14;11:13,13;18:4;
26:13;30:4;33:8;34:2,
12,13;35:5;38:4;39:12,
17,23;41:16,17,18,21
**news (4)**
23:3,4,9;27:4
**next (1)**
25:8
**night (1)**
24:10
**Ninth (1)**
22:3
**nominally (1)**
33:14
**nonexistent (1)**
14:3
**non-maritime (2)**
6:2;10:18
**nonparty (1)**
29:13
**nor (1)**
42:22
**North (3)**
31:3;40:20;41:6
**note (1)**
38:18
**noted (3)**
10:4;36:19,23
**notice (2)**
28:6,20
**NY2d (2)**
39:18;42:20

**O**

**obligation (1)**
41:14
**obligor (1)**
32:17
**obtained (1)**
26:6
**obviously (3)**
10:10;32:18;43:8
**occur (1)**
7:1
**occurred (7)**
6:13;7:14;8:11;

10:22,23,25;14:1
**occurring (1)**
25:19
**O'Connor (1)**
5:1
**Odyssey (4)**
4:4;6:4;38:17,18
**off (2)**
4:14;5:1
**offered (1)**
18:9
**offering (1)**
15:12
**office (2)**
34:21;40:20
**officer (1)**
25:3
**officers (1)**
33:3
**OK (2)**
2:25;23:12
**once (6)**
5:19;12:9;18:15;
20:3;21:12;26:18
**one (19)**
4:3,21;8:4;11:17;
12:2,3;17:15;18:13,16,
21,22;22:25;24:20;
32:24;35:16,25;36:4;
42:6,9
**only (13)**
12:9;13:9;14:6,21;
17:15;18:21,22;21:6;
22:25;31:11;33:1;
35:24;42:14
**open (1)**
39:19
**openly (1)**
23:2
**operate (1)**
16:19
**opportunity (1)**
13:21
**oppose (1)**
43:8
**opposed (3)**
18:7;23:2;32:14
**order (19)**
2:13;18:4;25:1,14;
26:6;27:2,12,25;28:2,5,
17;31:9;36:6,20,24,25;
42:24;43:1,4
**ordered (1)**
28:12
**ore (1)**
12:15
**original (1)**
30:24
**originate (1)**
33:24
**otherwise (2)**
2:25;17:5
**out (20)**

3:12;5:23;7:2;11:20;
12:16,16;16:5,11;
18:20;19:14;20:20;
23:10;24:22;31:12;
32:7;35:5;37:9,13;
39:16;41:12
**outset (1)**
36:19
**over (5)**
4:15,19;22:16;25:8;
27:12
**owed (1)**
18:16
**owing (1)**
40:2
**own (1)**
27:20
**owner (1)**
3:23
**owners (2)**
3:22;23:18
**ownership (1)**
28:3

**P**

**page (3)**
35:13,20;39:15
**pages (1)**
30:19
**paid (7)**
19:4,13;20:9,10;
26:18,19;34:23
**panel (4)**
22:11;25:14;40:12,
14
**papers (3)**
2:17;25:6;34:7
**paperwork (1)**
31:14
**Paragraph (6)**
11:21;13:3,24;35:13,
21;36:5
**paragraphs (2)**
31:1;36:4
**parallel (1)**
25:12
**Pardon (1)**
28:24
**part (2)**
6:10;35:9
**partial (1)**
22:12
**particular (6)**
32:6,7,11,19;34:22;
42:4
**parties (11)**
6:9;11:22;17:6,7,13;
19:10,18;25:11;29:11;
37:24;39:7
**party (18)**
7:21;8:14;9:21;10:1;
13:17;17:10,19,20;

