UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

COMMODITIES & MINERALS ENTERPRISE LTD.,

      Plaintiff,

vs.                                          Case No.: 8:13-cv-2512-JSM-MAP

GRETCHEN SHIPPING INC.,

      Defendant.

_____/

## DECLARATION OF MICHAEL J. FREVOLA

MICHAEL J. FREVOLA, an attorney admitted to practice in the State of New York, affirms under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am a member of the law firm of Holland & Knight LLP, attorneys for Plaintiff Commodities and Minerals Enterprise Ltd. ("CME"). I make this affirmation on the basis of my personal knowledge and in order to submit true and correct copies of documents referenced in the opposition to Defendant Gretchen Shipping Inc.'s ("Gretchen") expedited motion pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to vacate the Court's Order Directing the Issuance of the Process of Attachment and Garnishment dated September 30, 2013 (the "Attachment Order").

2.     In June 2012, CME initiated arbitration in New York against Gretchen regarding charter party disputes (the "Pending SMA Arbitration"). A Society of Maritime Arbitrators panel was constituted last year to hear the parties' disputes regarding the inadequate discharge rate of the *M/V GENERAL PIAR* and nothing else.

3.      In June 2012, CME sought an injunction and a temporary restraining order in the United States District Court for the Southern District of Florida to restrain Gretchen from drawing down on the Citibank letter of credit (*Commodities & Minerals Enterprise, Ltd. v. Citibank, N.A., et al.,* Case No 12-22333-CIV-UNGARO (S.D. Fla.)).   Those proceedings involved the disputes and claims that are the subject of the Pending SMA Arbitration.

4.      On Tuesday, September 17, 2013, CME filed a maritime attachment proceeding in the United States District Court for the Southern District of New York against Defendant Gretchen under Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule B") involving the same claims CME now makes before this Court (the "New York Proceeding").   In the New York Proceeding, CME obtained a writ of attachment seeking to attach the proceeds from the Citibank Letter of Credit (the "L/C") that CME had opened in accordance with the parties' charter of the *M/V GENERAL PIAR*.   At that time, CME believed that the proceeds from the L/C, when drawn upon, would issue in New York.

5.      On September 19, 2013, Defendant Gretchen made a motion to vacate the writ of attachment pursuant to Rule E(4)(f) of the Supplemental Rules in the New York Proceeding and the court issued an order to show cause why CME's maritime attachment should not be vacated. The court scheduled a hearing on Gretchen's motion for Friday, September 27, 2013.

6.      Attached hereto as Exhibit 1 is a true and correct copy of a letter by Kirk Lyons, counsel for Defendant Gretchen, to the arbitration panel in the Pending SMA Arbitration, dated September 20, 2013.   In the letter, Gretchen seeks an emergency hearing in order to obtain a partial final award such that it could seek to draw down on the L/C in the full amount, $2.5 million. Gretchen made this request to the arbitration panel which already had been constituted for a year despite CME's having demanded arbitration of new and distinct claims, which include

2

the claims involved in this action, under a separate and distinct arbitration panel, and despite CME's new claims (and hence Gretchen's claimed right to draw down on the L/C) not being before that panel.

7.     On September 24, 2013, the chairman of the Pending SMA Arbitration panel deferred Gretchen's request for an emergency hearing in light of the hearing on Gretchen's motion to vacate in New York Proceeding scheduled for Friday, September 27.

8.     On Friday, September 27, 2013, after a hearing that lasted for over an hour, the Honorable Kevin P. Castel, United States District Judge, United States District Court for the Southern District of New York, granted Gretchen's application by Order to Show Cause to vacate CME's Rule B Attachment Order.  In support of vacatur Gretchen presented the same arguments it now presents to this Court in support of its motion to vacate currently pending in these proceedings, namely: (1) that CME's claim was not a maritime claim, (2) that the L/C and its proceeds were not attachable property, and (3) that Gretchen's property could not be found in the district.  The basis for the vacatur of the Attachment Order was that the property sought to be attached (proceeds from the L/C) was not present in the Southern District of New York, but rather was present in the Middle District of Florida.

9.     Attached hereto as Exhibit 2 is a true and correct copy of the unpublished opinion in *Royal Caribbean Cruises Ltd. v. Nat'l Biofuels, L.P.*, cv-07-3144 (C.D. Cal. May 25, 2007).

10.     Attached hereto as Exhibit 3 are true and correct copies of the Memorandums of Law filed in the NY Proceedings by the parties in support and in opposition to Gretchen's motion to vacate the attachment.

I affirm under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2013 in New York, New York.

_____
Michael J. Prevola

# FREVOLA
# DECLARATION
# EXHIBIT 1



# LYONS ✦ FLOOD

**Attorneys At Law**

LYONS & FLOOD LLP
65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NY 10018
TEL  (212) 594-2400
FAX  (212) 594-4589
www.lyons-flood.com

KIRK M. LYONS
E-Mail: klyons@lyons-flood.com

ADMITTED IN NEW YORK, NEW JERSEY,
CONNECTICUT, & MASSACHUSETTS

September 20, 2013

**BY E-MAIL & USPS OVERNIGHT MAIL**

Mr. Thomas F. Fox                              **tomfoxsmsc@aol.com**
Southold Maritime Services Corp.
P.O. Box 76
Southold, NY 11971-0076

**BY E-MAIL & FEDEX**

Mr. Manfred W. Arnold                          **arnoldwestmarine@comcast.net**
840 Shackamaxon Drive
Westfield, NJ 07090

Mr. David W. Martowski                         **dmartowski@verizon.net**
91 Central Park West
New York, NY 10023

Re:  M/V "GENERAL PIAR" – Charter Party dated January 25, 2010
     Our File:  2600053

Gentlemen:

        We write on behalf of Respondents in this matter to request that the Panel schedule an
emergency hearing as soon as practicable in order to consider and decide a request that the Panel
issue a Partial Final Award in Respondents' favor in the amount of $2,500,000.00, on an
expedited basis.

        The basis for the request for a Partial Final Award is that Claimant has served
Respondents with the enclosed letter on September 18, 2013, notifying Respondents that it "is
tendering back the Vessel to you" and seeking confirmation that Respondents "have accepted
receipt of the Vessel," threatening that if such acceptance is not forthcoming, it "will use that
refusal as evidence of a failure to mitigate any damages that you may claim."

NEW YORK        NEW JERSEY        CONNECTICUT

This attempt at early re-delivery of the Vessel is a clear breach of the January 25, 2010, Charter Party, and there can be no argument that Respondents are entitled to recovery of the lost hire and other damages flowing from such a breach.

Presently, there are in excess of sixteen (16) months remaining in the charter period. At a hire rate in excess of $25,000 per day, the total hire that Respondents are entitled to (even after mitigation), easily exceeds $2,500,000.00.

As agreed to in Clause 25 of the Charter Party, Claimant provided an irrevocable standby letter of credit in the amount of $2,500,000.00 issued by Citibank N.A. in favor of Respondents, to serve as security for Claimant's hire obligation (the "L/C"). (A copy of the L/C is enclosed.) One of the conditions under which a draft for payment can be made under the L/C is the issuance of an arbitration award against Claimant and in favor of Respondents. Another condition under which a draft for payment can be made is the failure of Claimant to pay hire in a timely manner. The latest hire payment was due on September 15, 2013, and that hire has not been paid and is currently owed.

Since Claimant has tendered back the Vessel to Respondents, it has effectively stated that it will no longer pay any hire under the Charter Party. In the circumstances, the hire payment obligations under the L/C should be accelerated to the present date since Claimant has no intention to pay any further hire and it would be futile for Respondents to continue to issue hire invoices when Claimant has already effectively represented that it has no intention of paying any invoices.

Respondents seek a Partial Final Award so that they may thereby collect the $2,500,000.00 secured by the L/C provided by Claimant.

The need for an emergency hearing is based on two factors. First, Claimant has filed a Rule B attachment proceeding in the Southern District of New York and obtained an attachment order directed, among other things, to the L/C issued by Citibank. A hearing has been scheduled on September 27, 2013, before Judge Castel in connection with Respondents' motion to vacate the attachment order. The attachment order has effectively prevented Respondents from drawing down on the L/C for the one hire payment currently due and owing by Claimant.

Secondly, the Vessel is located in Venezuela and remains on charter to the Claimant. However, the Vessel is running low on fuel. Respondents have today requested Claimant to provide the minimum quantities of fuel oils under the Charter Party, but they are fearful that since Claimant tendered back the Vessel, Claimant will not provide the required quantities of fuel oils. At present rates of fuel oil consumption, the Vessel will soon be at risk in having insufficient fuel oil aboard.

Due to the urgency of the situation and the need for immediate relief, Respondents respectfully submit that an emergency hearing be scheduled.

In terms of scheduling, the undersigned will be in Amsterdam on September 23 and 24, arriving back in the US late evening on September 24 and therefore respectfully requests that a hearing not be scheduled on Monday and Tuesday of next week.

We thank you for your consideration.

Very truly yours,

**Lyons & Flood, LLP**

By: _____
Kirk M. Lyons

Encl.

**BY E-MAIL**

cc:   Hamilton, Miller & Birthisel LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131

Attn:   Jerry D. Hamilton, Esq.          **jhamilton@hamiltonmillerlaw.com**
Matthew P. O'Brien, Esq.          **mobrien@hamiltonmillerlaw.com**

Holland & Knight LLP
31 West 52nd Street
New York, NY 10019

Attn:   Michael J. Frevola, Esq.          **michael.frevola@hklawa.com**
Christopher R. Nolan, Esq.          **christopher.nolan@hklaw.com**
Marie E. Larson, Esq.          **marie.larsen@hklaw.com**

- 3 -

# Holland & Knight

31 West 52nd Street | New York NY 10019 | T 212 513 3200 | F 212 385 9010
Holland & Knight LLP | www.hklaw.com

Michael J Frevola
(212) 513-3516
michael.frevola@hklaw.com

September 18, 2013

*Via E-mail*
Gretchen Shipping Inc.
1801 S.W. 3rd Avenue
Suite 200
Miami, FL 33129

Att: Mr. Paris Katsoufis/Mr. Lambros Katsoufis

Re:     *M/V GENERAL PIAR* – Charter Party dated 1/25/2010

Dear Sirs:

We are counsel for Commodities & Minerals Enterprise Ltd. ("CME"), charterer of the *M/V GENERAL PIAR* (the "Vessel") under the referenced time charter party (the "Charter").  We write to advise you that CME demands arbitration under the Charter for its claims including, but not limited to, fraudulent inducement of the Charter.  CME seeks either rescission of the Charter or, in the alternative, damages resulting from fraudulent inducement in an amount currently calculated to be approximately $13,350,000, plus interest and attorneys' fees.  We have appointed the following arbitrator on CME's behalf:

> Mr. Anthony Siciliano
> Sentry Marine Services, Inc.,
> 9199 Chatham Circle, North Ridgeville, OH 44039
> Telephone: (631) 360-3580
> Fax: (631) 360-3560
> E-mail: ajsmarine@aol.com

Pursuant to the terms of the Charter, the arbitration shall be conducted in New York pursuant to the rules of the Society of Maritime Arbitrators, Inc. ("SMA Rules").  The SMA Rules require you to appoint an arbitrator within twenty days of receipt of this letter, failing which CME will appoint a second arbitrator with the same force and effect as if that second arbitrator were appointed by you.

2 –     Gretchen Shipping Inc.
Att: Mr. Paris Katsoufis/Mr. Lambros Katsoufis       September 18, 2013

We further write to notify you that CME is tendering back the Vessel to you.  Please confirm that you have accepted receipt of the Vessel.  *If you do not accept receipt of the Vessel, CME will use that refusal as evidence of a failure to mitigate any damages that you may claim.*

We look forward to hearing from you as to Gretchen Shipping Inc.'s arbitrator nomination.

Very truly yours,

HOLLAND & KNIGHT LLP

By:_____
    Michael J. Frevola

MJF/pb

cc:     Mr. Anthony Siciliano (by e-mail)

#25820611_v1

IRREVOCABLE LETTER OF CREDIT NO. 63656745

BENEFICIARY:
GRETCHEN SHIPPING INC.
C/O KYMA SHIP MANAGEMENT INC.
1801 S.W. 3RD AVENUE, SUITE 200
MIAMI, FL 33129

APPLICANT:
COMMODITIES AND MINERALS ENTERPRISE LTD.
501 BRICKELL KEY DRIVE, SUITE 502
MIAMI , FL 33131

AMOUNT: USD $2,500,000.00 (USD TWO MILLION FIVE HUNDRED THOUSAND AND 00/100)

DATE OF ISSUE:  JANUARY 28, 2011

DATE AND PLACE OF EXPIRY: JANUARY 28, 2012, AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. 63656745 IN FAVOR OF GRETCHEN SHIPPING INC. FOR AN AGGREGATE SUM NOT TO EXCEED USD $2,500,000.00 (TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 UNITED STATES DOLLARS) (THE 'FACE AMOUNT"). THIS LETTER OF CREDIT IS AVAILABLE BY YOUR DRAFT(S) AT SIGHT DRAWN ON US MENTIONING OUR LETTER OF CREDIT NUMBER INDICATED ABOVE AND ACCOMPANIED BY:

A)   DRAWING FOR INDIVIDUAL CHARTER HIRE

      1.1.   A COPY OF A GRETCHEN SHIPPING INC. INVOICE FOR CHARTER HIRE MARKED "UNPAID".

      2.1.   BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., CERTIFYING THAT THE APPLICANT, COMMODITIES AND MINERALS ENTERPRISE LTD., HAS NOT PAID CHARTER HIRE , DUE ON _____ (INSERT DUE DATE OF PAYMENT) UNDER THE CHARTER AGREEMENT BETWEEN GRETCHEN SHIPPING INC. AND COMMODITIES AND MINERALS ENTERPRISE LTD.;

    OR

B) ARBITRATION AWARD DRAWING

      1.1.   A COPY OF AN ARBITRATION AWARD AGAINST COMMODITIES AND MINERALS ENTERPRISE LTD. AND IN FAVOR OF GRETCHEN SHIPPING INC.

      2.1.   BENEFICIARY'S CERTIFICATE PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., CERTIFYING THAT THE BENEFICIARY NAMED IN CITIBANK N.A. LETTER OF CREDIT NO. 63656745



EXHIBIT

B

HAS WON AN ARBITRATION AWARD AGAINST THE APPLICANT, COMMODITIES AND MINERALS LTD., ON (DATE OF AWARD) PURSUANT TO DISPUTE RESOLUTION PROSCRIBED UNDER THE CHARTER AGREEMENT BETWEEN GRETCHEN SHIPPING INC. AND COMMODITIES AND MINERALS ENTERPRISE LTD.

OR

C) DRAWINGS FOR NON-EXTENSION OF EXPIRY DATE

1 1.  BENEFICIARY'S STATEMENT PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC., STATING "THE AMOUNT CLAIMED IS DUE AND PAYABLE TO BENEFICIARY BECAUSE CITIBANK N.A. ELECTED NOT TO EXTEND THE EXPIRATION DATE OF THEIR STANDBY LETTER OF CREDIT NO. 63656745 AND COMMODITIES AND MINERALS ENTERPRISE LTD HAVE FAILED TO ESTABLISH A NEW STANDBY LETTER OF CREDIT IN THE SAME FORM AND FACE AMOUNT WITH ANOTHER FIRST CLASS INSTITUTION ACCEPTABLE TO BENEFICIARY 30 DAYS PRIOR TO THE EXPIRATION DATE OF THIS LETTER OF CREDIT."

OR

D) DRAWING FOR NON-REINSTATEMENT OF THE AVAILABLE AMOUNT OF LETTER OF CREDIT

1.1.  BENEFICIARY'S STATEMENT PURPORTEDLY SIGNED BY TWO AUTHORIZED OFFICERS OF GRETCHEN SHIPPING INC. CERTIFYING THAT (I)  THERE HAVE BEEN 2 CONSECUTIVE DRAWS UNDER THE LETTER OF CREDIT AND (II) THE LETTER OF CREDIT IS NOT REINSTATED TO THE FACE AMOUNT OF LETTER OF CREDIT.