18:13,17;20:9,10,21;
21:1,2;33:2,21;38:8
**pattern (1)**
4:3
**pay (3)**
27:20;36:6;41:14
**paying (2)**
28:7;29:6
**payment (2)**
19:24;20:1
**payments (1)**
35:13
**pendency (1)**
27:21
**pending (1)**
43:4
**people (7)**
6:10;16:6,8;18:20;
19:1,7;29:2
**percent (3)**
42:9,10,11
**performed (1)**
42:19
**period (1)**
34:12
**permit (1)**
40:12
**permitting (2)**
10:1;36:21
**person (11)**
7:1;16:6,7;17:16,16;
18:21,22;19:12;20:17;
21:6,15
**person's (1)**
8:25
**petition (3)**
29:7,7,10
**physical (1)**
17:1
**place (11)**
14:9,9;22:20;24:8;
29:20;30:16;31:20,24;
32:1,11;40:19
**Plaintiff (24)**
2:2,16,25;3:2,4,9;
10:24;11:6,23;15:3;
21:3;28:6;29:15;33:18;
37:4,12;41:12,17,22;
42:2,12,22;43:3,14
**plaintiffs (1)**
4:5
**plaintiff's (8)**
2:13;3:8;7:13;10:6;
21:19;41:15,17,20
**plane (1)**
29:21
**planned (1)**
24:2
**players (1)**
6:23
**pleading (1)**
38:8
**point (12)**

9:20;10:13;11:20;
15:7;17:1;18:16;20:15;
23:12;26:1;35:2;36:8;
40:16
**pointed (3)**
19:14;31:12;41:12
**Polar (1)**
22:3
**policies (1)**
32:7
**policy (5)**
11:12;19:14;30:11;
39:16,23
**popped (1)**
27:9
**port (7)**
12:13;17:1;23:19,23,
23;24:3,7
**portion (1)**
4:19
**position (9)**
3:8,9;8:13,18;11:17,
19;27:24;31:23;38:22
**positions (1)**
11:17
**possibility (1)**
25:5
**potential (2)**
5:21;37:18
**practice (1)**
32:4
**preexisting (1)**
22:11
**preliminary (1)**
28:9
**prepare (1)**
34:25
**present (5)**
19:3;23:1;26:21;
34:17;41:1
**presentation (4)**
26:17;30:23;31:25;
34:7
**presentations (2)**
43:19,21
**presented (10)**
21:21;22:23;25:23;
26:1;30:23;31:7,10;
34:5;40:9;41:3
**presenting (4)**
16:17;22:22;34:6;
42:15
**presently (1)**
39:7
**president (1)**
13:4
**presumably (1)**
22:24
**pretty (1)**
23:11
**prevent (1)**
25:19
**previously (1)**

6:17
**prima (3)**
3:14;37:5,13
**principal (4)**
30:1,3;33:23;34:2
**principled (1)**
39:19
**principles (3)**
5:19;7:20;24:5
**prior (2)**
20:5;21:21
**private (7)**
30:3;33:8;34:3;42:1,
6,7,12
**probably (1)**
22:6
**problem (3)**
4:16;18:13,21
**problems (1)**
4:18
**procedures (1)**
29:11
**proceed (1)**
15:23
**proceeding (2)**
22:9;38:4
**proceeds (15)**
20:9,11,13,13,14,16,
16,20,22,23,24,25;
21:1,4;23:13
**process (3)**
25:10,15;32:20
**processing (1)**
29:25
**procure (1)**
5:21
**prohibition (1)**
10:1
**properly (2)**
7:25;37:25
**property (36)**
11:7;20:4,4;21:11,
20;23:13;24:12,23;
25:8,22;26:2,5,9,10;
27:1;32:1,9,10;34:5,
21;36:22;37:3,7;39:4,
8,9,13;40:1,16,17;
41:18,20,21;42:21,23;
43:12
**proposed (1)**
9:25
**prospect (1)**
39:6
**prove (1)**
30:6
**provided (1)**
5:23
**provider (1)**
40:20
**provides (3)**
33:2;40:4;41:2
**providing (1)**
5:7

**provision (3)**
24:22;31:8;40:24
**provisionally (1)**
38:12
**provisions (1)**
40:10
**public (2)**
11:12;39:23
**purely (1)**
6:17
**purpose (3)**
24:2;26:13;30:5
**purposes (5)**
6:19;32:1;38:14;
39:14;41:1
**pursuant (2)**
27:2;36:20
**put (6)**
3:22;14:23;18:9;
20:2;30:9;33:15
**putting (1)**
13:11
**puzzled (1)**
33:7

## Q

**quality (1)**
38:6
**qualms (1)**
15:13
**quickly (3)**
22:5,5,7
**quite (2)**
10:20;31:6
**quote (2)**
39:15;41:4
**quotes (1)**
6:16