ADDITIONAL CONDITIONS

PARTIAL DRAWINGS UNDER THIS LETTER OF CREDIT ARE ALLOWED, HOWEVER, THE AVAILABLE AMOUNT UNDER THIS LETTER OF CREDIT WILL BE THE FACE AMOUNT DECREASED BY ANY PAYMENTS MADE UNDER THIS LETTER OF CREDIT PLUS ANY AMOUNT OF INCREASE MADE BY AN AMENDMENT.

SUCH DRAWINGS FOR INDIVIDUAL CHARTER HIRE MAY NOT BE MADE WITHIN 15 CALENDAR DAYS FROM ANY PREVIOUS DRAWING DATE.

DRAWING(S) AS REQUESTED UNDER B) OR C) OR D) OF THIS LETTER OF CREDIT MAY BE MADE FOR THE THEN AVAILABLE AMOUNT UNDER THIS LETTER OF CREDIT.

IT IS A CONDITION OF THIS STANDBY LETTER OF CREDIT THAT ITS EXPIRY DATE SHALL BE AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR ONE (1) YEAR PERIODS FROM THE PRESENT OR ANY FUTURE EXPIRATION DATE, NOT BEYOND ITS FINAL EXPIRATION DATE OF APRIL 12, 2015 UNLESS WE SHALL NOTIFY BENEFICIARY AT LEAST 60 DAYS PRIOR TO SUCH EXPIRATION DATE, BY COURIER,

THAT WE HAVE ELECTED NOT TO EXTEND EXPIRY DATE OF THIS LETTER OF
CREDIT FOR ANY SUCH ADDITIONAL PERIOD.

THIS LETTER OF CREDIT WILL TERMINATE ON EARLIER OF (I) FINAL DRAWING
REDUCING THE AMOUNT OF LETTER OF CREDIT TO ZERO OR (II) JANUARY 28,
2012 OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

BANKING CHARGES OTHER THAN THE ISSUING BANK ARE FOR THE
BENEFICIARY'S ACCOUNT.

WE HEREBY AGREE WITH YOU THAT DRAFTS DRAWN IN COMPLIANCE WITH THE
TERMS AND CONDITIONS OF THIS CREDIT WILL BE DULY HONORED ON DUE
PRESENTATION IF PRESENTED ON OR BEFORE THE EXPIRATION DATE OR ANY
AUTOMATICALL EXTENDED EXPIRY DATE.

UPON RECEIPT OF DOCUMENTS IN ORDER, WE WILL PAY IN ACCORDANCE WITH
YOUR INSTRUCTIONS.

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS STANDBY IS
SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL
CHAMBER OF COMMERCE PUBLICATION NO. 590, AND AS TO MATTERS NOT
ADDRESSED BY THE ISP98, SHALL BE GOVERNED BY AND CONSTRUED  IN
ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND APPLICABLE
U.S. FEDERAL LAW.

REMIT DOCUMENTS BY COURIER TO:  CITIBANK N.A., C/O ITS SERVICER CITICORP
NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL
33610, ATTN: U.S. STANDBY DEPT.

AUTHORIZED SIGNATURE(S)
CITIBANK N.A.

# FREVOLA
# DECLARATION
# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|

| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. |
|---|---|

Present: The Honorable   A. HOWARD MATZ, U.S. DISTRICT JUDGE

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys **NOT** Present for Plaintiffs: | Attorneys **NOT** Present for Defendants: |
|---|---|

**Proceedings:**   IN CHAMBERS (No Proceedings Held)

## I.   INTRODUCTION

Plaintiff Royal Caribbean Cruises, Ltd. ("Plaintiff" or "RCL") and National Biofuels, L.P. ("Defendant") entered into a requirements contract in which Defendant agreed to sell Plaintiff biodiesel fuel according to Plaintiff's needs. On May 11, 2007, Plaintiff filed a Verified Complaint alleging that Defendant breached the contract by failing to provide fuel for delivery to one of Plaintiff's ships, as well as by not delivering additional fuel for which Plaintiff claims to have paid. On May 12, 2007, this Court issued an "Order Directing the Issuance of a Writ of Maritime Attachment and Garnishment," which Plaintiff used to attach Defendant's property that arrived at Westway Terminals in San Pedro, California.[1]

On May 22, 2007, the Court Granted Defendant's *ex parte* application for a post-attachment hearing, at which Plaintiff must show cause why the attachment should not be vacated. The Court conducted a hearing on May 24, 2007. In its papers and at the hearing, Defendant argued that the attachment should be vacated because (1) the Court lacks admiralty jurisdiction over the causes of action alleged in the Verified Complaint; and (2) Defendant is subject to suit in a convenient adjacent district. For the following reasons, both arguments fail. Therefore, the Court DENIES the *ex parte* application.

---

[1] Plaintiff obtained additional writs of attachment in New York and in the Northern District of California. (Declaration of Michael J. Frevola ("Frevola Decl.") ¶ 6; Declaration of Gerardo Manalac ("Manalac Decl."), Ex. 2, 3).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 07-3144 AHM (SHx)                    Date   May 25, 2007

Title   ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P.

## II.   BACKGROUND DISCUSSION OF MARITIME ATTACHMENT

The facts in this section come verbatim from *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 437-38 (2d Cir. 2006):

"[M]aritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844." *Aurora Mar. Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir.1996). In fact, "[t]he use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. The Disintegrating Co.*, 85 U.S. 272, 303 (1874). The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution. U.S. Const. art. III, § 2. The power's historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950). . . .

Under the Rules Enabling Act, 28 U.S.C. § 2073, the Supreme Court in 1966 established the Supplemental Rules for Certain Admiralty and Maritime Claims, 383 U.S. 1071 (1966), a reformed and comprehensive codification of admiralty rules to govern the practice of the federal courts. Periodic amendments have followed.

Two of these Supplemental Rules are relevant to this case. First, Rule B governs the process by which a party may attach another party's assets. Rule B provides in relevant part:

If a defendant is not found within the district, . . . a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property-up to the amount sued for-in the hands of garnishees named in the process. . . . The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed.R.Civ.P. Supp. Rule B(1). To begin the process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. *Id.* If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|

| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. |
|---|---|

defendant's property located within the district. The order of attachment may be requested and granted *ex parte*, though notice of the attachment to the defendant via appropriate service is required. *Id.* Supp. Rules B(2), E(3).

Second, the defendant has an opportunity under Rule E(4)(f) to appear before the district court to contest the attachment once its property has been restrained. Rule E(4)(f) provides, in relevant part:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules....

*Id.* Supp. Rule E(4)(f).

The text of Rule E(4)(f) itself does not explain under what circumstances the district court should vacate the attachment. Without doubt the Rule E(4)(f) hearing provides defendants with an opportunity to argue that the requirements of Rule B were not in fact met- for example, that the defendant turned out to be "found within the district." *Id.* Supp. Rule B(1)(a).

## III.   ANALYSIS

### A.   Elements Plaintiff Must Establish

"Supplemental Rule E(4)(f) provides that any person claiming an interest in the attached property is 'entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.' *Id.* at E(4)(f). Therefore, the plaintiff has the burden to show that the attachment should not be vacated, and at the hearing the defendant can attack 'the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings.' Fed.R.Civ.P. Supp. Rule E(f), Advisory Committee's Note." *Dolco Investments, Ltd. v. Moonriver Development, Ltd.*, 2007 WL 1237997, *3 (S.D.N.Y. 2007).

"Under *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.,* 460 F.3d 434 (2d Cir. 2006), in a Rule E(4)(f) inquiry challenging a Rule B attachment, a plaintiff has the burden to show only that: (a) it has a *prima facie* admiralty claim; (b) the named defendants cannot be found within [the] district; (c) the attached defendant's property was within the district; and (d) that there is no statutory or maritime law bar to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|
| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. | | |

attachment." *Id., citing Aqua Stoli,* 460 F.3d at 445.

As to these four elements, which Plaintiff must prove, Defendant challenges only the first two. First, Defendant claims that the Court lacks admiralty jurisdiction over the causes of action alleged in the Verified Complaint. This argument is premised on Defendant's characterization of the parties' contract as executory. Second, Defendant argued in its "Amended Memorandum in Support of Application for a Prompt Post-Attachment Hearing" that it can be found within the Central District of California, although Defendant later appeared to abandon this argument.

> **1.    Admiralty Jurisdiction**

Defendant cites to a long line of cases dealing with executory portions of requirement contracts. The first such case, *Steamship Overdale Co. v. Turner,* held that admiralty jurisdiction did not exist because the contract was still executory. 206 F. 339 (E.D. Pa. 1913). Similar to the contract between the parties here, *Steamship* involved the alleged breach of a contract to provide all the necessary coal required by the other party for its steamships. The court explained that admiralty jurisdiction did not exist because "[u]ntil the contract was executed, no particular vessel or no particular voyage was in contemplation of either of the parties. It had no reference to any particular maritime service or maritime transaction, nor to the navigation, business, or commerce of the sea. If coal had been supplied to the [steamship], the contract would apply as to the coal delivered to the navigation or commerce of the particular vessel, and admiralty would have jurisdiction. . . ." *Id.* at 341. This reasoning is referenced and followed in numerous cases cited by Defendant. *See, e.g.,* Garcia *v. Warner,* 9 F.Supp. 1010 (S.D.N.Y. 1934); *Jones v. Berwick Bay Oil Co.,* 697 F.Supp. 260 (E.D. La. 1988); *Dolco, supra.*

> **(a)    The Status of the Law Regarding Executory Contracts**

Plaintiff contends that the principle that executory portions of contracts are not subject to admiralty jurisdiction is no longer sound. The Court disagrees. Plaintiff first relies on two inapplicable Supreme Court cases that do not mention or in any way address executory contracts. In *Norfolk Southern Railway Company v. Kirby,* contracts between the parties called for the shipment of goods from Australia to Alabama, including ground shipping from Georgia to Alabama. 543 U.S. 14, 18-19 (2004). The

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 07-3144 AHM (SHx)                     Date   May 25, 2007

Title   ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P.

Court ruled that a railroad derailment during the ground shipping was subject to admiralty jurisdiction, because the contracts' "primary objective [was] to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States" and the "principle objective of [the] contract was maritime commerce." *Id.* at 24, 25. The relevant portion of the contract was not executory, and the Court did not even mention executory contracts.

In *Exxon Corporation v. Central Gulf Lines, Inc.*, the Court overruled *Minturn v. Maynard*, 58 U.S. 477 (1854) and held that there is no *per se* rule excluding agency contracts from admiralty. 500 U.S. 603, 604-05 (1991). As in *Norfolk Southern*, the relevant portion of the contract was not executory, and the Court did not mention executory contracts. In fact, the Court specifically emphasized that its ruling was "a narrow one" and it "remove[d] only the precedent of *Minturn* from the body of rules that have developed over what types of contracts are maritime." *Id.* at 612.

Plaintiff also cites to *Compania Argentina de Navegacion Dodero v. Atlas Maritime Corporation*, in which the court found admiralty jurisdiction did apply to a contract to repair a specific ship at a specific time. 144 F.Supp. 13, 14 (S.D.N.Y. 1956). The defendant in *Compania* argued that the contract was not subject to admiralty jurisdiction, because "the action is one alleging a breach of an executory contract, and . . . such actions are not within the admiralty jurisdiction of [the court]." *Id.* at 14. The court responded that "[i]f such was ever the law, it is certainly not the law since the decision of the United States Supreme Court in *Archawski v. Hanioti*, 1956, 350 U.S. 532." *Id. Compania's* reliance on *Archawski* was misguided, because *Archawski* did not concern or even mention an executory contract. *Compania* found that admiralty jurisdiction existed because the contract concerned a single delivery of products to a specified vessel. The court distinguished that situation from those in *Steamship and Garcia*, where there were "agreements to supply the owner of several steamships all the fuel required by the steamships for a period of time" and "no particular vessel and no particular voyage was in the contemplation of the parties." *Id.* at 14-15. In distinguishing *Steamship* and *Garcia*, *Compania* implicitly acknowledged the vitality of the principle set forth in those cases: that there is no admiralty jurisdiction over portions of a requirements contract that are not linked to a particular vessel and a particular voyage.

**(b)    The Cases Cited by Defendant Are Inapplicable Here**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 07-3144 AHM (SHx)                                     Date   May 25, 2007

Title   ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P.

Plaintiff then argues that even if the executory portion of a requirements contract is not subject to admiralty jurisdiction, this contract is not executory, and hence the *Steamship* and *Garcia* line of cases are inapplicable.  This Court agrees.  Black's Law Dictionary defines "executory contract" as: "A contract that remains wholly unperformed or for which there remains something still to be done on *both* sides. . . ."  Bryan A. Garner (ed.), *Black's Law Dictionary* (8th ed. 2004) (emphasis added).  Plaintiff argues that this contract is not executory with respect to the fuel for the cruise ship M/V INFINITY (the "Infinity"), because, Plaintiff alleges, it paid for this fuel on December 26, 2006, and the fuel "was slated for loading aboard [various] cruise ships [including] M/V INFINITY. . . ."  (Verified Complaint ¶ 16).  Thus, the substance of the Verified Complaint relates to the "necessities of a particular vessel for her own voyage," as required for admiralty jurisdiction in *Steamship*.  *Steamship*, 206 F. at 340.

Plaintiff offers a series of e-mails that support its argument that the fuel it paid for in December was later tied to the Infinity.  A February 27, 2007 e-mail from Paul Litvinov ("Litvinov"), the Commodity Manager of Plaintiff's Fuel Supply Chain, to Kevin Gorman, a representative of the Defendant, confirmed "the anticipated schedule and quantity requirements for . . . specific RCL vessels that would be taking on [Defendant's] fuel."  (Declaration of Paul Litvinov ("Litvinov Decl."), ¶ 2, Ex. A).  This schedule allocates the fuel to four specific ships, one of which is the Infinity (denoted as "IN").  (*Id.* at ¶ 3, Ex. A).  In an April 22, 2007 e-mail from Litvinov to Gerardo Manalac ("Manalac"), the Chief Executive Officer of National Biofuels LLC,[2] Plaintiff requests a specific volume of fuel (1500 MT) for an April 22, 2007 delivery to the Infinity.  This is the fuel that was not provided.

Defendant argues that it is "completely absurd" for Plaintiff to attempt to tie the December 26, 2006 payment mentioned in the Verified Complaint to specific vessels, because there is no reference to specific vessels in the documents transmitting funds or in the contract itself.  (Manalac Reply Decl., Ex. 3-4; Verified Complaint ¶ 16).  Manalac states that Defendant "does not know at the time of any given delivery whether [Plaintiff] actually loads delivered quantities upon any given vessel, or whether [Plaintiff] purchases it and re-sells it to any of a multitude of potential buyers. . . ."  (*Id.*

---

[2] According to Manalac, National Biofuels LLC is the general partner for Defendant National Biofuels, L.P.  (Declaration of Gerardo Manalac in Further Support of Application for an Order Vacating Attachment ("Manalac Reply Decl."), ¶ 2).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. | | |

at ¶ 8).  As stated in the preceding paragraph, the two e-mails attached to the Litvinov Declaration sets forth the expected monthly fuel schedule *by ship* and these e-mails nominate precise amounts of fuel for delivery *by ship*.

Defendant further argued at the hearing that the contract was executory because Plaintiff failed to fulfill its requirements under the contract.  As Defendant's counsel acknowledged at the hearing, the April 19, 2007 e-mail from Litvinov to Manalac *is* a nomination, as required of Plaintiff according to the contract.  (Litvinov Decl., Ex. B). Defendant argued, however, that Plaintiff did not fulfill its additional requirement to specify a delivery vehicle.[3]  This argument fails for two reasons.  First, Defendant fails to establish where the contract states that Plaintiff is required to specify the delivery vehicle.  Second, the e-mail from Litvinov does confirm that Jankovich, a barge company, would pick up the fuel.  (Litvinov Decl., Ex. B).  Defendant's counsel argued that the e-mail did not adequately specify the delivery vehicle, because it asked whether Jankovich could pick up the fuel, rather than stating that it would.  That is not a fair construction.  What Litvinov was asking was whether the specified fuel quantities would be available on the delivery dates.  (*Id.*).  He made it clear that if the fuel was available, it would be picked up by Jankovich.  (*Id.*).  Thus, Defendant's argument fails.