## R

**raise (2)**
9:6,8
**raised (2)**
9:6,13
**rate (9)**
12:2,3,4,5,21,22;
13:6;14:3,5
**rates (1)**
12:7
**rather (1)**
13:11
**rational (2)**
28:12,13
**reach (1)**
14:4
**read (5)**
2:16;3:18;10:10;
11:11;26:18
**readily (1)**
19:18
**reading (1)**

42:17
**ready (2)**
2:2;25:10
**really (1)**
13:11
**reason (11)**
6:16;13:9;16:25;
17:2;19:2,11;22:25;
23:5;26:22;32:22;
41:20
**reasonable (1)**
12:3
**recap (2)**
13:4;14:17
**recaps (1)**
15:9
**receipt (2)**
20:6;36:5
**receive (2)**
20:12,23
**received (2)**
20:1,4
**receives (1)**
20:16
**Recess (1)**
36:18
**recitation (1)**
11:12
**recites (1)**
11:21
**recognize (1)**
11:9
**recognized (2)**
39:10
**Recognizing (1)**
37:2
**record (2)**
11:20;43:13
**red (1)**
20:2
**reference (2)**
16:15,16
**referenced (2)**
13:24;35:12
**referred (1)**
17:24
**refused (1)**
31:9
**regard (4)**
11:6;15:4;17:11;
29:15
**regards (12)**
3:15,16,17;4:12;
14:15,22;16:1;17:23;
30:7;31:14,19;32:6
**reject (1)**
31:6
**rejected (1)**
18:11
**relate (2)**
16:20;37:18
**relationship (5)**
4:5,6,6;10:43;41:25;

42:6
**release (3)**
26:24,25;27:11
**re-let (1)**
12:18
**relied (2)**
3:2;32:1
**relief (7)**
9:13;10:5,8;13:7,15;
25:13;38:7
**rely (2)**
13:14;19:7
**remedies (1)**
29:4
**Remember (1)**
33:11
**Remit (3)**
31:2;41:2,5
**remitting (1)**
42:16
**report (2)**
23:9;27:7
**represent (1)**
32:19
**representation (3)**
12:10;25:3,4
**representations (5)**
12:2;13:6,22,25;
14:17
**representatives (1)**
11:22
**represented (1)**
12:21
**request (2)**
18:11;21:7
**require (1)**
42:3
**requirement (4)**
25:2;37:3;41:23;
42:9
**requirements (2)**
19:13;37:9
**requires (1)**
42:2
**res (1)**
18:14
**rescind (2)**
38:9,10
**rescission (5)**
12:19;13:7,14;37:23;
38:20
**respect (1)**
32:14
**respects (1)**
32:8
**respond (1)**
13:21
**respondents (1)**
25:16
**response (3)**
9:13;10:9,11
**responsible (1)**
27:24

**re-tender (2)**
12:19,20
**return (2)**
14:19;37:1
**rifle (1)**
7:2
**rig (1)**
5:23
**right (15)**
2:25;11:19;17:17;
20:12,23;22:1;25:7,7,
17,18;27:7,8;30:16;
36:8,12
**rights (4)**
27:22,23;29:3;31:6
**rise (2)**
10:21;40:5
**Robert (1)**
2:5
**rule (11)**
19:5;22:19;24:14,15,
17,21;25:17;26:6;32:2;
36:20,25
**rules (4)**
24:18;32:12;36:20,
25
**running (1)**
31:14

**S**

**sailors (1)**
3:22
**sake (1)**
38:23
**salty (1)**
7:22
**same (5)**
18:1;24:5;28:10;
31:18;32:11
**sanctity (1)**
18:25
**sandbag (1)**
14:13
**saw (1)**
23:4
**saying (8)**
5:2;6:21;14:24;15:4;
20:12;21:8;34:20,21
**schedule (1)**
27:18
**Scheindlin (3)**
5:17,22;10:13
**Scheindlin's (2)**
3:25;10:15
**scrutiny (1)**
41:19
**sea (2)**
6:21;7:5
**seal (1)**
23:3
**seat (1)**
34:24