Accordingly, the Court finds that Plaintiff has made a *prima facie* showing that the payment it made *and completed* in December 2006 was for a supply of biodiesel fuel ultimately designated for a particular vessel (the Infinity).  As a result, the line of cases cited by Defendant regarding executory contracts are distinguishable.  Therefore, the Court finds that Plaintiff's claim is subject to admiralty jurisdiction.

### 2.    Defendant is Not Found Within the Central District of California

"The Admiralty Rules do not define the expression 'found within the district.'  In the cases construing Rule 2, however, the requirement is said to present a two-pronged inquiry: first whether (the respondent) can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process."  *State of Oregon State Highway Commission v. Tug Go Getter*, 398 F.2d 873, 874 (9th Cir. 1968)

---

[3] According to counsel for both parties, fuel deliveries cannot be made directly from the storage tanks at Westway Terminal to Plaintiff's ships.  Instead, the fuel is loaded onto a barge, which transports the fuel from the storage tanks to the ships.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|
| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. | | |

(internal citations omitted).

In his declaration in support of Plaintiff's initial *ex parte* application for an order directing the issuance of a writ of attachment, Plaintiff's counsel Michael J. Frevola ("Frevola") researched the Defendant's presence in California. (Declaration of Michael J. Frevola, Esq. in Support of Plaintiffs' [sic] *Ex Parte* Application ¶ 7). He declared that he "conducted a search for [Defendant] on-line through the California Business Portal and searched the local telephone directories for any listings of the corporate Defendants. Defendant NBF has no listed business addresses in California, has no listed telephone address in California, and has no agent for service of process present in [the Central] District (although it does have such an agent in the Northern District of California)." *Id.*

In its May 22, 2007 "Amended Memorandum in Support of Application for a Prompt Post-Attachment Hearing," Defendant argues that it *is* subject to personal jurisdiction in the Central District of California. Defendant appears to have abandoned this argument, because it was not argued in either its May 23, 2007 "Memorandum in Support of Vacating Attachment" (hereinafter, "Reply") or at the hearing. Regardless of whether Defendant meant to abandon this argument, Defendant offers no evidence of the second required prong – that it can be found for service of process in the Central District of California. Therefore, the Court finds that, for the purposes of Supplemental Rule 2, Defendant is not "found" in the Central District of California.

### 3. Conclusion

Therefore, the Court finds that Plaintiff has met its burden to survive Defendant's challenge to its Rule B attachment.

### B. Elements That Defendant Must Establish to Have the Attachment Vacated

Although Plaintiff has satisfied its burden under the Supplemental Rules,

the Court may still vacate the attachment if Defendant establishes one of the equitable grounds for vacatur set forth in *Aqua Stoli*, 460 F.3d at 445. According to *Aqua Stoli*, "a district court may vacate the attachment if the defendant shows at the Rule E hearing that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|

| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. |
|---|---|

. . . the defendant is subject to suit in a convenient adjacent jurisdiction." *Id.*[4] Defendant argues that (1) it is subject to suit in the Northern District of California (the "Northern District") and (2) the Northern District is a convenient adjacent jurisdiction.

### 1.    Whether Defendant Is Subject to Suit in the Northern District of California

As stated above, Defendant must prove first that it is subject to personal jurisdiction in the Northern District and second, that it can be found there for service of process. *See, State of Oregon State Highway Commission,* 398 F.2d at 874. Defendant does have an agent for service of process in the Northern District. As stated above, however, Frevola's search for Defendant's presence in California yielded no business address or telephone number. (Declaration of Michael J. Frevola, Esq. in Support of Plaintiffs' [sic] *Ex Parte* Application ¶ 7).

In its May 23, 2007 Reply, Defendant for the first time claims to have an office and place of business in the Northern District at 228 Hamilton Avenue, Suite 325, Palo Alto, California 94301. (Reply, 4:11; Manalac Reply Decl. ¶ 4). Defendant states that it has two full time employees working at this office and has had at least two such employees there since March 2006. (Reply, 4:11-13; Manalac Reply Decl. ¶ 4).

At the hearing, the Court expressed skepticism about the adequacy of Defendant's evidence establishing that it has an office in the Northern District.[5] The Court noted that

---

[4] Defendant does not argue the two other bases for a district court to vacate the attachment that are set forth in *Aqua Stoli. Aqua Stoli,* 460 F.3d at 445.

[5] Despite the claimed existence of this office, there is no California office address listed in the "Foreign Limited Partnership Application for Registration" that Defendant filed with the California Secretary of State on March 14, 2006. (Manalac Decl., Ex. 1). In an effort to corroborate the existence of the office, Defendant submits an April 17, 2007 invoice from a third-party supplier for office, furniture, and communications rent. (Manalac Reply Decl. ¶ 4, Ex. 1). Manalac claims this invoice demonstrates the Palo Alto office address and that the office is used for business purposes. (*Id.*). However, the invoice contains no office address whatsoever for Defendant, either in Palo Alto or its Houston headquarters. (*Id.* at Ex. 1). Instead, the space in the invoice that would

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|

| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. |
|---|---|

Defendant's filings on May 21 and May 22 made no mention of this office or argument that Defendant is subject to personal jurisdiction in the Northern District.[6] Defendant's counsel explained that this omission was due to the rush to submit these filings, but Defendant had ample time since the writ was entered on May 12.

Defendant mentioned the alleged office for the first time in its Reply, and the only evidence supporting its existence is Manalac's sloppy reply declaration. In any event, the Court makes no conclusive finding on whether Defendant is subject to suit in the Northern District.

> **2.     Whether the Northern District is a Convenient Adjacent Jurisdiction**

*Aqua Stoli* addresses the question of whether an adjacent jurisdiction is "convenient" as follows:

> The concept of "convenience," however, is a narrowly circumscribed one: A district court may vacate a maritime attachment only if the defendant would be subject to an in personam lawsuit in a jurisdiction adjacent to the one in which the attachment proceedings were brought. An "across the river" case where, for example, assets are attached in the Eastern District but the defendant is located in the Southern District is a paradigmatic example of a case where an attachment should be vacated. It is less clear to us that a district court could vacate an attachment on convenience grounds where the adjacent district is more remote and therefore less obviously "convenient" to the plaintiff.

*Aqua Stoli*, 460 F.3d at 444.

---

presumably list Defendant's address is conspicuously blank. (*Id.*). The only address actually listed on the invoice is that of the company that sent the invoice to Defendant. *Id.*

[6] These filings were the May 21, 2007 "Memorandum in Support of Application for a Prompt Post-Attachment Hearing" and the May 22, 2007 "Amended Memorandum in Support of Application for a Prompt Post-Attachment Hearing."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3144 AHM (SHx) | | Date | May 25, 2007 |
|---|---|---|---|---|
| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. | | | |

It is noteworthy that the "paradigmatic example" of the Southern and Eastern Districts of New York are the only jurisdictions in which the parties or the Court have found an attachment that was vacated because Defendant was subject to suit in a convenient adjacent jurisdiction. *See, e.g., Royal Swan Navigation Co. Ltd. v. Global Container Lines Ltd.*, 868 F.Supp. 599 (S.D.N.Y. 1994) (court's approach later rejected in *Aqua Stoli*, 460 F.3d at 446). Defendant argues that the Central and Northern Districts of California are similarly "across the river" from each other. The federal courthouse in Foley Square is some two miles across the East River from the federal courthouse in Cadman Plaza. The closest federal courthouse in the Northern District, in San Jose, is over 300 miles from this Court. Defendant further argues that the Northern District is convenient because Plaintiff's counsel has an office in San Francisco. Defendant fails to present any cases, however, in which courts found it appropriate to consider the Plaintiff's (or Plaintiff's counsel's) contacts in the adjacent district. Thus, the Court finds that the Northern District is not a "convenient adjacent jurisdiction" for purposes of vacating the attachment.

### 3.    Conclusion

The Court finds that Defendant has not met its burden of proving that the attachment should be vacated because Defendant is subject to suit in a convenient adjacent jurisdiction. The court-made bases for vacating attachments set forth in *Aqua Stoli* are designed to avoid the inequity resulting when a plaintiff technically meets the requirements in the Supplemental Rules, but may be seeking the attachment in the forum district for an improper purpose. That is not the case here. In the most basic sense, this dispute arose because Plaintiff paid Defendant for fuel that Defendant never delivered. The Court finds that equity dictates maintaining the attachment to the benefit of the party that paid, rather than vacating the attachment to the benefit of the party that received payment but did not deliver.

//

//

//

//

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3144 AHM (SHx) | Date | May 25, 2007 |
|---|---|---|---|

| Title | ROYAL CARIBBEAN CRUISES LTD. v. NATIONAL BIOFUELS, L.P. |
|---|---|

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's *ex parte* application to vacate the attachment.[7]

THIS ORDER IS NOT INTENDED FOR PUBLICATION.

_____ : _____

Initials of Preparer          _____

---

[7] Dkt. No. 15.

# FREVOLA
# DECLARATION
# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITIES & MINERALS ENTERPRISE LTD.,

                      Plaintiff,

    -against-

GRETCHEN SHIPPING INC.,

                    Defendant.

**ECF CASE**

13 Civ. 6548 (PKC)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE THE ATTACHMENT

**Lyons & Flood, LLP**

Of Counsel:

Jon Werner

Attorneys for Defendant
GRETCHEN SHIPPING INC.
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

ARGUMENT.................................................................................................................................. 4

POINT I       PLAINTIFF BEARS THE BURDEN OF SHOWING
THAT AN ATTACHMENT SHOULD NOT BE
VACATED UNDER RULE E(4)(F) .......................................................... 4

POINT II      THE ATTACHMENT ORDER MUST BE VACATED
BECAUSE PLAINTIFF DOES NOT POSSESS A *PRIMA
FACIE* ADMIRALTY CLAIM ................................................................. 4

POINT III     THE ATTACHMENT ORDER MUST BE VACATED
BECAUSE GRETCHEN HAS NO ATTACHABLE
PROPERTY INTEREST IN THE LETTER OF CREDIT ........................ 7

POINT IV    THE ATTACHMENT ORDER MUST BE VACATED
BECAUSE THE LETTER OF CREDIT IS NOT
LOCATED WITHIN THE DISTRICT ..................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Indus. v. Apple Films*, 39 N.Y.2d 670 (1976) ............................................................. 7, 8

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006) .................... 1, 4

*Chuidian v. Phillipine Nat'l Bank*, 976 F.2d 561 (9th Cir. 1992) .................................................. 10

*Diakan Love, S.A. v. Al-Haddad Bros. Enterprises, Inc.*, 584 F. Supp. 782 (S.D.N.Y. 1984) ...................................................................................................................................... 9

*Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420 (S.D.N.Y. 1987) ..................... 9

*In re M.J. Sales & Distributing Co.*, 25 B.R. 608 (Bankr. S.D.N.Y. 1982) ................................... 9

*In re North Shore & Central Illinois Freight Co.*, 30 B.R. 377 (Bankr. N.D. Ill. 1983) ............... 9

*In re Page*, 18 B.R. 713 (D.C.D.C. 1982) .................................................................................... 9

*In re Planes, Inc.*, 29 B.R. 370 (Bankr. N.D. Ga. 1983) ............................................................... 9

*In re Twist Cap, Inc.*, 1 B.R. 284 (Bankr. D. Fla. 1979) ............................................................... 9

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ................. 5, 6

*Maritima Petroleo e Engenharia Ltda v. Ocean Rig IA*, 78 F. Supp. 2d 162 (S.D.N.Y. 1999) ...................................................................................................................................... 6

*Prime Shipping Company Ltd. v. Wajilam Exports Pte. Ltd.*, 2006 U.S. Dist. LEXIS 34637 (S.D.N.Y. 2006) ................................................................................................................ 9

*Reed Int'l Trading Corp. v. Donau Bank AG*, 866 F. Supp. 750 (S.D.N.Y. 1994) ..................... 10

*Reibor International, Ltd. v. Cargo Carriers (KACZ-CO.), Ltd.*, 759 F.2d 262 (2d Cir. 1985) ....................................................................................................................................... 7, 9

*RSB Manufacturing Corp. v. Bank of Baroda*, 15 B.R. 650 (S.D.N.Y. 1981) ............................. 10

*Sabolyk v. Morgan Guaranty Trust Co. of New York*, No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y. 1984) ................................................................................................................. 10

*Shipping Corp. of India v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58 (2d Cir. 2009) ..................... 7

*Sisson v. Ruby*, 497 U.S. 358 (1990) ............................................................................................ 5

*Supreme Merchandise Co. v. Chemical Bank*, 70 N.Y.2d 344 (1987) .................................. 7, 8, 9

**Treatises**

1 Thomas J. Schoenbaum, Admiralty and Maritime Law (2d ed. 1999) ........................................ 6

**Rules**

Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset
Forfeiture Actions ................................................................................................................. 1

Rule E(4) of the Supplemental Rules for Admiralty or Maritime Claims and Asset
Forfeiture Actions ............................................................................................................. 1, 4

.

## PRELIMINARY STATEMENT

Defendant, GRETCHEN SHIPPING INC. ("GRETCHEN"), through its attorneys, Lyons & Flood, LLP, hereby submits this Memorandum of Law in support of its motion to vacate the Ex Parte Order For Process of Maritime Attachment and Garnishment ("Attachment Order") issued to plaintiff COMMODITIES & MINERALS ENTERPRISE LTD. ("CME") on September 17, 2013, pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") and Local Admiralty Rule E.1. Accompanying this Memorandum of Law are the Affirmation of Jon Werner dated September 19, 2013 ("Werner Aff."), and the Exhibits attached thereto, to which this Court is respectfully referred.

The dispositive issues for adjudication by this Court are:

1. Whether CME's claim for fraudulent inducement constitutes a "valid *prima facie* admiralty claim" under *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006);

2. Whether GRETCHEN has an attachable property interest in the letter of credit sought to be restrained by CME; and

3. Whether the letter of credit sought to be restrained by CME constitutes property within the district.

As set forth more fully below, CME's fraudulent inducement claim is not considered to be an "admiralty" claim under Federal maritime law (which governs this dispute pursuant to Clause 22 of the relevant charter party) and therefore, cannot support admiralty jurisdiction in this case, let alone a Supplemental Rule B attachment. In addition, the Attachment Order must

be vacated because GRETCHEN does not possess an attachable property interest in the letter of credit sought to be restrained, which in any event is not located within the district.

## STATEMENT OF FACTS

Defendant GRETCHEN is the registered owner of the M/V GENERAL PIAR, a self-unloading feeder vessel. This action, which was commenced on September 17, 2013, seeks security for CME's claim that GRETCHEN fraudulently induced CME into entering into the January 25, 2010 "BALTIME 1939" time charter of the M/V GENERAL PIAR for a period of 60 months (the "Charter Party"). A copy of the Charter Party is attached as Exhibit 1 to plaintiff's Verified Complaint – *see* Werner Aff. at Exhibit A.

One of the terms of the Charter Party was that CME was required to obtain an irrevocable standby letter of credit from a first-class bank with offices in Miami in the amount of $2.5 million in favor of GRETCHEN to serve as security for the hire payments owed by CME under the Charter Party. *See* Exhibit 1 to Exhibit A of Werner Aff. at Clause 25.

CME obtained the letter of credit from Citibank, N.A. on January 28, 2011, for a term of 60 months. Pursuant to Clause 25 of the Charter Party, one of four conditions must be met before GRETCHEN may draw from the letter of credit: (1) CME's nonpayment of the hire due to GRETCHEN; (2) an arbitration award against CME in favor of GRETCHEN; (3) CME's failure to renew the letter of credit; or (4) CME's failure to reinstate the letter of credit following two consecutive draws. A copy of the letter of credit is attached as Exhibit D to the Werner Aff.