**Second (7)**
17:24;24:20;32:24;
37:10;39:10,12,16
**seeing (1)**
11:24
**seek (3)**
10:4;13:15;29:11
**seeking (5)**
13:7;22:2;25:13;
38:19,20
**seem (2)**
9:14;18:13
**seize (2)**
17:5;22:5
**send (1)**
21:10
**sensible (1)**
6:18
**sent (3)**
13:24;16:5;18:20
**separate (4)**
12:1;26:12;31:21;
35:11
**September (3)**
2:11,12;36:23
**served (1)**
28:2
**servers (1)**
32:18
**serves (1)**
17:3
**service (2)**
12:15;40:20
**servicer (3)**
31:3,13;41:6
**set (7)**
2:10;3:1,2,3;21:14;
37:1;40:6
**several (2)**
13:9;40:4
**severe (1)**
43:11
**ship (27)**
3:22,23;4:13;6:12;
7:6;11:23,24,25;12:1,7,
10,13;13:6;14:2,16,17,
18,24;15:8,9;23:17,22,
25;24:6,8;28:1,2
**Shipping (1)**
22:4
**ships (4)**
3:22;5:14;7:7;23:18
**shooting (1)**
7:11
**shoots (1)**
7:2
**shore (2)**
13:24,25
**show (2)**
2:13;36:24
**showing (1)**
12:7
**showstopper (1)**

24:10
**shuttle (1)**
12:15
**side (4)**
3:11;5:8;6:2;18:9
**sides (1)**
25:25
**sign (1)**
23:24
**signed (8)**
2:13;7:25;8:12;
10:24,25;12:11;36:19;
43:1
**signing (1)**
11:1
**similar (4)**
10:14;18:8,8;21:25
**simple (1)**
30:19
**sited (1)**
29:16
**sites (1)**
32:4
**situated (2)**
41:17,20
**situation (10)**
4:13;5:11;7:3,5;
8:25;17:17;18:1,8;
21:25;32:12
**situations (2)**
4:4;6:25
**situs (1)**
26:11
**slower (1)**
12:22
**slowing (1)**
12:17
**sneaking (1)**
24:9
**somebody (6)**
7:3;16:4;23:19,24;
33:18,19
**someone (1)**
33:17
**somewhere (2)**
21:10;32:9
**soon (1)**
25:5
**sorry (3)**
9:7;12:4;33:12
**sort (1)**
43:11
**sought (6)**
9:24;10:8;33:10;
36:24;37:23;38:7
**sound (1)**
22:21
**sounds (1)**
31:21
**Southern (2)**
4:1;5:18
**speak (1)**
19:2

**speaking (1)**
34:11
**specifically (2)**
11:8;35:8
**spelled (1)**
37:9
**Sperry (6)**
17:24;18:2,2,4,6,11
**spreadsheet (1)**
12:7
**stage (3)**
2:10;3:2;40:8
**stand (1)**
34:24
**standby (13)**
11:10;16:21;17:15;
18:12;19:1,7,16,19;
20:8;31:5;34:19;39:21;
41:8
**standing (1)**
31:21
**stands (1)**
38:21
**start (1)**
7:20
**started (3)**
29:21;30:4,14
**state (2)**
11:12;39:17
**statement (2)**
16:13;21:8
**statements (1)**
16:18
**states (1)**
40:18
**statute (4)**
8:24;9:3,19,21
**statutory (3)**
2:22;37:8;39:1
**stay (10)**
27:16,17;28:14,15,
22;29:3;43:4,7,9,13
**stays (3)**
28:23;29:2,12
**steam (1)**
23:19
**steaming (1)**
23:23
**still (1)**
29:5
**Stoli (3)**
2:15;3:1;37:10,11
**stop (2)**
15:16;25:14
**stopped (1)**
15:16
**stopping (1)**
15:17
**story (1)**
18:22
**stream (1)**
16:8
**street (1)**

20:18
**strictly (3)**
  7:12;30:18;42:18
**strong (1)**
  11:12;39:16
**stronger (1)**
  39:24
**stuck (1)**
  12:22
**stuff (1)**
  4:18
**subdivisions (1)**
  40:6
**subject (2)**
  15:1,5
**substantial (1)**
  37:3
**substantive (1)**
  38:1
**sued (1)**
  8:13
**Suffice (1)**
  38:18
**sufficient (1)**
  3:14
**sufficiently (1)**
  3:11
**suggest (1)**
  6:5
**suit (1)**
  37:24
**suits (1)**
  37:20
**sum (2)**
  42:2,3
**supplemental (4)**
  8:20;24:18;36:20,25
**supports (1)**
  33:3
**suppose (1)**
  42:6
**supposed (3)**
  14:22;15:3;18:12
**Supreme (14)**
  4:24;5:8;6:20;11:9;
  16:11;17:11;18:5;
  19:15;37:14;39:12,17,
  20,22;42:17
**sure (2)**
  35:3;43:9
**surmising (1)**
  23:8
**sustain (1)**
  3:14