The letter of credit describes the "DATE AND PLACE OF EXPIRY" as being "AT THE OFFICE OF OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610" and further directs that documents in support of drafts be remitted by courier to "CITIBANK N.A., C/O ITS SERVICER

2

CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FL 33610, ATTN: U.S. STANDBY DEPT." *See* Exhibit D to Werner Aff.

On June 25, 2012, CME initiated arbitration proceedings before the Society of Maritime Arbitration in New York, as contemplated by Section 22(B) of the Charter Party. The arbitral panel has been convened, the parties have made submissions, and the arbitration proceedings remain pending. In those proceedings, CME aims to recover the damages it claims to have suffered as a result of certain alleged deficiencies with respect to the M/V GENERAL PIAR, and further seeks rescission of the Charter Party based on an alleged material breach by GRETCHEN.

In June of 2012, CME also filed injunction proceedings and sought a temporary restraining order in a Federal district court in Miami to restrain GRETCHEN from drawing down on the letter of credit posted by CME in GRETCHEN's favor to secure payment of hire. CME requests for relief were denied in their entirety and the Miami lawsuit was dismissed in September of 2012.

Now, CME is trying once again to prevent GRETCHEN from obtaining payment of the hire that it is justly entitled to, by seeking to attach the letter of credit issued by Citibank N.A. in this Supplemental Rule B action.

## ARGUMENT

### POINT I

### PLAINTIFF BEARS THE BURDEN OF SHOWING THAT AN ATTACHMENT SHOULD NOT BE VACATED UNDER RULE E(4)(f)

It is well-established that under Supplemental Rule E(4)(f), the burden is on the plaintiff to demonstrate why the attachment should not be vacated. *Aqua Stoli*, *supra* at 460 F.3d at 445. To sustain its burden on a motion to vacate, a plaintiff must demonstrate that the filing and service requirements of Supplemental Rules B and E have been met and, in addition, that: (a) it has a "valid *prima facie* admiralty claim" against the defendant; (b) the defendant cannot be found within the district; (c) the defendant has property within the district that has been restrained; and (d) there is no statutory or maritime bar to the attachment. *Id.* at 445.

Thus, CME has the burden to establish, *inter alia*, that it has a "valid *prima facie* admiralty claim" against GRETCHEN, that GRETCHEN has property within the district, and that there is no statutory or maritime bar to the attachment. As set forth below, CME cannot carry these burdens and therefore, GRETCHEN respectfully submits that the Attachment Order should be vacated and CME's action dismissed with prejudice.

### POINT II

### THE ATTACHMENT ORDER MUST BE VACATED BECAUSE PLAINTIFF DOES NOT POSSESS A *PRIMA FACIE* ADMIRALTY CLAIM

As noted above, it is well-settled under the Second Circuit's decision in *Aqua Stoli* that a plaintiff such as CME must establish the existence of a valid *prima facie* admiralty claim against the defendant in order to survive a motion to vacate under Supplemental Rule E(4)(f).

CME is seeking security for its claim that GRETCHEN fraudulently induced it to enter into the Charter Party. However, under Federal maritime law, which pursuant to Clause 22 of

4

the Charter Party is the governing law, CME's claim for fraudulent inducement does not support maritime jurisdiction.

In its Verified Complaint, plaintiff CME has alleged that "[t]his is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims for the fraudulent inducement of a maritime contract, i.e., an executed time charter party for the employment of a seagoing cargo. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is brought under the provision of Rule B of the Supplemental Rules For Certain Admiralty and Maritime Claims, and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration." *See* Exhibit A to Werner Aff. at ¶ 4.

While fraudulent inducement can qualify as a maritime tort in some circumstances, it cannot and does not qualify in this case. The Supreme Court has developed a two-pronged test to determine whether a tort falls within the scope of federal admiralty jurisdiction. The first prong examines the locality of the injury. A tort satisfies the locality requirement if it "occurred on navigable waters" or if the "injury suffered on land was caused by a vessel on navigable water." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

The second prong considers the connection between the tort and traditional maritime activity. A tort satisfies the connection requirement if it both has "'a potentially disruptive impact on maritime commerce'" and is of a general category of activities with "'a substantial relationship to traditional maritime activity.'" *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 364 (1990)).

"[A] party seeking to invoke federal admiralty jurisdiction ... over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Grubart*, *supra*,

513 U.S. at 534. *See also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 3-5 at 78

(2d ed. 1999) (the test for admiralty tort jurisdiction "requires that an incident (1) occur on

navigable waters; (2) bear a substantial relationship to traditional maritime activity; and (3) have

a potential impact on maritime commerce"); *Maritima Petroleo e Engenharia Ltda v. Ocean Rig*

*IA*, 78 F. Supp. 2d 162, 171 (S.D.N.Y. 1999) ("Intentional torts, such as fraud, misrepresentation

and fraudulent inducement to contract 'must have an effect on navigable waters to be within

admiralty jurisdiction.'") (quoting 1 Schoenbaum § 3-5 at 79).

Here, CME's fraudulent inducement claim does not meet any of the criteria outlined by

the Supreme Court in *Grubart*. The fraudulent inducement did not occur on navigable waters,

since any misrepresentations which are alleged to have occurred most certainly occurred on land

when the parties were negotiating and executing the Charter Party. Once the Charter Party was

entered into, the alleged fraud in the inducement was complete and thus, all potential tortious

acts occurred on land. Nor do the alleged tortious acts complained of bear any relationship to

traditional maritime activities or have a potential impact of maritime commerce. Therefore,

defendant GRETCHEN respectfully submits that the Attachment Order must be vacated for lack

of a *prima facie* admiralty claim, and furthermore that plaintiff's claims must be dismissed for

lack of subject matter jurisdiction. *See, e.g., Maritima, supra*, 78 F. Supp. 2d at 172 (holding

that where "there is no evidence that any element of the alleged fraud was committed anywhere

close to navigable water, or had any effect on water, plaintiff's tort claim is dismissed for lack of

maritime jurisdiction.")

## POINT III

### THE ATTACHMENT ORDER MUST BE VACATED
### BECAUSE GRETCHEN HAS NO ATTACHABLE
### PROPERTY INTEREST IN THE LETTER OF CREDIT

Even if CME possessed the necessary *prima facie* valid maritime claim to support a

Supplemental Rule B attachment in this case, the attachment of the letter of credit issued by

Citibank N.A. must fail, because GRETCHEN does not possess an attachable property interest in

the letter of credit.

At the outset, it should be noted that New York state law governs the issues of the nature

and *situs* of the property sought to be attached. *See, e.g., Shipping Corp. of India v. Jaldhi*

*Overseas PTE Ltd.*, 585 F.3d 58, 70 (2d Cir. 2009) ("When there is no federal maritime law to

guide our decision, we generally look to state law to determine property rights") (citing to *Reibor*

*International, Ltd. v. Cargo Carriers (KACZ-CO.)*, Ltd., 759 F.2d 262, 266 (2d Cir. 1985)).

It is well-settled under New York law that a beneficiary's interest in an executory letter

of credit is not considered property of the beneficiary for the purposes of attachment.  In

*Supreme Merchandise Co. v. Chemical Bank*, 70 N.Y.2d 344 (1987), the Court of Appeals

examined the then novel issue of whether a beneficiary had an attachable property interest in a

letter of credit under circumstances where it was executory, meaning that no draft seeking

payment had been made to the negotiating bank.  It considered an argument that the property

interest involved is akin to the contingent property interests involved in *ABKCO Indus. v. Apple*

*Films*, 39 N.Y.2d 670 (1976), which concerned an agreement to pay a portion of net profits from

promotion of a film that had not been released yet, but ultimately rejected that argument, holding

that "[t]here is a different, and in a relevant sense even greater, contingency in the beneficiary's

interest here than in ABKCO." *Id.* at 350.

Specifically, the Court of Appeals held that:

> A letter of credit "is an executory contract that conditions performance of the issuer's obligation (payment) upon performance by the beneficiary (delivery of specified documents)." (Harfield, Letters of Credit, at 79 [ALI-ABA Uniform Commercial Code Practice Handbook 1979] [Letters of Credit].) In the absence of compliance with the terms and conditions of a letter of credit, the issuing bank owes nothing to the beneficiary. Whereas the debtor's interest in ABKCO was contingent solely as to value, which depended on events beyond its own control, Kinzoku's interest is dependent upon its own future performance. Before payment would be due, Kinzoku would have to perform by timely shipment of the goods, compliance with the terms of the credit, and presentation of conforming documents. Given that a beneficiary of a letter of credit retains the option to defeat the interest and render it worthless, we are mindful that allowing attachment in this instance -- unlike ABKCO -- could serve as a disincentive to a beneficiary's performance of the underlying contract as well as the terms of the letter of credit. While this contingency is particularly pertinent in a situation where the beneficiary is a seller of goods thousands of miles from New York, we nevertheless agree with the court below that even claims that depend on further action by the debtor may constitute "property" and that this distinction from ABKCO is not alone dispositive (see, 117 AD2d 424, 431, supra).

> The more profound difference from ABKCO, however, lies in the fact that what is at issue here is Kinzoku's interest in a negotiable letter of credit, an instrument extensively used in domestic and international trade, which because of its unique character typically implicates others than the immediate parties to the underlying transaction. The transaction before us, for example, involves not only Kinzoku and its buyer, but also the issuing bank and two negotiating banks -- none of whom had any part in the dispute between petitioner and Kinzoku, yet whose interests could be affected by permitting attachment of Kinzoku's interest in the letter of credit.

*Id.* at 350-351.

The Court of Appeals then concluded that for policy reasons that rationale of *ABKCO* could not be extended to letter of credit, on the basis that "letters of credit have been recognized 'as an essential lubricant that permits the wheels of international trade to turn' as 'indispensable

to international trade' and as 'an invaluable tool that can be employed to facilitate an unlimited variety of transactions.'". *Id.* at 351-352.

A number of Federal courts have similarly held that the proceeds of letters of credit are not subject to attachment. *See, e.g., Prime Shipping Company Ltd. v. Wajilam Exports Pte. Ltd.*, 2006 U.S. Dist. LEXIS 34637 (S.D.N.Y. 2006); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420 (S.D.N.Y. 1987); *Diakan Love, S.A. v. Al-Haddad Bros. Enterprises, Inc.*, 584 F. Supp. 782 (S.D.N.Y. 1984). The same question has arisen in the bankruptcy setting, and those courts have reached a similar conclusion. *See In re North Shore & Central Illinois Freight Co.*, 30 B.R. 377 (Bankr. N.D. Ill. 1983); *In re Planes, Inc.*, 29 B.R. 370 (Bankr. N.D. Ga. 1983); *In re M.J. Sales & Distributing Co.*, 25 B.R. 608 (Bankr. S.D.N.Y. 1982); *In re Page*, 18 B.R. 713 (D.C.D.C. 1982); *but see In re Twist Cap, Inc.*, 1 B.R. 284 (Bankr. D. Fla. 1979).

Here, because no draft has been made under the letter of credit at issue, it remains executory. Therefore, the service of the Attachment Order on Citibank N.A. cannot reach any property of GRETCHEN since prior to the presentation of conforming documents, Citibank N.A. is neither indebted to GRETCHEN nor does it hold any of property of GRETCHEN. As the Second Circuit explained in Reibor, an attachment is void unless a garnishee actually "possesses" a defendant's property when the attachment is served. *Reibor, supra*, 759 F.2d at 266.

Moreover, even if a draft had been made, or were to be made, the same policy reasons set forth by the Court of Appeals in *Supreme Merchandise Co.* would mandate that the proceeds of the letter of credit be deemed not be the property of GRETCHEN for the purposes of attachment. In sum, letters of credit and their proceeds are not attachable property under New York state law,

and therefore, the Attachment Order in this case should be vacated since the only property sought to be restrained is forever outside the reach of the Attachment Order.

## POINT IV

### THE ATTACHMENT ORDER MUST BE VACATED BECAUSE THE LETTER OF CREDIT IS NOT LOCATED WITHIN THE DISTRICT

As noted above, plaintiff CME also bears the burden of establishing that the property sought to be restrained under the Attachment Order is located within the district.

Here, CME cannot meet that burden because the letter of credit plainly states on its face that its place of expiry and the location to which documents in support of drafts must be remitted to, are in Tampa, Florida – not in New York. *See* Exhibit D to Werner Aff. This also comports with the requirement in Clause 25 of the Charter Party that the letter of credit be procured from a first-class bank with offices in Miami.

Thus, defendant respectfully submits that Tampa, Florida as the place of issuance of the letter of credit, is also the place of performance of the letter of credit, and therefore the legal *situs* of the letter of credit. *See, e.g., Reed Int'l Trading Corp. v. Donau Bank AG,* 866 F. Supp. 750, 755, n.2 (S.D.N.Y. 1994) ("Under letter of credit law, the place of issuance of the letter of credit determines the place of its performance"); *Chuidian v. Phillipine Nat'l Bank,* 976 F.2d 561, 562 (9th Cir. 1992) ("place of issuance of a letter of credit … determine[s] the place of its performance"); *Sabolyk v. Morgan Guaranty Trust Co. of New York,* No. 84 Civ. 3179, 1984 WL 1275 (S.D.N.Y. 1984) (unpublished decision); *RSB Manufacturing Corp. v. Bank of Baroda,* 15 B.R. 650, 653-54 (S.D.N.Y. 1981) (looking to the place of issuance of a letter of credit to determine the place of its performance).

Since the place of performance (and thus, the legal *situs*) of the letter of credit is outside the district, plaintiff CME's attachment must be vacated.

## **CONCLUSION**

For the foregoing reasons, defendant GRETCHEN respectfully requests that this Court

grant the within motion, vacate the Attachment Order, dismiss CME's action with prejudice,

release any and all property attached or restrained pursuant to the Attachment Order, and award

such other and further relief as the Court may deem just and proper.

Dated: September 19, 2013
     New York, New York

<div style="margin-left:300px">

LYONS & FLOOD, LLP
Attorneys for Defendant
GRETCHEN SHIPPING INC.