**T**

**tabled (2)**
  22:14,15
**talk (2)**
  6:25;22:4
**talking (4)**
  4:11;14:16;17:21;

35:17
**talks (2)**
  13:5;18:6
**Tampa (12)**
  29:17,22,25;31:4;
  33:20;34:16,18,24;
  40:22;41:7,10;42:16
**telling (1)**
  14:11;21:11
**tells (1)**
  3:22
**ten (1)**
  43:9
**tendered (1)**
  43:1
**tendering (1)**
  12:19
**terms (17)**
  6:7;11:24;13:8,19,
  22;14:25;19:3;21:17;
  29:20;30:6,13,21;
  31:17,19;32:6,17;
  42:19
**test (4)**
  6:18;12:24;30:9;
  37:20
**testify (1)**
  14:15
**testimony (1)**
  15:14
**tests (1)**
  3:3
**Texas (1)**
  7:4
**theirs (2)**
  34:9,10
**theory (1)**
  30:9
**thereafter (1)**
  2:12
**therefore (3)**
  4:7;10:7;17:3
**thereunder (1)**
  39:14
**third (14)**
  6:9;17:6,10;19:18;
  20:9,10,21,25;21:2;
  31:4;35:13,21;40:21;
  41:7
**though (1)**
  32:11
**thought (2)**
  22:13;33:23
**three (2)**
  30:19;31:1
**times (2)**
  23:11;32:8
**title (2)**
  17:3;32:10
**today (4)**
  14:13,19;37:1;43:21
**together (1)**
  11:24

**told (5)**
  23:5;27:3;30:12,15;
  32:23
**tons (3)**
  12:4,8,9
**took (2)**
  14:8,9
**top (1)**
  12:12
**tort (22)**
  3:17;4:22;5:3,11,12,
  12;6:3,4,8;7:8,18;8:7,
  10;9:3;10:2,5,8,13,23;
  11:4;37:17,21
**torts (3)**
  6:25;37:17,18
**towards (1)**
  23:23
**train (1)**
  5:2
**transaction (3)**
  17:7,14,20
**transfer (2)**
  35:10,17
**transferable (2)**
  19:18,21
**transferred (1)**
  18:5
**transportation (1)**
  4:20
**treat (1)**
  5:9
**trial (1)**
  9:23
**tried (1)**
  24:9
**trucked (1)**
  4:15
**trucking (1)**
  4:18
**trust (1)**
  19:9
**trying (5)**
  6:20;15:7;17:18;
  25:18;30:6
**Turkey (3)**
  4:14,15,17
**turn (5)**
  23:25;28:4;29:4,15;
  34:4
**turned (1)**
  24:3
**turns (1)**
  3:12
**two (7)**
  6:3;11:16;12:1;13:4;
  14:18;17:7;35:11
**type (2)**
  14:22;30:7
**typically (1)**
  17:12

**U**

**undeniably (1)**
  38:11
**under (25)**
  2:14;5:19;6:14;
  10:14;11:1,3;14:5;
  15:5;16:23,24;19:24;
  21:14,15,21;22:3;23:2;
  27:22,23;28:7;29:25;
  32:12;39:12,19;40:10,
  10
**underlying (3)**
  4:8;17:13,20
**unfortunately (1)**
  25:15
**unilateral (2)**
  28:12;29:12
**unilaterally (1)**
  22:22
**unique (1)**
  17:12
**unless (2)**
  21:17;24:12
**unquestionably (1)**
  4:7
**unrelated (1)**
  16:9
**up (8)**
  7:7;12:17;16:7,9;
  22:10;34:8,19;36:22
**upon (6)**
  32:1;36:5;38:15;
  40:14;41:22;42:14
**urges (1)**
  41:17
**use (5)**
  19:1,10,11;25:17;
  28:9
**used (3)**
  4:10;25:18;41:14