</div>

By:      _____

<div style="margin-left:300px">

Jon Werner
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400
jwerner@lyons-flood.com

</div>

U:\kmhldocs\2600053\Motions\MOL-vacate.doc

## CERTIFICATE OF SERVICE

Jon Werner, an attorney duly admitted to practice before this Honorable Court, affirms on

this 19th day of September 2013, I served true copies of the foregoing, via CM/ECF and by e-

mail to:

Holland & Knight LLP
31 West 52nd Street
New York, NY 10019

Attn:   Michael J. Frevola, Esq.
**michael.frevola@hklawa.com**

Christopher R. Nolan, Esq.
**christopher.nolan@hklaw.com**

Marie E. Larson, Esq.
**marie.larsen@hklaw.com**

_____
Jon Werner

U:\kmhldocs\2600053\Motions\MOL-vacate.doc

12

Michael J. Frevola
Christopher R. Nolan
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd St.
New York, NY  10019
Telephone:  (212) 513-3200
Telefax:  (212) 385-9010
michael.frevola@hklaw.com
christopher.nolan@hklaw.com
marie.larsen@hklaw.com

ATTORNEYS FOR PLAINTIFF
COMMODITIES & MINERALS ENTERPRISE LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITIES & MINERALS ENTERPRISE LTD.,<br><br>        Plaintiff,<br><br>    -against-<br><br>GRETCHEN SHIPPING INC.,<br><br><br>        Defendant. | Civil Action No. 13-CV- 6548 (PKC) |

**COMMODITIES & MINERALS ENTERPRISE LTD.'S MEMORANDUM OF
LAW IN OPPOSITION TO DEFENDANT GRETCHEN SHIPPING INC.'S
MOTION TO VACATE THE MARITIME ATTACHMENT ORDER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 2

ARGUMENT ............................................................................................................................... 2

   I.   PLAINTIFF HAS THE BURDEN TO SHOW VACATUR IS INAPPROPRIATE
       UNDER SUPPLEMENTAL RULE E(4)(f) ....................................................................... 2

   II.  CME'S FRAUD IN THE INDUCEMENT CLAIM SOUNDS IN ADMIRALTY ............ 3

   III. GRETCHEN'S INTERPRETATION OF ITS DRAW DOWN RIGHTS ON THE
       IRREVOCABLE STANDBY LETTER OF CREDIT ARE TOO NARROW AND
       INCONSISTENT WITH THE FACTS OF THIS CASE ................................................. 12

   IV. PROCEEDS FROM THE CITIBANK STANDBY LETTER OF CREDIT ARE
       REMITTED IN NEW YORK........................................................................................... 19

CONCLUSION........................................................................................................................... 21

## TABLE OF AUTHORITIES

Page(s)

CASES

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
    460 F.3d 434 (2d Cir. 2006)..................................................................................................2

*Archawski v. Hanioti,*
    350 U.S. 532 (1956)...................................................................................................... 9-10

*Blue Whale Corp. v. Grand China Shipping Dev't Corp.,*
    722 F.3d 488 (2d Cir. 2013).................................................................................................3

*Brenntag Int'l Chem., Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999)...............................................................................................12

*Chuidian v. Phillippine Nat'l Bank,*
    976 F.2d 561 (9th Cir. 1992) ..............................................................................................18

*Diakan Love, S.A. v. Al-Haddad Bros. Enter.,*
    584 F. Supp. 782 (S.D.N.Y. 1984) .....................................................................................17

*Daye Nonferrous Metals Co. v. Trafigura,*
    No. 96 Civ. 9740, 1997 WL 375680 (S.D.N.Y. July 7, 1997) .................................................16

*Ferrostaal Metals Corp. v. S.S. Lash Pacifico,*
    652 F. Supp. 420 (S.D.N.Y. 1987) .....................................................................................17

*Harry Hoffman Printing v. Graphic Communications, Int'l Union, Local 261,*
    912 F.2d 608 (2d Cir.1990)...................................................................................................8

*Ice Flake Maritime Ltd. v. Westcoat AS,*
    No. 07 Civ. 2002, 2007 WL 2979471 (S.D.N.Y. Oct. 11, 2007) ............................................2

*In re Kinoshita & Co. Ltd.,*
    287 F.2d 951 (2d Cir. 1961)...................................................................................................8

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
    513 U.S. 527 (1995)......................................................................................................... 4-5

*Luckenbach v. 500 Tons, More or Less, of Scrap Iron,*
    213 F. 670 (E.D. Pa. 1914) ..................................................................................................9

*Maritima Petroleo e Engenharia Ltda. v. Ocean Rig IA,*
    78 F. Supp. 2d 162 (S.D.N.Y. 1999).....................................................................................7

- ii -

*Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.,*
   722 F. Supp. 1032 (S.D.N.Y. 1989)............................................................................8

*Markel Am. Ins. Co. v. Fitt,*
   528 F. Supp. 2d 1010 (S.D. Cal. 2007)....................................................................10

*Martino v. New Hampshire Ins. Co.,*
   No. 88-4876, 1990 WL 67223 (E.D. Pa. May 18, 1990).........................................10

*McAllister Bros., Inc. v. Ocean Marine Indem. Co.,*
   742 F. Supp. 70 (S.D.N.Y. 1989) ............................................................................10

*Milestone Shipping, S.A. v. Estech Trading LLC,*
   811 F. Supp. 2d 915 (S.D.N.Y. 2011)........................................................................8

*N. Insur. Co. v. Lamm,*
   2007 AMC 901 (11th Cir. 2005)..............................................................................10

*Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels,*
   512 Fed. Appx. 890, 2013 WL 880074, (11th Cir. Mar. 11, 2013) ......................5-7

*Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels,*
   636 F.3d 1338 (11th Cir. 2011) ..............................................................................5-7

*Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels,*
   No. 8:06-cv-1685, 2010 WL 3259707 (M.D. Fla. Aug. 18, 2010)...........................5

*Prime Shipping Co. Ltd. v. Wajilam Export(s) PTE Ltd.,*
   No. 06 Cv. 1183, 2006 WL 1539330 (S.D.N.Y. June 2, 2006)...............................17

*Pringle v. Water Quality Ins. Syndicate,*
   646 F. Supp. 2d 1161 (C.D. Cal. 2009) ..................................................................10

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.,*
   585 F.3d 58 (2d Cir. 2009)........................................................................................2

*Sotheby's, Inc. v. Minor,*
   08 Civ. 7694 (BSJ)(HBP), 2009 WL 3444887 (S.D.N.Y. Oct. 26, 2009)................9

*Sperry Int'l Trade Inc. v. Gvt. of Israel,*
   689 F.2d 301 (2d Cir. 1982)........................................................................... 13-14, 16

*Supreme Merchandise Co. v. Chemical Bank,*
   70 N.Y.2d 344 (1978) ..................................................................................... 11, 16-17

*United Fruit Co. v. U.S.,*
   1951 AMC 173 (1st Cir. 1951)...................................................................................8

*Williamson v. Recovery Ltd.,*
    542 F.3d 43 (2d Cir. 2008)........................................................................................6

STATUTES

28 U.S.C. § 1333 ........................................................................................5

Fed. R. Civ. P. Supplemental Rule B(3)(a)........................................................15

Fed. R. Civ. P. Supplemental Rule C................................................................16

Fed. R. Civ. P. Supplemental Rule E(4)(f) .......................................................1, 2


OTHER AUTHORITIES

*Morrison, The Remedial Powers of the Admiralty*, 43 Yale L.J. 1 (1933) ...................10

Thomas J. Hall, *Letters of Credit*, 7 Bus. & Com. Litig. Fed. Cts.
    § 82:50  (Robert L. Haig ed., 3d ed. 2012) .........................................................13

## PRELIMINARY STATEMENT

Plaintiff Commodities and Minerals Enterprise Ltd. ("CME"), respectfully submits this opposition to Defendant Gretchen Shipping Inc.'s ("Gretchen") expedited motion pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to vacate the Court's *Ex Parte* Order for Process of Maritime Attachment dated September 17, 2013 (the "Attachment Order").

The three issues raised by Gretchen's motion – (1) whether CME's fraudulent inducement claim sounds in admiralty; (2) whether CME can attach the proceeds from the standby letter of credit where Gretchen is the sole beneficiary; (3) and whether said proceeds are in fact remitted within this Honorable District – all must be answered in the affirmative.

CME respectfully submits that U.S. Supreme Court and Circuit precedent confirm that the fraud allegations alleged herein, made in connection with an executed maritime charter, sound in admiralty and confer subject matter jurisdiction upon this Court. Further, CME's timing in seeking and obtaining the Attachment Order – within the window between Gretchen being entitled to draw down on the standby letter of credit established by CME and the proceeds actually being transmitted by Citibank – was correct and the proceeds legally may be restrained. Finally, the letter of credit proceeds are remitted from the location of CME's primary account, New York, per Citibank policy. As such, there are in fact assets in New York in which Gretchen has, or may have, a property interest and which could (at least partially) satisfy the damages set forth in CME's Verified Complaint.

Gretchen's vacatur motion should be denied, the Attachment Order should remain in place, and the parties should be left to proceed forward in arbitration.

## FACTUAL BACKGROUND

CME does not dispute the procedural posture set forth by Gretchen in its statement of facts (save its statement of "just" entitlement to hire payments, in light of CME's fraudulent inducement claims). However, CME respectfully refers the Court to its Verified Complaint filed September 17, 2013, and annexed as Exhibit A to the Affirmation of John Werner, counsel for Gretchen, for a complete recitation of the fraudulent inducement allegations made.[1]

For the purposes of determining this motion, CME respectfully refers the Court to the Affirmation of Michael J. Frevola dated September 25, 2013 ("Frevola Aff."), and the Declaration of Carlos Suarez, the Commercial Director of CME, dated September 24, 2013.

## ARGUMENT

I.   PLAINTIFF HAS THE BURDEN TO SHOW VACATUR IS INAPPROPRIATE
     UNDER SUPPLEMENTAL RULE E(4)(f)

Plaintiff agrees with Defendant that Plaintiff must demonstrate the following four elements to maintain the Attachment Order issued by the Court: (1) a valid *prima facie* admiralty claim; (2) the defendant must be "absent" from the district; (3) the defendant's property must be within the district; and (4) there is no statutory or maritime bar. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006), *overruled on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.,* 585 F.3d 58 (2d Cir. 2009)[2]; *Ice Flake Maritime Ltd. v. Westcoat AS*, No. 07 Civ. 2002, 2007 WL 2979471, at *1 (S.D.N.Y. Oct. 11, 2007) (Castel, J.).

---

[1]  CME uses the same defined terms from its Verified Complaint herein.

[2]  *Aqua Stoli* also provided three equitable grounds wherein an attachment may be vacated. 460 F. 3d at 436. None of the three grounds are applicable here nor has Defendant raised any of those equitable arguments.

Gretchen challenges the first and third elements in the *Aqua Stoli* test. CME's pleadings, and the circumstances surrounding the *res* in question, merit the denial of Gretchen's vacatur motion for the reasons set forth below.

## II.   CME'S FRAUD IN THE INDUCEMENT CLAIM SOUNDS IN ADMIRALTY

Gretchen challenges whether this Court has admiralty jurisdiction over CME's fraudulent inducement claim. Gretchen Brief, at 5. However, it does so by addressing the issue in terms of whether CME has "establish[ed] the existence of a valid *prima facie* admiralty claim." *Id.* at 4. The Second Circuit recently instructed that parties must be more careful when addressing the exact terms of the Rule B challenge being made. In *Blue Whale Corp. v. Grand China Shipping Dev't Corp.*, 722 F.3d 488, 494 (2d Cir. 2013), the Second Circuit observed that a Rule B inquiry has both a procedural and substantive component[3] in which different bodies of law could be controlling.

In regard to the procedural aspects of a Rule B claim, the Second Circuit held that

> federal law controls the procedural inquiry, namely, whether a plaintiff's claim sounds in admiralty. [citations omitted]. This question is inherently procedural by virtue of its relationship to the courts' subject matter jurisdiction and, thus, is controlled by federal maritime law. Here, the parties do not dispute that the plaintiff's claim sounds in admiralty because it arises out of a maritime contract.

*Id.* The maritime contract referenced in *Blue Whale* was a vessel charter party -- a quintessential maritime contract such that the parties and the Second Circuit accepted that the dispute sounded in admiralty and subject matter jurisdiction existed. *Id.* at 491-493 (multiple references to the vessel charter party and clauses therein).

---

[3]  The substantive component of the Rule B analysis first requires a determination of the applicable law and then assesses the sufficiency of the plaintiff's allegations supporting the claim to the requirements of the claim under the applicable law. *See Blue Whale*, 722 F.3d at 494. Gretchen does not contest the sufficiency of the allegations of CME's fraudulent inducement claim. As such, CME's opposition focuses on showing its fraudulent inducement claim sounds in admiralty under the general maritime law of the United States.

Here, Gretchen acknowledges a maritime contract the Charter of the Vessel – exists between the parties. Gretchen references Clause 22 of that Charter, which calls for the application of U.S. maritime law to resolve the parties' disputes. But Gretchen then denies that a fraudulent inducement claim arising out of that Charter sounds in admiralty, even where the claimed misrepresentations involve effects felt on navigable waters, including:

(1)     Misrepresentations concerning the Vessel's discharge rate spanning the entire length of the Charter, which ultimately turned out to be less than 40% of the represented rate and which caused the Vessel's operations to be delayed (Verified Complaint ¶ 59);

(2)     Misrepresentations regarding the cost of War Risk Insurance per annum under the Charter spanning the entire length of the Charter, which ultimately turned out to be over 25 times more expensive than represented and cost CME over $300,000 (Verified Complaint ¶ 58); and

(3)     Misrepresentations regarding the recipient of the brokerage commission received every 15 days during the life of the Charter, which commission was added into the hire rate paid on the Vessel and which has amounted to approximately $1 million over the course of the Charter (Verified Complaint ¶¶ 57, 60).

Gretchen's position is incorrect. The Charter is a maritime contract and CME's fraudulent inducement allegations arise specifically out of the formation and execution of that contract.

Gretchen's argument that fraudulent inducement claims cannot come within maritime jurisdiction is premised on the notion that CME cannot satisfy the two-prong test for maritime tort jurisdiction articulated by the Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). *Grubart*'s facts and holdings have little

relationship to the case at bar. *Grubart* involved the question of whether the Admiralty Extension Act allowed the court to assert admiralty jurisdiction over injuries felt on land by property owners which had sustained flooding damage from an incursion of the Chicago River allegedly caused by defendant's maritime construction activities.

*Grubart* was a maritime tort case in which no contractual relationship existed between the plaintiff and defendant. This case, in contrast, does not involve a lawsuit between strangers. Rather, a maritime contract exists between the parties, and a federal appeals court recently has held (relying on Second Circuit precedent) that a fraudulent inducement claim made in the exact same circumstances fell within maritime jurisdiction. *See Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 636 F.3d 1338, 1341 (11th Cir. 2011).

The plaintiff in Odyssey Marine Exploration, Inc. sought damages from a deepwater shipwreck exploratory company when the company failed to properly remunerate him for shipwreck research he conducted on the company's behalf. In particular, the plaintiff alleged: (1) a maritime tort of fraud in the inducement, (2) rescission, and (3) mutual mistake. *See Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, No. 8:06-cv-1685, 2010 WL 3259707, at *1 (M.D. Fla. Aug. 18, 2010).   The district court dismissed the plaintiff's claim for lack of subject matter jurisdiction, finding neither diversity jurisdiction nor admiralty jurisdiction existed. *Id.* at *4. With respect to admiralty jurisdiction, the district court found neither of the alleged contracts "involves maritime commerce" under 28 U.S.C. § 1333 because the research contracts "consists simply of an obligation to pay money in exchange for research" and these obligations did not concern the operation, navigation, or management of a vessel." *Id.* at *4 (quoting and referencing Supreme Court precedent).

- 5 -

The Eleventh Circuit reversed, finding the district court's review of the plaintiff's claim too narrow. In particular, it specifically rejected the notion that the contracts failed to concern maritime commerce because the research provided by the plaintiff assisted in the locating and recovering of a sunken vessel. 636 F.3d at 1340. The Eleventh Circuit noted its conclusion was "bolstered" by the Second Circuit's decision in *Williamson v. Recovery Ltd.,* 542 F.3d 43 (2d Cir. 2008), in which the plaintiffs' non-compete and non-disclosure agreements contained Ohio choice of law clauses nevertheless were held to be maritime contracts subject to admiralty jurisdiction. Although the defendants therein had argued the dispute concerned simple land-based employment contracts with no maritime flavor, the Second Circuit disagreed and found the terms of the contract concerned a maritime venture sufficient to sound in admiralty. *Id.* at 49. The Eleventh Circuit found the Second Circuit's analysis "highly persuasive" and in so finding it reversed the district court's dismissal and reinstated the plaintiff's fraudulent inducement of maritime contracts claims. 636 F.3d at 1341.

Two years later, the Eleventh Circuit would again consider the circumstances surrounding the Odyssey Marine Exploration case, but this time to assess the sufficiency of the allegations pled when facing a motion to dismiss. The appellate court affirmed the dismissal of the district court of the amended complaint, finding in regard to the plaintiff's fraudulent inducement claim that it failed to plead sufficient facts showing injury. 512 Fed. Appx. 890, 2013 WL 880074, at *3 (11th Cir. Mar. 11, 2013).

Significantly, the Eleventh Circuit found that the fact that the plaintiff's contracts had a sufficiently "salty" flavor and therefore found that the plaintiff's fraudulent inducement claim fell within admiralty jurisdiction. The *Odyssey Marine Exploration* 2011 ruling confirms that a fraudulent inducement claim in connection with a maritime contract sounds in admiralty.

- 6 -

Gretchen, like the defendant in *Odyssey Marine Exploration*, argues that "the alleged tortious acts complained of bear [no] relationship to traditional maritime activities or have a potential impact on maritime commerce." Gretchen Brief, at 6. The definition of maritime commerce, in connection with a fraudulently induced maritime contract, is simply broader than Gretchen is willing to concede.