**V**

**vacate (6)**
  14:20;26:22;28:5,5;
  36:24;37:4
**vacated (2)**
  2:14;42:25
**vacating (1)**
  28:21
**vague (1)**
  36:9
**various (1)**
  25:11
**Vegas (1)**
  20:2
**Venezuela (1)**
  12:16
**verified (3)**
  7:13;11:21;14:7
**vessel (11)**

4:16;6:12;12:4,18,
  20,22;21:24,24;23:19;
  28:3;37:19
**vessel's (1)**
  12:21
**vested (1)**
  17:17
**view (1)**
  5:7
**violate (1)**
  10:1
**visit (1)**
  13:4

**W**

**wait (3)**
  29:6,9;34:25
**waiting (1)**
  24:8
**walk-around (1)**
  12:1
**wants (3)**
  20:2,17;21:12
**water (4)**
  6:13;7:2,3,12
**waters (3)**
  5:25;12:10;37:19
**way (8)**
  4:10;5:9;25:17;30:1,
  9,24;31:18;35:24
**week (1)**
  14:15
**well-pleaded (1)**
  15:2
**whatsoever (1)**
  41:25
**wherever (3)**
  30:1;31:19;32:10
**whole (3)**
  26:12;32:20;35:2
**wind (2)**
  7:7;34:19
**wins (1)**
  18:11
**wire (5)**
  35:4,9,17;36:2,7
**wired (2)**
  35:4,25
**wisdom (1)**
  27:20
**within (13)**
  2:18;8:16,21;12:24;
  24:23;26:10,10;31:6;
  37:6,7;38:13;39:2,9
**without (2)**
  10:2;38:23
**withstand (1)**
  41:19
**witness (4)**
  14:15;15:14,15,20
**words (6)**
  4:9;9:2;26:8;28:10;

COMMODITIES & MINERALS ENTERPRISE LTD., v
GRETCHEN SHIPPING, INC.,

September 27, 2013

31:13;35:24
**work (1)**
    29:24
**worked (1)**
    33:19
**workers (1)**
    7:6
**working (1)**
    7:7
**works (1)**
    30:1
**world (2)**
    16:9;19:10
**wound (3)**
    16:9;22:10;34:8
**wreck (1)**
    5:2
**writ (6)**
    2:10;13:13;24:8,11;
    36:21;37:2
**write (1)**
    14:25
**wrong (1)**
    29:17
**wrote (1)**
    39:12

## Y

**years (1)**
    22:7
**York (19)**
    9:14;11:13,13;18:4;
    26:14;30:4;33:8;34:2,
    12,13;35:5;38:4;39:12,
    17,23;41:16,17,18,21

## 1

**10 (1)**
    42:9
**100 (1)**
    42:11
**1017 (1)**
    9:18
**120 (4)**
    25:8;26:10;28:15,15
**1338 (1)**
    38:18
**14 (1)**
    13:24
**15 (1)**
    18:3
**17 (2)**
    2:11;36:23
**175 (1)**
    39:15
**19 (3)**
    2:12;11:21;13:3
**1995 (1)**
    37:16
**1999 (1)**
    39:16

## 2

**2 (1)**
    13:2
**2,000 (1)**
    12:9
**2.5 (2)**
    18:10;22:12
**2:30 (1)**
    37:1
**2005 (1)**
    9:18
**2011 (2)**
    40:8,19
**2012 (1)**
    40:20
**2013 (1)**
    36:23
**20-day (1)**
    25:15
**22 (1)**
    9:17
**245 (1)**
    39:15
**25 (1)**
    33:2
**252 (1)**
    39:15
**28 (3)**
    40:7,19,20
**283 (1)**
    38:16

## 3

**33610 (2)**
    31:4;41:7
**344 (1)**
    39:18
**352 (1)**
    42:20
**3800 (3)**
    31:3;40:21;41:6
**3d (1)**
    9:18

## 4

**4500 (2)**
    12:4,8
**460 (1)**
    37:10

## 5

**5 (1)**
    5:23
**50 (1)**
    42:10
**513 (1)**
    37:16
**527 (1)**

37:16

## 6

**636 (1)**
    38:17

## 7

**7 (1)**
    12:6
**70 (2)**
    39:17;42:20

## 8

**874 (1)**
    38:16