Gretchen cites one case that, on its face, appears to support its argument that a fraudulent inducement claim is not subject to maritime jurisdiction because there was no impact on navigable waters. But review of the facts of that case show that a critical distinction exists– *the underlying contract was not a maritime contract.* In *Maritima Petroleo e Engenharia Ltda. v. Ocean Rig IA*, 78 F. Supp. 2d 162, 171 (S.D.N.Y. 1999), the plaintiff alleged that misrepresentations were made by defendant concerning the completion and delivery date of oil rigs in a memorandum of agreement, which contract the court found (correctly) to be a non-maritime contract. 78 F. Supp. 2d at 165. Starting from that point– in other words, that the MOA was not a maritime contract– it is not surprising that the district court likewise found that plaintiff's misrepresentation claims also were not subject to admiralty jurisdiction.

The *Maritima* decision diverges from *Odyssey Marine Exploration*, and the case at bar as well, because the contracts at issue in *Maritima* – contracts to procure maritime contracts – were not maritime in and of themselves. *Id.* at 169 ("Here, the MOA is not a contract to provide offshore drilling rigs. It is an agreement to *procure* contracts for the future use of defendants' rigs.") (emphasis in original). Because the underlying contract involving the plaintiff's fraudulent inducement claim was not maritime in nature, a fraudulent inducement claim based on that contract likewise was not maritime.

The intertwining of the tort with the parties' contractual relationship likewise was focused upon by the First Circuit in *Carroll v. Protection Maritime Ins. Co.*, 512 F.2d 4 (1st Cir. 1975). In *Carroll*, plaintiff fisherman alleged that the defendant maritime insurance company blacklisted plaintiffs (by telling shipowner that the insurer would not insure the blacklisted men). When the shipowners terminated the claimants' employment or refused to re-hire the plaintiffs as a result of the blacklist, the claimants filed suit in federal court and claimed admiralty jurisdiction over their tortious interference with contract and advantageous business relationship claim against the insurers. *See id.* at 5. The insurers argued that the claimants' tort claim did not occur on navigable waters, hence admiralty jurisdiction was not present. *See id.* The appeals court disagreed, stating:

> [W]e do not read into [cases rejecting admiralty jurisdiction for their torts' strictly land-based nature] the implications that torts, to draw on the passage we have quoted from *Executive Jet Aviation, supra*, which have "no maritime locality", but have an intimate "relationship to maritime service, commerce, or navigation" . . . should be excluded from admiralty jurisdiction.
>
> **The tort alleged in this case seems to us so interwoven with present and potential maritime contractual relationships** – traditional concerns of admiralty – *as to fall within that jurisdiction*. Moreover, as we have noted, **the impact of such a tort as this**, while felt by the blacklisted seamen, **is equally manifest in the operations of the affected vessels.**

*Id.* at 8-9 (emphasis added).

The First Circuit cited numerous cases for its holding. And numerous others likewise support it. This Court's finding that CME's claim sounds in admiralty would also be consistent with decades-old precedent in the Second Circuit as well as other jurisdictions. Over 50 years ago, the Second Circuit affirmed the compelling of arbitration of a fraudulent inducement claim arising out of a vessel charter party. *See In re Kinoshita & Co. Ltd.*, 287 F.2d 951, 953 (2d Cir. 1961). Because it is well settled that "[t]here must be an independent basis of jurisdiction before

a district court may entertain petitions under the [Federal Arbitration] Act," *Harry Hoffman Printing v. Graphic Communications, Int'l Union, Local 261*, 912 F.2d 608, 611 (2d Cir. 1990), it necessarily follows the Second Circuit accepted admiralty jurisdiction existed when affirming the compelling of arbitration under section 4 of the Federal Arbitration Act. *Id.*

Moreover, 130 years ago, the Eastern District of Pennsylvania ruled under its admiralty jurisdiction that a charter procured through the fraud of brokers was subject to rescission. *The HERO*, 6 F. 526 (E.D. Pa. 1881).[4]

In *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 722 F. Supp. 1032 (S.D.N.Y. 1989), the defendant chartered plaintiff's vessel which then sat idle in Nigeria for an extended period of time.  Plaintiff then sued defendant in admiralty for both breach of charter and fraud. *See id.* at 1033.

In *United Fruit Co. v. U.S.*, 1951 A.M.C. 173 (1st Cir. 1951), the First Circuit found that admiralty jurisdiction permitted rescission of a release that was tendered in connection with a charter party by mistake.

In *Milestone Shipping, S.A. v. Estech Trading LLC*, 811 F. Supp. 2d 915 (S.D.N.Y. 2011), the court assessed in the context of a Rule B attachment action the sufficiency on summary judgment of the plaintiff's fraudulent concealment claim pertaining to an escrow agreement formed in connection with a maritime charter party.

The foregoing cases demonstrate that admiralty jurisdiction frequently is held to exist with respect to fraudulent inducement claims.  This may well be because of the nature of the plaintiff's remedies in the fraudulent inducement and rescission contexts.

---

[4]  Although the case does not explicitly refer to admiralty jurisdiction, the reference to libellant for plaintiff and respondent for defendant are terms used by federal courts sitting in admiralty decades ago.

- 9 -

It is well-settled that a party claiming fraudulent inducement is entitled to sue in the alternative to: (1) ratify the contract and claim damages and (2) seek rescission of the contract, and that the plaintiff need not decide which remedy to elect until after the tribunal has reached its verdict. *See, e.g., Sotheby's, Inc. v. Minor*, 08 Civ. 7694 (BSJ)(HBP), 2009 WL 3444887, *4-5 (S.D.N.Y. Oct. 26, 2009) (citing cases). Gretchen's jurisdiction argument did not recognize that CME has pled these alternative claims. *See* Verified Complaint ¶ 65. If CME ultimately chooses to recover its damages, which requires ratification of the Charter, there is no question that it is making claim under a maritime contract (i.e., the Charter). Hence, CME's claim squarely subject to admiralty jurisdiction. *See, e.g., Luckenbach v. 500 Tons, More or Less, of Scrap Iron*, 213 F. 670, 675-76 (E.D. Pa. 1914) (plaintiff charterer permitted to recover damages under fraudulently-induced charter party where owner represented that it would not commingle plaintiff's cargo but did).

In regard to former point on damages, CME's claimed damages include $10,000/day overpayment of hire, which amount totals over $13 million in overpayments. In *Archawski v. Hanioti*, 350 U.S. 532 (1956), the plaintiffs sought to recover overpayments made to the owner of a cruise line resulting from a prematurely terminated cruise. The plaintiffs claimed that the defendant had fraudulently absconded with the funds. *Id.* at 533-34. The Court was presented with the question of whether plaintiffs' claims were subject to maritime jurisdiction, which question it answered as follows:

> The truth is that in a case such as the present one there is neither an actual promise to repay the passage moneys nor a second contract. The problem is to prevent unjust enrichment from a maritime contract. *See Morrison, The Remedial Powers of the Admiralty*, 43 Yale L.J. 1, 27 (1933). A court that prevents a maritime contract from being exploited in that way does not reach beyond the domain of maritime affairs. ***We conclude that, so long as the claim asserted arises out of a maritime contract, the admiralty court has jurisdiction over it***.

- 10 -

*Id.* at 535 (emphasis added).

Like the plaintiffs in *Archawski*, here CME claims that it has overpaid substantial amounts to Gretchen and that it would be inequitable for Gretchen to keep those amounts. Hence, CME's claim falls within admiralty jurisdiction.

In regard to the latter point on rescission, rescission frequently is plead as an affirmative defense to a party seeking damages under a contract. Many marine insurance decisions involving rescission fall within admiralty jurisdiction because the insured sues under the maritime contract (the marine insurance policy) and the insurer seeks to rescind. *See N. Ins. Co. v. Lamm*, 2007 AMC 901 (11th Cir. 2005); *Pringle v. Water Quality Ins. Syndicate*, 646 F. Supp. 2d 1161 (C.D. Cal. 2009); *Markel Am. Ins. Co. v. Fitt*, 528 F. Supp. 2d 1010 (S.D. Cal. 2007); *McAllister Bros., Inc. v. Ocean Marine Indem. Co.*, 742 F. Supp. 70 (S.D.N.Y. 1989); *Martino v. New Hampshire Ins. Co.*, No. 88-4876, 1990 WL 67223 (E.D.Pa. May 18, 1990).

Here, if CME elects rescission as its remedy, it essentially is seeking a declaratory judgment that it is not liable to Gretchen for further payments under the Charter. This argument is not speculative − Gretchen this week, only days after the first default on hire, seeks to execute on the $2.5 million Citibank Letter of Credit ("L/C"). *See* Frevola Aff. ¶ 2, Ex. A. There is no question that Gretchen's breach of Charter claims for non-payment of hire are maritime claims that would be subject to admiralty jurisdiction. In a procedurally similar case before the Fourth Circuit, the court held that the nature of the underlying claim to the parties' dispute should not be the "declaratory" application for non-liability, but rather the counter-claimant's cause of action. *In re Lockheed Martin Corp.*, 503 F.3d 351 (4th Cir. 2007). As that court observed:

> This case, like *Beacon Theatres* [*Inc. v. Westover*, 359 U.S. 500 (1959)], involves a declaratory judgment action ***commenced by the party that,*** but for the existence of the declaratory judgment procedure, ***would have been the defendant.*** Although the action sounds in admiralty, that is only because National won the

race to the courthouse door and made the Rule 9(h) designation first. *Beacon Theatres*, however, requires us to ignore National's status as the declaratory judgment plaintiff and to instead look how the action otherwise would have proceeded. Without the declaratory judgment vehicle, Lockheed would have sued National for breach of the insurance policy . . . and would have been entitled [to a jury trial under the savings-to-suitors clause]. . . .

At issue in this case is a dispute over whether an insurer is obligated to indemnify its insured for damage sustained by an insured vessel. ***In the usual course of events*** − that is, without the declaratory judgment vehicle − ***Lockheed would have sued National for breach of the insurance contract. And under the saving-to-suitors clause, Lockheed would have been entitled to a jury trial on that claim. Accordingly, under Beacon Theatres, Lockheed cannot lose its right to a jury trial simply because National initiated the declaratory judgment action.***

*Id.* at 359-60 (emphasis added).

Here, looking at CME's alternative request for rescission, in effect CME is stating that it is entitled to a declaration that it is not liable for any further hire payments under the Charter, i.e., a maritime contract. Hence, once again, the issues are interwoven with the Charter.

For all of the foregoing reasons, CME respectfully submits that its claim are subject to maritime jurisdiction and the use of Rule B is therefore proper.

III.   GRETCHEN'S INTERPRETATION OF ITS DRAW DOWN RIGHTS ON THE IRREVOCABLE STANDBY LETTER OF CREDIT ARE TOO NARROW AND INCONSISTENT WITH THE FACTS OF THIS CASE

CME respectfully disagrees with the conclusion reached by Gretchen that it does not possess an "attachable property interest in the letter of credit" and as such, the Attachment Order must fail. Gretchen Brief, at 7. CME recognizes the "executory" letter of credit line of cases in the context of an attachment order, *id.* at 7-9, and carefully considered the issue before seeking relief before this Court. However, the circumstances surrounding the standby letter of credit between *one* beneficiary and *one* applicant herein differs substantially from the parade of

horribles that could occur in the *negotiable* letter of credit cases primarily relied upon by Gretchen.   Moreover, Gretchen's "no attachable *res*" theory fails to appreciate that facts immediate before and now after CME sought and obtained the Attachment Order.   Simply put, timing matters.

Gretchen's statement at the very end of its third brief point is telling:  "[m]oreover, *even if a draft has been made, or were to be made*, the same policy reasons set forth in the Court of Appeals in *Supreme Merchandise Co.* would mandate that the proceeds of the letter of credit *be deemed not the property* of GRETCHEN for the purposes of attachment."  Gretchen Brief, at 9 (emphasis added).  Gretchen's interest in the L/C, if/when a "draft" has been made, cannot be "deemed" an un-attachable property interest.   In support of this conclusion, we address the terms of the L/C and Gretchen's efforts to draw on the L/C once CME recently failed to remit its charter hire payment.

The L/C, by its own terms, is a $2.5 million "irrevocable standby letter" issued by one bank, Citibank, N.A., and with the sole beneficiary being Gretchen.  *See* Werner Aff., Ex. D at 1. The Second Circuit has noted that, "[a] stand-by letter of credit is meant to be drawn upon only in the event that its applicant fails to make a direct payment to the beneficiary, while a documentary letter is payable upon simple presentation of, *inter alia*, shipping documents." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999).  The terms of the L/C here matches this Circuit's definition of a standby letter of credit.

Clause "A" of the L/C allows Gretchen to draw down on it in the event charter hire for the Vessel is unpaid.  *See* Werner Aff., Ex. D at 1. Per clause 1.1 and 2.1 of the L/C, Gretchen would simply courier Citibank, "a copy of a Gretchen Shipping Inc. invoice for charter hire

marked 'unpaid'" and a certificate authorized by two Gretchen officers certifying that CME had not paid charter hire by the due date. *Id.*

Under "additional conditions", the L/C provides that "partial drawing under this letter are allowed". *Id.* at 2.   In regard to the timing of payment, the L/C notes, "upon receipt of documents in order, we will pay in accordance with your instructions." *Id.* at 3.  The L/C terms are consistent with the Vessel charter. As alleged in paragraph 15 in the Verified Complaint, "[h]ire is payable under the Charter every 15 days as set forth in Part II, Clause 6 of Exhibit 1." In Box 20, when addressing "hire payment", it provides, "[i]n U.S. dollars by swift transfer, hire to be paid punctually and regularly, strictly on time and without any delay ..."  Verified Complaint, Ex. 1 at 1.

As is its custom, Gretchen, through its ship management company Kyma, would email an invoice to CME for the next 15 days of charter hire.  On September 6, 2013, Invoice number 112 was received by CME in the amount of $408,157.03, which encompassed the charter hire period from September 15 to September 30, 2013 and was "due on receipt" on September 15.   On September 16, 2013, with Gretchen not having received the hire payment, a reminder email was sent to CME noting the payment was due. *See* Frevola Aff. ¶ 5, Ex. B (containing the September 6 and 15 emails, along with the overdue invoice).   The next day, a follow-up email was sent to CME noting the lack of charter hire payment and remittance advice. *Id.* ¶ 6, Ex. C.[5]

By the time the September 16 email was sent, per the express terms of the L/C, Gretchen already was entitled to draw down on the L/C for the missed hire payment in the amount of $408,157.03.  CME waited until September 17, 2013 to file its Rule B application to ensure that

---

[5]   Both of these emails were presented to the Court in addition to the filed Rule B attachment papers in order to show the immediacy of the need for an attachment order as Gretchen was entitled to draw down on the L/C as of September 16, 2013 by presenting the necessary documents to Citibank.

Gretchen could – and presumably would – draw down on $408,157.03.  When the Court issued the Order of Attachment, both the Order and Writ were served on Citibank's New York branch per instructions provided by Citibank.  *See* Frevola Aff. ¶ 8.

When CME recently realized the fraud perpetrated upon it by Gretchen and other individuals and parties when entering into the Charter, CME refused to make further hire payments.   That, in turn, triggered the L/C obligations and provided Gretchen, as L/C beneficiary, with letter of credit proceeds to draw down on and which could ultimately be attached under state law attachment or Rule B attachment.  This very short period of time has been recognized as an attachment "window" in the context of letters of credit.   As one commentator noted when addressing the attachment of letters of credit, "the order of attachment route may be successful *only if the levy occurs during a narrow window of opportunity between presentment to the issuer and payment by the issuer*."  Thomas J. Hall, *Letters of Credit*, 7 Bus. & Com. Litig. Fed. Cts. § 82:50 (Robert L. Haig ed., 3d ed. 2012) (emphasis added).

In *Sperry Int'l Trade Inc. v. Gvt. of Israel*, 689 F.2d 301 (2d Cir. 1982), the Second Circuit noted a similar fact pattern where proceeds from a Citibank irrevocable standby letter of credit were attached per court order.   Sperry and the Israeli government entered into an agreement where Sperry would design and construct the Israeli Air Force's communication system.  *Id.* at 302.  The contract called for Sperry opening an irrevocable letter of credit for around $15 which Israel could draw down in the event Sperry breached the contract.  Three years later, Israel sought to draw down on the letter of credit by sending the proceed to its account at another bank.  Between Israel's presentment of a sight draft and certification that the terms of the letter of credit had been met entitling it to proceeds and the transmittal of these proceeds to

Citibank, Sperry sought an obtained an *ex parte* attachment order in connection with the letter of credit proceeds. *Id.* at 303.

At the same time, the propriety of Israel's attempt to draw down on the letter of credit was being determined by an already constituted arbitration panel. Sperry filed a motion to halt Israel's attempts to draw down on the letter of credit, a motion the arbitration panel ultimately granted by issuing a partial final award ordering that the proceeds of the letter of credit be held in an escrow account[6] jointly naming Sperry and Israel. *Id.* The Second Circuit was called upon to confirm the arbitrators had the power to order the letter of credit proceeds into an escrow account until the claims and counterclaims in arbitration were decided. And it did, finding vacatur of the arbitration award was not appropriate under the Federal Arbitration Act. *Id.* at 305-06. In so finding, Sperry's actions of attaching the letter of credit proceeds were notably not argued to be grounds to vacate the arbitration award ordering the escrow proceeds be maintained outside the letter of credit rubric.

In the matter at bar, CME ultimately seeks a similar result. Gretchen has been entitled to draw down on the L/C as of September 16, 2013. Cryptically, Gretchen in its papers states "even if draft had been made, or were to be made" -- with the implication Gretchen may well have presented the necessary documents to Citibank for release of payments by Citibank to Gretchen, as the L/C provides, "in accordance with your instructions." CME has not received confirmation from Citibank that any proceeds have been restrained but this is not unusual as Supplemental Rule B(3)(a) provides that Citibank, as garnishee, is not required to serve an Answer "admit[ing]

---

[6]  Following CME's obtaining of an Order of Attachment and Gretchen's vacatur motion, CME proposed a solution to protracted litigation on a sort timeline. The full $2.5 million proceeds could be transferred to an escrow account to stand for the parties' respective claims and counterclaims to be decided in arbitration. Gretchen refused, concerned that they would be giving up their current draw down rights under Clause 25 of the charter party if they were to agree with an escrow account in lieu of a letter of credit.

any debts, credits, or effects" restrained for 21 days. With Citibank only served on September 17, Citibank is well within its reporting period.

Separate from the issue of whether L/C proceeds in the amount of $408,157.03 have been restrained yet pursuant to the Attachment Order, Gretchen now has its sights set on drawing down on the entire $2.5 million L/C by relying on the L/C clause which allows for drawing down of proceeds if an arbitration award is issued in Gretchen's favor. Conveniently, one day after filing its vacatur papers with the Court, it submitted a letter to an already-convened arbitration panel (regarding a different dispute between CME and Gretchen) seeking a partial final award to collect on the full L/C because CME has provided notice of its intention to re-deliver the Vessel to Gretchen earlier than the full term of the charter which would result in alleged damages in excess of $2.5 million. *See* Frevola Aff. ¶ 2, Ex. A (September 20, 2013 letter from counsel for Gretchen to the arbitration panel). Gretchen sought an emergency hearing for September 26, the day before the Rule B vacatur hearing before this Honorable Court, to obtain a partial award and then the next day seek vacatur of the Attachment Order so that it could draw down on the entire $2.5 million. *Id.* (noting on page 2, "the attachment order has effectively prevented Respondents from drawing down on the L/C for the one hire payment currently due and owing by Claimant"). On September 24, the panel denied Gretchen's request in light of the proceedings before this Court. Frevola Aff. ¶¶ 2-4.

It is difficult to reconcile Gretchen's protestations in its vacatur papers before this Court that there is no attachable property interest in the L/C when its actions and statements paint a decidedly different picture. CME's anticipatory actions in seeking and obtaining the Rule B Attachment Order are no different than the actions taken by the plaintiff in *Sperry* or by maritime practitioners for hundreds of years who have sought Rule B attachment orders and/or Rule C

arrest orders before a vessel enters the jurisdiction so that when it arrives and the *res* may be restrained, the order and writ are effectuated before the vessel can escape.  The Attachment Order herein is effective for 120 days and Citibank has consented to continuous service of the order and writ.  *See* CME Docket, entry # 2.  The Attachment Order should stand in the interim in the event Gretchen does seek to draw down on the L/C.  *See Daye Nonferrous Metals Co. v. Trafigura*, No. 96 Civ. 9740, 1997 WL 375680, at *3 (S.D.N.Y. July 7, 1997) (noting an order of attachment was issued in the event the defendant drew down on the letter of credit allowing for the proceeds to be attached), *aff'd in part, vac'd in part*, 152 F.3d 917, 1998 WL 385968 (2d Cir. 1998) (expressing "no view" on the initial validity of the orders of attachment when affirming the lower court's dissolving of a preliminary injunction and vacating orders of attachment as a result of the defendant ultimately paying an arbitration award issued against it which obviated the need for attachment orders).

We note in support of Gretchen's statement that, "even if a draft had been made, or were to be made", the proceeds should not be attached Defendant cites the "policy reasons" set forth in *Supreme Merchandise Co. v. Chemical Bank*, 70 N.Y.2d 344 (1978).  But a careful reading of *Supreme Merchandise* confirms the policy concerns articulated do not reflect the circumstances of this case.  That decision addressed "negotiable" letters of credit, where the issuing bank is not only obligated to pay the beneficiary, but instead any bank that the beneficiary may nominate. Because these types of letters of credit can and often do pass from entity to another entity, the court observed it typically "implicates other than the immediate parties to the underlying transaction."  70 N.Y.2d at 351.

Indeed, the court noted that besides the beneficiary, there were three banks involved whose interest could be impacted by the attachment of the negotiable letter of credit.  *Id.*    In

- 18 -

closing, the court noted one universal concern: "if an issu[ing] bank's payment is blocked by an attachment order of a plaintiff seeking to establish jurisdiction for its own unrelated dispute with the seller -- thereby often embroiling other parties in a contest as to priority among creditors -- it is at the cost of diminution of confidence in the certainty and integrity of letters of credit in this jurisdiction." *Id.* at 353. Here, the universe of companies impacted by attaching the L/C proceeds is limited to Gretchen and CME -- the immediate parties to the Charter. There is no larger policy concern about competing creditors or establishing jurisdiction -- these peripheral issues in the context of a negotiable letter of credit are nonexistent with the stand-by L/C here.[7]

The Court's Attachment Order should stand.

## IV.  PROCEEDS FROM THE CITIBANK STANDBY LETTER OF CREDIT ARE REMITTED IN NEW YORK

CME does not dispute that there are references to the State of Florida in the L/C. Gretchen is correct to note that documents to draw down on the L/C are to be presented in Florida, that the L/C itself expires in an office in Florida, and that the Charter called for the L/C being issued by a qualified bank with offices in Florida. However, missing is any statement that the proceeds from a drawn down L/C must be remitted in Florida.

Gretchen cites cases addressing the "place of performance" for a letter of credit but those general statement cannot overcome the fact that the "first class bank" chosen by CME, which was required to be "acceptable to Owners [Gretchen]" is Citibank, N.A. And Citibank confirmed

---

[7] The other cases cited by Gretchen are similarly distinguishable from the circumstances of this case. *See Prime Shipping Co. Ltd. v. Wajilam Export(s) PTE Ltd.*, No. 06 Cv. 1183, 2006 WL 1539330 (S.D.N.Y. June 2, 2006) (negotiable letter of credit where the proceeds were those pledged to a bank, not the defendant, and thus not attachable); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420 (S.D.N.Y. 1987) (judgment creditor of the debtor used restraining notices to restrain an open letter of credit); *Diakan Love, S.A. v. Al-Haddad Bros. Enter.*, 584 F. Supp. 782 (S.D.N.Y. 1984) (key consideration for refusal to attach letter of credit proceeds being "multi-party relationship which the letter constitutes" such that "the inseparable interests of other parties" would be negatively implicated and impacted).

- 19 -

to its customer, CME, on September 16, 2013, that should Gretchen seek to draw down on the L/C:

> [C]itibank funds issued to a party drawing on a Citibank Letter of Credit would issue from the bank branch at which the customer's principal account was located. She further explained that because CME's primary account with Citibank is with the Citibank Private Bank in New York, this would be the location from which draws on the Letter of Credit would originate.

*See* Frevola Aff. ¶ 7, Ex. D, Declaration of CME employee Carlos Suarez dated September 25, 2013, at ¶¶ 3-4. As a result of this information, CME filed its Rule B application in the Southern District of New York as opposed to the Middle District of Florida, Tampa Division, as it originally contemplated doing. The situs of the proceeds in respect to this particular L/C is in fact New York per Citibank's practice. Gretchen could have demanded otherwise in the Charter or L/C, such as when it demanded the "first class bank" have a Miami office. But it did not. And as one of the cases cited by Gretchen teaches, *Chuidian v. Phillippine Nat'l Bank*, 976 F.2d 561, 563 (9th Cir. 1992), with the increased usage of letters of credit in industry and an inability to articulate rules for every possible circumstance, there is a general "policy favoring flexibility in the articulation of rules governing letters of credit."

Here, Citibank has the flexibility to set its own policy on proceeds issuing from where the applicant to the letter of credit maintains it primary account. Unless overridden by the specific contractual terms between the parties, which it was not, the situs of the proceeds is New York. And the Court's Attachment Order and writ of attachment provide for its restraint.

- 20 -

## <u>CONCLUSION</u>

CME respectfully requests that the Court deny Gretchen's motion to vacate the attachment

Order in its entirety and such other and further relief which it may deem just and proper.


Dated: New York, New York
       September 25, 2013


                                HOLLAND & KNIGHT LLP

                  By:      /s/ Michael J. Frevola
                                Michael J. Frevola
                                Christopher R. Nolan
                                Marie Larsen
                                31 West 52nd Street
                                New York, New York 10019
                                Phone: (212) 513-3200
                                fax (212) 385-9010
                                michael.frevola@hklaw.com
                                chris.nolan@hklaw.com
                                marie.larsen@hklaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITIES & MINERALS ENTERPRISE
LTD.,

                          Plaintiff,

     -against-

GRETCHEN SHIPPING INC.,

                      Defendant.

**ECF CASE**

13 Civ. 6548 (PKC)

## REPLY MEMORANDUM OF LAW IN FURTHER
## SUPPORT OF MOTION TO VACATE THE ATTACHMENT

Of Counsel:

Kirk M. Lyons
Jon Werner

**Lyons & Flood, LLP**

Attorneys for Defendant
GRETCHEN SHIPPING INC.
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

POINT I    CME'S CLAIMS DO NOT SOUND IN ADMIRALTY
           UNDER THE BINDING STANDARDS SET BY THE
           U.S. SUPREME COURT .......................................................................... 1

POINT II   CME CONCEDES THAT THERE IS NOTHING AT
           PRESENT TO ATTACH ABSENT A DRAW ON THE
           LETTER OF CREDIT ............................................................................... 9

POINT III  CME HAS FAILED TO ESTABLISH THAT THE *SITUS*
           OF THE LETTER OF CREDIT IS IN NEW YORK ............................... 12

## PRELIMINARY STATEMENT

Defendant, GRETCHEN SHIPPING INC. ("GRETCHEN"), through its attorneys, Lyons

& Flood, LLP, hereby submits this Reply Memorandum of Law in further support of its motion

to vacate the Ex Parte Order For Process of Maritime Attachment and Garnishment

("Attachment Order") issued to plaintiff COMMODITIES & MINERALS ENTERPRISE LTD.

("CME") on September 17, 2013, pursuant to Rule E(4)(f) of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") and Local

Admiralty Rule E.1.

## ARGUMENT

### POINT I

### CME'S CLAIMS DO NOT SOUND IN ADMIRALTY UNDER THE BINDING STANDARDS SET BY THE U.S. SUPREME COURT

As GRETCHEN pointed out in its initial memorandum of law in support of its motion to

vacate, the most recent articulation by the United States Supreme Court of the test by which

courts should determine whether there is admiralty jurisdiction over a tort claim, occurred in

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

In *Grubart*, the Supreme Court established two-pronged test, with the first prong

examining whether the tort "occurred on navigable waters" or if the "injury suffered on land was

caused by a vessel on navigable water," and the second prong considering whether the tort has

"'a potentially disruptive impact on maritime commerce'" and is of a general category of

activities with "'a substantial relationship to traditional maritime activity.'" *Id.* at 534 (quoting

*Sisson v. Ruby*, 497 U.S. 358, 364 (1990)).

The Supreme Court could not have been clearer in its articulation of this standard:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant
> to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions

> both of location and of connection with maritime activity.  A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. 46 U.S.C. App. § 740. The connection test raises two issues.  A court, first, must "assess the general features of the type of incident involved," … to determine whether the incident has "a potentially disruptive impact on maritime commerce," …. Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."

*Grubart, supra*, 513 U.S. at 534 (internal citations omitted).

The U.S. Supreme Court's decision in *Grubart* did not occur in a vacuum.  Rather it was the latest of a long line of cases establishing and refining the standard for evaluating the boundaries of maritime jurisdiction over tort claims.  In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), the U.S. Supreme Court, in the context of aviation torts, concluded that the test for admiralty jurisdiction requires both that the injury occur on navigable waters and that the activity have some connection to maritime commerce.  In *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982) and *Sisson v. Ruby*, 497 U.S. 358 (1990), the Court applied the *Executive Jet* formulation outside the context of aviation torts and required that all maritime torts have a substantial relationship to traditional maritime activity.  *Grubart*, in its application and refinement of the *Sisson* standard, merely confirmed that whether the tort occurred on navigable waters remains part of the inquiry in determining admiralty jurisdiction.

Despite the extremely clear and specific mandate from the U.S. Supreme Court in *Executive Jet, Foremost*, and *Sisson*, and as applied by *Grubart*, which clearly is directed at defining the standard to be applied to **all torts** upon which admiralty jurisdiction is claimed to be premised, CME nevertheless requests this Court to reject the *Grubart* test and hold that it should not be applied in this case to its claim of fraudulent inducement, a tort cause of action.

2

Instead, CME argues, the *Grubart* test should be distinguished on its facts, and this Court should craft a new standard from whole cloth to address the situation where a tort claim is alleged despite the existence of a maritime contract between the parties. (See CME's Memo at pp. 4-5). CME's sole support for this feckless proposition is the Eleventh Circuit's decision in *Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked Vessel or Vessels*, 636 F.3d 1338 (11th Cir. 2011).

However, this support is non-existent. A review of the *Odyssey* decision demonstrates that it provides no support whatsoever for CME's position. Despite citing to *Grubart* for another proposition, the Eleventh Circuit never discussed or applied the *Grubart* test to evaluate whether a tort fell within the scope of the court's admiralty jurisdiction. It did not do so, because the only question it was confronted with was the issue of whether a written research agreement or an oral agreement in connection thereof, constituted a maritime contract. As the Eleventh Circuit explained:

> Upon a thorough review of the parties' briefs and the district court's order, we hold that Bray has brought a proper federal claim. In relevant part, the district court concluded that Bray failed to set out a claim cognizable in admiralty jurisdiction because, "[a]lthough both Bray's research and Odyssey's obligation to pay pertain to the location of a ship, neither the research agreement nor the purported oral agreement amount to a maritime contract." This was so, the court reasoned, "because neither contract involves maritime commerce." We cannot agree.

*Odyssey, supra*, 636 F.3d at 1340; *see also Odyssey Marine Exploration, Inc. v. Shipwrecked Vessel*, 512 Fed. Appx. 890, 892 n.1 (11th Cir. 2013) (explaining that its prior holding "reversed the district court's dismissal of Bray's action for lack of subject-matter jurisdiction and remanded for further proceedings, holding that Bray's contract claims were cognizable in federal admiralty jurisprudence because his contracts with Odyssey "were by their terms entered in connection with maritime commercial venture.")

Nobody involved in the *Odyssey* case, including the Eleventh Circuit, appears to have considered the question of whether any of the tort claims plead were within admiralty jurisdiction. Everyone simply assumed that the claims were contractual in nature and analyzed the claims from a contractual standpoint. How this came about might be explained by the comment by the District Court in the underlying decision that although "[n]either 'rescission' nor 'mutual mistake' constitute a 'claim' upon which a plaintiff may sue ... 'Florida's courts have muddied the waters by confusing the law of remedies with underlying causes of action, a claim for 'rescission' is well-recognized under Florida law.'" *Odyssey Marine Exploration, Inc. v. Unidentified*, 2010 U.S. Dist. LEXIS 92680, at \*5 n.5 (M.D. Fla. Aug. 18, 2010).

Thus, only by virtue of some strange quirk of Florida state law might a tort claim for fraudulent inducement or rescission be somehow converted into a contract claim, for which admiralty jurisdiction might therefore exist.

The fact that the *Odyssey* decisions so heavily relied upon by CME never addressed the issue involved in this case is not surprising. Virtually all of the cases cited to, or relied upon, by CME on the issue of whether tort claims are included in the scope of this Court's admiralty jurisdiction,[1] do not directly address or discuss that question – likely because the issue was never raised by the parties or the courts involved, perhaps because in almost all of them there is a separate and independent basis for admiralty jurisdiction such as a claim for breach of a maritime contract.

---

[1] Including *In re Petition of Kinoshita & Co.*, 287 F.2d 951 (2d Cir. 1961); *The Hero*, 6 F. 526, 528 (D. Pa. 1881); *Maritime Ventures International, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 722 F. Supp. 1032 (S.D.N.Y. 1989); *United Fruit Co. v. U.S.*, 1951 A.M.C. 173 (1st Cir. 1951); and *Milestone Shipping, S.A. v. Estech Trading LLC*, 811 F. Supp. 2d 915 (S.D.N.Y. 2011).

In fact, the only decision relied upon by CME in which the question of whether there existed maritime jurisdiction over a tort claim was actually raised and discussed, appears to be *Carroll v. Protection Maritime Ins. Co., Ltd.*, 512 F.2d 4, 6 (1st Cir. 1975).

In that decision, the First Circuit engaged in judicial activism, openly refusing to apply the location test set forth by the Supreme Court in *Executive Jet*, arguing that since "a contract for services between a seaman and a vessel owner is at the heart of maritime relationships" there must be admiralty jurisdiction over a claim for tortious interference with respect to same. While the First Circuit (and the courts within it) have continued to adhere to this "impact" based exception to the Supreme Court's locality test, the *Carroll* decision has found no purchase in the Second Circuit, with the exception of *Kalafrana Shipping, Ltd. v. Sea Gull Shipping Co.*, 591 F. Supp. 2d 505 (S.D.N.Y. 2008), itself a controversial departure from established precedent.

By contrast, the cases relied upon GRETCHEN directly address the issue and clearly establish the primacy and applicability of the *Grubart* test to the question of whether a tort is within the scope of a court's admiralty jurisdiction. CME's attempt to distinguish *Maritima Petroleo e Engenharia Ltda v. Ocean Rig IA*, 78 F. Supp. 2d 162 (S.D.N.Y. 1999) is unavailing. Contrary to CME's suggestion, maritime jurisdiction over the fraudulent inducement claim in *Maritima* was rejected on the basis of the failure to satisfy the location test, not due to the characterization of the underlying contract.

Perhaps this uncertainty in its arguments is why CME, while asking this Court to reject to the *Grubart* test as inapplicable, nevertheless also argues that the fraudulent inducement claim involved misrepresentations causing effects felt on navigable waters, thereby seeking to satisfy the *Grubart* criteria. (See CME's Memo at p. 4).

The effects which CME alleges as being felt on navigable waters are: (1) misrepresentations concerning the Vessel's discharge rate, (2) misrepresentations regarding the cost of War Risk Insurance, and (3) misrepresentations regarding the recipient of the brokerage commission. (See CME's Memo at p. 4).

There can be no dispute that these alleged misrepresentations all occurred on land. However, CME seems to be arguing that since the alleged misrepresentations related to the Vessel and/or since the effects of those misrepresentations were felt on navigable waters, that somehow this causes the tort of fraudulent inducement to satisfy the *Grubart* test.

This is clearly an erroneous reading of *Grubart,* which requires a showing that the alleged tort occurred on navigable waters. In *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105 (2d Cir. 1997), the Second Circuit (applying the *Grubart* test) held that there was no admiralty tort jurisdiction over a cargo claim involving a shipment of goods by sea and land, where the loss occurred as a result of a train derailment in Montana. As the Court explained: "Under these standards, it is clear that since the incident at issue in the instant case **occurred solely on land**--as the result of a train derailment having no relationship whatsoever to admiralty activity--admiralty tort jurisdiction does not lie." *Id.* at 109 (emphasis added).

In the case of *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139 (9th Cir. 1995), moreover, a shipping company had a contract that placed a vessel in a pool agreement, providing the owners of various vessels control over the commercial shipping operations of the vessels in order to share in trading revenues. Plaintiff there filed suit when a vessel in question was sold and new sailing instructions issued for that vessel by the new owner, who was not a party to the pool agreement. *Id.* at 141. Alleging tortious interference with the pooling agreement, plaintiff there claimed that maritime jurisdiction applied and attachment should issue because, it claimed,

6

the tort took place at sea.  The Ninth Circuit disagreed.  Holding that "[t]here is no doubt … that whether the injury occurred on navigable waters remains part of the inquiry in determining admiralty jurisdiction," the court found that all of "the claimed damages arose solely on land" and thus no admiralty jurisdiction existed, despite the fact that shipping routes and operations were implicated in the case.  *Id.* at 142-43.

The holding of *Lauritzen* is directly on point here, where all of the alleged injury took place on land.  Moreover, in *Lauritzen*, shipping routes and operations were actually affected by the tortious interference, but jurisdiction still did not lie.  Here, CME has not shown that shipping routes or operations of the Vessel were at all affected by the alleged tortious conduct.

In *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989), is another good example of the application of the location test under similar circumstances.  The Fifth Circuit was called upon to determine whether certain intentional torts, included alleged misrepresentations that induced plaintiffs to enter into freight forwarding agreements characterized by the court as having "strong maritime implications," constituted maritime torts for purposes of admiralty jurisdiction.  Applying the location test, the court looked to the location where the alleged misrepresentations occurred, namely at a meeting in Hamburg, Germany, and to the place where the alleged misrepresentations took effect, which the court found to be "on land."  *Id.*  Most particularly, the court noted that no injury occurred to the cargo that was the subject matter of the agreements while aboard ship, and that "[a]t best, the injury, if any, that occurred on navigable waters was too remote from the tortious act to meet the situs requirement for admiralty jurisdiction."  *Id.*

The Fifth Circuit  further rejected the lower court's rationale that the nature of the contract mandated admiralty jurisdiction, holding instead that "[a] party to a contract with strong

maritime implications must still satisfy … [the] situs requirement when seeking to predicate jurisdiction on a maritime tort." *Id.* (citations omitted). "[I]ntereference with a maritime contract does not vest the court with admiralty tort jurisdiction absent an impact on navigable waters." *Id.* at 289-90.

*Kuehne & Nagel*'s analysis of the location test is also directly on point here. As in *Kuehne & Nagel*, CME alleges that GRETCHEN engaged in intentional torts relating to the entry into the Charter Party. As in *Kuehne & Nagel*, CME's claims are garden-variety fraud claims that result from alleged conduct that took place on land and produced alleged injuries in the form of phantom lost profits and unlawful payments suffered on land. CME has not alleged, nor can it allege, that the injury it claims to have suffered occurred on navigable waters. The mere fact that shipping is tangentially implicated is insufficient to satisfy the location test where the injury at issue does not take place on navigable waters.

Dozens of circuit and district court admiralty tort cases confirm that even where some aspect of shipping might be tangentially involved such that an "effect" could arguably be said to be felt at sea, the only relevant "effect" for admiralty jurisdiction is whether the alleged injury which is the basis of the claim took place on water. *See, e.g., Erogov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 455-56 (5th Cir. 1999) (location prong not met because injury in tortious interference case concerning wages for crewmen was not felt at sea); *Broughton v. Fla. Int'l Underwriters, Inc.*, 139 F.3d 861, 865 (11th Cir. 1998) (breach of duty to plaintiffs related to insurance for ship insufficient to satisfy jurisdiction because injury took place on land even though "there may be some connection between the alleged tort and traditional maritime activity"); *Carter v. Allstate Ins. Co. (In re Indigo Sky)*, 743 F. Supp. 2d 103, 107 (D. Conn. 2010) (holding that since a boat fire at a marina "does not involve a tort that

occurred on navigable waters and merely had effects on land" the court lacked admiralty

jurisdiction under the *Grubart* test); *Smith v. Mitlof*, 198 F. Supp. 2d 492, 500 (S.D.N.Y. 2002)

("Plaintiffs' contention that torts such as these fall under admiralty jurisdiction if the "effects" of

the tort are felt on navigable water is unpersuasive.")

CME's further attempts to try to recast its claim for fraudulent inducement as a claim for

breach of contract or for a declaratory judgment of some kind should also be rejected. (See

CME's Memo. at pp. 10-12). All CME had to do under Rule 8 was plead its causes of action in a

"short and plain statement." If the pleading contortions suggested by CME are required to

understand the nature of its causes of action, then GRETCHEN respectfully submits that CME's

Verified Complaint should be dismissed for failure to state a claim.

## POINT II

### CME CONCEDES THAT THERE IS NOTHING AT PRESENT TO ATTACH ABSENT A DRAW ON THE LETTER OF CREDIT

CME's attempts to argue that GRETCHEN possesses an attachable property interest in

the letter of credit are fatally defective.

CME starts out by recognizing the validity of the cases GRETCHEN relied upon for the

unattachability of "executory" letters of credit. (See CME's Memo. at p. 12). However, CME

then glosses over that critical point, and starts arguing about whether the policy arguments

outlined by the New York Court of Appeals in support of its decision in *Supreme Merchandise*

*Co. v. Chemical Bank*, 70 N.Y.2d 344 (1987), should be applied to the letter of credit at issue in

this case.

The bottom line in this case is that during the entire time that the Attachment Order has

been issued, no draft has been presented to Citibank N.A. (or its agents) seeking payment of any

proceeds of the letter of credit. Since no draft has been presented, there is nothing for the

9

Attachment Order to reach. Without a conforming draft being presented, Citibank N.A. simply owes no debt to GRETCHEN. CME appears to concede this point readily – see CME's Memo at p. 15 – yet it proceeds to ignore the law it cites.

Knowing that no property of GRETCHEN is actually under attachment at present, CME has devolved into asking that this Court simply allow it to maintain the Attachment Order in place indefinitely to act as a *de facto* injunction against GRETCHEN being able to exercise its rights with respect to the letter of credit. (See CME's Memo. at pp. 17-18). This proposal should be flatly rejected, not only because it violates and circumvents established standards regarding obtaining injunctive relief with respect to letters of credit (*see, e.g., Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999)), but also because it violates Supplemental Rule B itself.

It is well-settled that in the absence of any showing that a defendant's property may be found within the district, a Supplemental Rule B attachment must be vacated. *See, e.g., Arctic Ocean Int'l, Ltd. v. High Seas Shipping, Ltd.*, 622 F. Supp. 2d 46 (S.D.N.Y. 2009); *Wight Shipping, Ltd. v. Societe Anonyme Marocaine de L'Industrie Du Raffinage S.A.*, 2008 U.S. Dist. LEXIS 106420 (S.D.N.Y. Nov. 24, 2008) (declining to issue attachment order without more "than a conclusory allegation that Defendant 'is believed to have or will have property' in this District located at any of twenty-three or more garnishees during the pendency of the requested order"); *Chug Lin Marine Serv. Corp. v. China Chance Shipping, Ltd.*, 2008 U.S. Dist. LEXIS 106417 (S.D.N.Y. Dec. 12, 2008) (same); *Marco Polo Shipping Co. Pte. v. Supakit Prods. Co.*, 2009 U.S. Dist. LEXIS 19057 (S.D.N.Y. 2009) (same); *Blueye Navigation, Inc. v. Oltenia Navigation, Inc.*, 1995 U.S. Dist. LEXIS 1844 (S.D.N.Y. Feb. 17, 1995).

"Plaintiff cannot maintain an order of attachment indefinitely in the sheer hope that defendant's property may one day be found within the district." *Kola Shipping Ltd. v. Shakti Bhog Foods Ltd.*, 2009 U.S. Dist. LEXIS 14392, *8 (S.D.N.Y. Feb. 24, 2009) (holding that "after four months of unsuccessful attempts to attach funds, it is no longer reasonable to expect that any actual property of the defendant is or will be found in the district."). *See also Mahroos v. S/S Tatiana L*, 1988 A.M.C. 757 (S.D.N.Y. 1986) ("a plaintiff should not be able to keep an action going indefinitely on the claim that at some unknown date in the future the *res* will appear within the jurisdiction of the court without giving any basis for such a hope") (quoting *The Crispin Company v. S/S Jowood*, 1973 A.M.C. 2623 (S.D.N.Y. 1973)).

Contrary to CME's suggestion, the same policy issues presented by restraints of "negotiable" letters of credit are applicable in the case of standby letters of credit as well. For example, just as "negotiable" letters of credit may be assigned and transferred, so too can the proceeds of a standby letter of credit be assigned and transferred. Furthermore, while there is no negotiating bank involved in the instant letter of credit transaction that is not a particular feature of standby letters of credit versus "negotiable" letters of credit. At any time, GRETCHEN could (for a fee) engage another financial institution to serve as a negotiating bank with respect to the letter of credit, thus, implicating another bank in the transaction, triggering the policy concerns warned of by the New York Court of Appeals and the numerous courts which have followed its precedent.

11

## POINT III

### CME HAS FAILED TO ESTABLISH THAT THE *SITUS* OF THE LETTER OF CREDIT IS IN NEW YORK

In its attempt to meet its burden of showing that the legal *situs* of the letter of credit is in New York rather than Florida, CME relies entirely upon the Declaration of Carols Suarez, the Commercial Director of CME, dated September 24, 2013, in which Mr. Suarez states that on Monday, September 16, 2013, at the request of CME's Financial Director Lisa Sherriff, he contacted various individuals at Citibank N.A. in Florida and was told by them that the funds drawn under the letter of credit would be issued from CME's bank account in New York.

Although Mr. Suarez's declaration is executed under penalty of perjury as required by 28 U.S.C. § 1746, his recounting of claimed statements by individuals at Citibank N.A. is inadmissible double hearsay under FRE 802. Such unverified hearsay statements should not be considered in evaluation of GRETCHEN's motion and should not be considered sufficient for CME to meet its burden to establish that property of GRETCHEN is located within the district. At minimum, CME is bound to present declarations or sworn testimony of representatives of Citibank N.A. as to the *situs* of the letter of credit at issue.

### CONCLUSION

For the foregoing reasons, defendant GRETCHEN respectfully requests that this Court grant its motion in its entirety, vacate the Attachment Order, dismiss CME's action with prejudice, release any and all property attached or restrained pursuant to the Attachment Order, and award such other and further relief as the Court may deem just and proper.

Dated: September 26, 2013
New York, New York

LYONS & FLOOD, LLP
Attorneys for Defendant
GRETCHEN SHIPPING INC.

By:  _____

Kirk M. Lyons
Jon Werner
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400
klyons@lyons-flood.com
jwerner@lyons-flood.com

13

## CERTIFICATE OF SERVICE

Jon Werner, an attorney duly admitted to practice before this Honorable Court, affirms on

this 26th day of September 2013, I served true copies of the foregoing, via CM/ECF and by e-

mail to:

> Holland & Knight LLP
> 31 West 52nd Street
> New York, NY 10019
>
> Attn:   Michael J. Frevola, Esq.
>             **michael.frevola@hklawa.com**
>
>             Christopher R. Nolan, Esq.
>             **christopher.nolan@hklaw.com**
>
>             Marie E. Larson, Esq.
>             **marie.larsen@hklaw.com**

_____
Jon Werner

14