UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

COMMODITIES & MINERALS ENTERPRISE LTD.,

     Plaintiff,

vs.                                                          Case No.:  8:13-cv-2512-JSM-MAP

GRETCHEN SHIPPING INC.,

     Defendant.

_____/

**DECLARATION OF TYRONE V. SERRAO IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANT GRETCHEN SHIPPING INC.'S MOTION TO
VACATE THE MARITIME ATTACHMENT ORDER**

     Tyrone V. Serrao declares under penalty of perjury as follows:

     1.    I am the President of plaintiff Commodities & Minerals Enterprise Ltd. ("CME" or "Plaintiff").

     2.    I make this declaration in support of CME's opposition to Defendant Gretchen Shipping Inc.'s ("Gretchen") motion to vacate the writ of maritime attachment issued by this Court on September 30, 2013.  The information cited herein is based on my personal knowledge or, where indicated, on review of documents in my files or documents obtained through publicly-available resources.

     3.    CME was and is a company organized and existing under the laws of the British Virgin Islands.  To the extent that CME has a principal place of business, CME's personnel generally operate from an office in Puerto Ordaz, Venezuela.  CME is not registered to do

business in Florida and has no office in Florida. As noted on our business cards, CME maintains a mailing address in Miami with an affiliated company, Lubercy Investments, Inc. ("Lubercy"), at 501 Brickell Key Drive, Suite 506, Miami, FL. I have annexed as Exhibit 1 true copies of the Lubercy lease and Lubercy's registration with the Florida Department of State, Division of Corporations showing Lubercy's address.

**CME's Venezuelan Iron Ore Project**

4.     CME specializes in the trading of commodities and minerals, particularly iron ore, through its business relationships with Venezuelan companies. As part of CME's iron ore business, as described further below, CME time chartered the *M/V GENERAL PIAR* (the "Vessel") from Gretchen for a period of 60 months on the BALTIME 1939 Form, as amended by the parties (the "Charter"). I have annexed as Exhibit 2 a true copy of the Charter dated January 25, 2010.

5.     CME purchases iron ore from the mining company, CVG Ferrominera Orinoco CA ("FMO") in Venezuela. CME largely sells to customers in China, but we also have provided shipments to the European and American markets.

6.     When CME began trading in 2004, our transactions with Venezuelan suppliers were simply buy/sell transactions. Over time, however, the economic situation in Venezuela deteriorated. CME's contract partner FMO suffered severe cash flow problems, affecting its operations, including but not limited to its production capacity.

7.     As a result of the Venezuelan economic deterioration, CME worked with FMO and we adapted our business operation so that we would supply FMO with equipment and spares required by FMO under a barter arrangement (i.e., CME would provide equipment and spares to

2

FMO in exchange for iron ore and derivative iron products). Under this arrangement, we have been involved with a number of projects, including supplying of a ship loader, a wagon tilter and a stacker. CME has supplied over 1000 wagons to FMO, which we have used for transporting material by rail from the mine to the production plant.

8.      CME also has had a contract with FMO for the operation, maintenance and management of the "Transfer System." The "Transfer System" is the name given to a particular operation for loading vessels in Puerto Ordaz. FMO owns a transfer station, which is a large vessel, the *M/V BOCA GRANDE II*, which is anchored offshore Venezuela in deep water. When vessels arrive in Venezuelan waters to load iron ore at FMO's facility, the vessels enter the Orinoco River from the Atlantic Ocean and navigate approximately 178 miles upriver to FMO's port facility. Because of draft restrictions, vessels do not load to capacity but rather load only to a tonnage permitted by the river depth. The partially-laden vessels then return downriver. Once the vessels exit the river into open waters, they sail approximately 100 miles to the Transfer Station (the *M/V BOCA GRANDE II*), where the vessel will complete loading to the agreed tonnage.

9.      A number of shuttle vessels operate between FMO's port facility and the Transfer Station for purposes of keeping the Transfer Station loaded with iron ore to top off the outbound partially-laden vessels. One of those shuttle vessels has been the Vessel (the *M/V GENERAL PIAR*).

**CME's Charter of the Vessel**                                    .

10.     In mid-2009, I was advised by FMO that one of its shuttle vessels, the *M/V RIO ORINOCO*, was being taken out of service due to its age and condition. In addition, FMO's

3

other shuttle, the *M/V RIO CARONI*, was scheduled to undergo drydocking.  My colleagues and I realized that CME would have to replace this loss of capacity in the vessel shuttle service caused by the retirement of the *M/V RIO ORINOCO*.

11.     At this time, CME was being represented by the Gerardo A. Vazquez, P.A. d/b/a/ Vazquez & Associates (the "Firm") through attorney Gerardo A. Vazquez ("Vazquez") in a dispute with Agrico Sales Inc. ("Agrico") concerning cost overruns in a shiploader construction contract that Agrico had agreed to perform.  The dispute with Agrico proceeded to arbitration in Miami, with the Firm (through Vazquez) representing CME, and continued until an award was issued on October 30, 2012.  Vazquez and the Firm previously had represented our company in performing some of CME's corporate filings, in which capacity the Firm (through Vazquez) continued to represent CME until several weeks ago.

12.     In connection with his ongoing representation of CME discussed in the preceding paragraph, the Firm and Vazquez learned from me that we were looking to charter a vessel to replace the loss of capacity that would occur as a result of the retirement of the *M/V RIO ORINOCO*.

13.     After Vazquez and the Firm learned from me that CME was looking for a replacement vessel, Vazquez called me and told me that he had a Greek friend in the shipping business, Paris Katsoufis, who might be able to provide a vessel for the shuttle service.  Paris Katsoufis is the president of Kyma Ship Management Inc. ("Kyma").  Vazquez told me that Paris Katsoufis had invited me to have dinner at his house.  Subsequent to this dinner, in November 2009, I travelled with Paris Katsoufis, Stephen Harrington ("Harrington"), and Vazquez to

4

CME's operations in Venezuela so that Paris Katsoufis and Harrington could educate themselves on CME's operations.

14. In November and December 2009, Paris Katsoufis in his capacity as Kyma's president corresponded with CME repeatedly (usually with Arturo Contreras and/or our attorney Vazquez) regarding the Vessel. On or about December 4, 2009, Kyma sent to CME a "Letter of Intent" regarding CME's chartering of the Vessel, which Letter of Intent listed Kyma as the would-be charterer of the Vessel (or its nominee). At that point, from what Paris Katsoufis told CME, the Vessel was not yet owned by Gretchen and was not yet managed by Kyma. The Letter of Intent was a result of the negotiations performed by CME's Arturo Contreras together with Vazquez. The Letter of Intent did not sit comfortable with me as I was not in agreement with CME providing a Standby Irrevocable Letter of Credit and therefore questioned the necessity of this with Vazquez. Vazquez told me that Kyma was at the stage of purchasing a vessel solely for the purpose of this contract and therefore, Kyma could not be expected to do this without having some form of guarantee from CME. I also proposed to Vazquez that we should insist upon Kyma providing a guarantee for CME, in the form of a Standby Irrevocable Letter of Credit, as security against Kyma's non-performance in accordance with the terms of the Charter. Vazquez informed me that it was unnecessary for Kyma to provide such a guarantee as CME would be able to seize the Vessel in such an event. I questioned the feasibility of this with Vazquez on the basis that Kyma may be financing the purchase of the Vessel using a financial instrument such as a mortgage. Again, Vazquez reassured me that there would not be any problem and I could accept to sign the Letter of Intent. On the basis that Vazquez was acting in the capacity of our lawyer, I accepted his advice and signed the Letter of Intent. Arturo Contreras was also present

5

throughout this discussion and my queries which were put to Vazquez.  A true copy of the Letter of Intent is annexed as Exhibit 3.

15.     On December 9, 2009, Mr. Katsoufis and CME's Arturo Contreras visited the Vessel in Jacksonville, Florida to inspect it.  I have annexed as Exhibit 4 true copies of Mr. Katsoufis' e-mails dated December 11, 2009 and December 21, 2009 regarding the Vessel (then named the *M/V CHRISTOFFER OLDENDORFF*), which e-mails were addressed to me as well as colleagues of mine.

16.     At this time, based on my conversations with Paris Katsoufis, Gretchen did not yet exist as a corporate entity.  Gretchen came about as a result of the Charter, in that the Vessel was purchased by Kyma's personnel to perform the Charter and Gretchen was created to "own" the Vessel as a single ship entity.  In fact, I was told by Paris Katsoufis that the name Gretchen was selected as a tribute to my daughter.  With exception of a voyage to China undertaken by the Vessel in connection with its drydocking near the beginning of the Charter, the Vessel essentially has operated in Venezuelan waters during the entirety of Gretchen's lifespan.

17.     I have never spoken with or met an actual employee of Gretchen.  Over the last three and a half years of chartering the Vessel, all of my interactions with "Gretchen" – and all of my colleagues' interactions with "Gretchen" – have been through Kyma.  All of the e-mail correspondence comes from e-mail addresses with "@kymaship.com."  As an example, I have annexed as Exhibit 5 a true copy of an e-mail from Kyma forwarding the Gretchen Shipping hire invoice, with all of the shipowner's e-mail addresses having the "@kymaship.com" e-mail stem and which shows Gretchen's e-mail contact details as mdavis@kymaship.com.  The Vessel's

6

income appears to be managed by Kyma (although hire payments are made into a bank account in Gretchen Shipping's name). Gretchen uses Kyma's address and contact details as its own.

18.     On Tuesday, January 19, 2010, CME's Carlos Suarez sent to Kyma's Paris Katsoufis a proposed time charter party for purposes of discussion during upcoming negotiations regarding the Charter. That proposed time charter was a "back-to-back" version of the time charter that CME would have with FMO for the Vessel's use as a shuttle vessel.

19.     On Wednesday, January 20, 2010, CME's Arturo Contreras and Vazquez met with Kyma and Gretchen to discuss the terms of the Charter.

20.     During this first day of negotiations or shortly thereafter, Kyma/Gretchen rejected CME's proposed time charter in its entirety. They explained to CME that the form we had proposed was unacceptable, and countered with the BALTIME 1939 form that they provided to us prior to the parties' next meeting. According to Kyma and Gretchen, the BALTIME 1939 form was the form that had to be used. The form that Kyma/Gretchen provided, with Parts I and II already filled out, was the Charter (a true copy of which is annexed as Exhibit 2).

21.     Between Friday, January 22, 2010 and Monday, January 25, 2010, I attended Charter negotiations that largely occurred in Kyma's Miami offices (portions of the Charter negotiations also occurred at Luberdy's offices in Miami) with Kyma's/Gretchen's representatives along with my colleagues Lisa Sherriff and Carlos Suarez and our attorney Vazquez. Arturo Contreras from my company also attended a portion of the negotiations. In attendance for Kyma/Gretchen were Paris Katsoufis, Lambros Katsoufis, Mark Davis, and Harrington. It was my understanding that Harrington was a consultant for the Vessel's ownership interests.

7

22.      Before CME agreed to the Charter, I was reluctant to sign the Charter because certain terms gave me and my colleagues concern, including the following: (a) Gretchen/Kyma wanted CME to agree to provide a Standby Irrevocable Letter of Credit to secure CME's hire payments for the Vessel; (b) Gretchen/Kyma wanted CME to cover a portion of the Vessel's War Risk Insurance for the Vessel; and (c) Gretchen/Kyma did not include a *force majeure* clause in the Charter.     At one point, during a meeting at Kyma's offices in Miami in the late afternoon/early evening of Sunday, January, 24, 2010, we walked out of the negotiations.   Each time that we were on the verge of ending the negotiations, however, we were assured by Vazquez and the Firm that the Charter's terms – and specifically the Letter of Credit clause and lack of *force majeure* clause – were acceptable and commonplace and that CME should agree to the Charter.   As Vazquez was our attorney and the Firm was representing CME in a number a capacities, we believed Vazquez when he gave us his advice that the Charter's terms were ordinary and acceptable.

23.      Eventually, on Monday, January 25, 2010, we agreed to execute the Charter.   The initial daily hire rate for the Vessel was $25,641.03, which rate would increase 2% per annum. As part of the commencement of the Charter, CME opened a $2.5 million standby irrevocable Letter of Credit with HSBC.   Subsequently, in early 2011, the HSBC Letter of Credit was closed and replaced by a $2.5 million standby irrevocable Letter of Credit opened with Citibank (the "Citibank Letter of Credit").   Whilst we were in the process of arranging the renewed Standby Irrevocable Letter of Credit with Citibank, Gretchen sought to draw down on the HSBC Standby Irrevocable Letter of Credit claiming that we had not renewed.   Gretchen suggested that they would "give back" the funds once the renewed Standby Irrevocable Letter of Credit was in place.

8

Gretchen took this action at the end of January 2011 whereas the expiration date of the HSBC Standby Irrevocable Letter of Credit was not until 11 February 2011.

24.     At no time before the Charter's execution did Firm and Vazquez disclose to me or anyone else at CME that they had a financial interest in the execution of the Charter.

25.     Had we known that Firm and Vazquez had a financial interest in the execution of the Charter, CME would have consulted with another lawyer to obtain independent advice regarding the Charter prior to executing it.

26.     Firm invoiced CME by retainer during the time that the Charter negotiations were taking place, which invoices CME paid and which invoices CME understood covered Vazquez's time incurred while participating in the Charter negotiations.

**Recent Developments in Venezuela**

27.     In the last two years, the situation with FMO, and with Venezuela in general, has grown increasingly worse.  Despite our efforts to work with FMO, FMO's cash flow has continued to be a problem and, in turn, that has impacted production.  As a consequence, FMO has provided CME with much less iron ore than the contractually-agreed quantity.  Nevertheless, we have continued to honor our agreements with FMO regarding the Transfer System and with Gretchen regarding the Vessel.

28.     As another way to prevent FMO's cash flow shortages from interfering with production, in 2012 we executed an "Ex Works" contract with FMO.  As part of that contract, CME paid FMO's mining subcontractors for various work performed (such as loading material from the mine, transporting it to the crushing plant for crushing, screening and separating, and transporting the finished product to FMO's port facility).  In return for its paying FMO's

9

subcontractors, we were to be reimbursed with iron ore under its Strategic Alliance Agreement with FMO.

29.    Despite our assistance to FMO, FMO did not perform its obligations in return. Frequently, the material produced, which production CME helped facilitate and which should have been provided to us, instead was supplied to others.  Not only did FMO prefer other customers over CME, but the circumstances of some of these other transactions led us to question the legitimacy of those transactions.  As a result, CME's operations were disrupted and it caused us problems with our customers.

30.    The most recent changes in Venezuela made CME's situation untenable.  Within the past three to four months, major changes have taken place within FMO.  The Venezuelan military has taken over management of all government-owned companies.  One of the byproducts of the change in management is that the military opened investigations into certain of FMO's contracts and discovered a number of them to be irregular.

31.    As a result of its investigations, the Venezuelan military has taken the view that all of FMO's contracts are irregular.  Within the last few weeks, all supply contracts have been placed on hold.  We received word recently that all of FMO's supply contracts have been cancelled, and the Vessel has been released from shuttle service.

**CME's Discovery of Vazquez's Duplicity**

32.    When the Venezuelan military took over management of FMO, my colleague Lisa Sherriff – CME's Financial Director – contacted maritime counsel for guidance on what options CME might have with respect to the Charter in light of FMO's non-performance under its obligations to CME.

10

33.     As a result of that consultation, we learned that charter parties typically contain a "force majeure" clause that protects both parties against unexpected occurrences such as the events in Venezuela, especially charter parties of a vessel for an extended period of time such as the Charter and especially when the charter contemplates servicing a region in which political upheaval is a threat.   The Charter, however, did not contain such a clause because Vazquez advised CME that it was not needed.

34.     We also learned that two clauses contained in the Charter were highly unusual: (a) Clause 20, which contained the provision that "[h]ire to be paid punctually and regularly, strictly on time and without any delay . . . .", and (b) Clause 25, which required CME to establish a $2.5 million irrevocable standby letter of credit as security for its hire payments that could be drawn upon by Gretchen immediately in the event that CME missed (or was late on) a hire payment.

35.     Other representations made by Gretchen/Kyma regarding the Charter that also turned out to be materially false were the impact of the War Risk Insurance and the Vessel's discharging rate.   With respect to the War Risk Insurance, Gretchen/Kyma advised during the Charter negotiations that the insurance premium for War Risk Insurance for the Venezuela region would be greater than normal because of the uncertain political situation.   As to the cost of that insurance, Gretchen advised that the annual increase in the insurance premium compared to regular risk areas would be less than $5,000.   In fact, the increase in insurance was ten times that amount (although later settled downwards).   With respect to the Vessel's discharging rate, Gretchen/Kyma represented that the Vessel would have a discharge rate of 4,500 metric tons/hour.   This was the primary reason why CME was motivated to charter the Vessel, because we needed a discharging rate of at least 3,000 metric tons/hour.   In actual operations, however,

11

the Vessel discharged at rates as slow as 1,116 metric tons/hour and never more than 2,000 metric tons/hour.

36.     Furthermore, from discussions with our current counsel, it is my understanding that the Charter's hire rate is approximately $10,000 more per day than the average daily hire rate obtained during the time period by other shipowners. Using the $10,000 per day figure, from the commencement of the Charter CME has paid approximately $13,350,000 in charter hire more than the average daily rate of hire.

37.     As a result of the one-sided nature of the Charter, Ms. Sherriff and I began to examine our files with respect to the negotiation and the execution of the Charter. In particular, we examined Vazquez's behavior in insisting that CME execute the Charter as it was proposed by Gretchen/Kyma.

38.     On or about September 12, 2013, in discussing Vazquez's actions internally with my colleagues, I learned from our vessel operations manager Mr. Carlos Suarez that Mr. Suarez had seen a few pages of documents that contained Vazquez's name on them. Mr. Suarez has been our representative managing the arbitration between CME and Gretchen under the Charter concerning the Vessel's inadequate discharge rate. The documents – which are Western Union payment order summaries of payments ordered by Kyma – had been produced by Gretchen's counsel to CME's counsel in late January 2013 but it was not then appreciated that the documents evidenced payments made by Gretchen and Kyma to CME's counsel or the basis for such payments.

39.     When Mr. Suarez reviewed his arbitration file after my conversation with him, he found two Western Union payment order summaries containing Vazquez's name on them. True

copies of those Western Union payment order summaries are annexed as Exhibit 6.   The documents that Mr. Suarez had seen were not relevant to issues in the arbitration he was managing, so he did not understand the significance of the documents.

40.     The Western Union payment summaries annexed as Exhibit 6 show that the Firm has been receiving payments from Kyma.  Furthermore, the payments received by the Firm are identical in amount to payments received by another entity, Vipsen Corp. ("Vipsen").

41.     When we saw that Vipsen and the Firm both were receiving identical payments, Ms. Sherriff conducted some on-line research and learned that Vipsen is Harrington's company. I have attached as Exhibit 7 a true copy of the on-line information that we obtained showing that Vipsen is a company owned by Harrington.  In other words, both Vazquez and Harrington, who were in the Charter negotiations as CME's and the shipowner's respective consultants, are being paid identical amounts (through their respective companies) by Kyma for some reason.

42.     As explained in CME's complaint, the amounts received by Vipsen and the Firm correspond nearly identically with what would be a 2.5% commission under the Charter.  Clause 24 of the Charter, entitled "Brokerage commission and to whom payable" (Exhibit 2, Clause 24) shows that an entity called "V&H Ventures, Ltd." is allocated a 2.5% brokerage commission on the CME's hire payments made every 15 days.

43.     CME has never been advised what is V & H Ventures, Ltd. and whether it is in any way connected to our former attorney, Vazquez, and Kyma's and Gretchen's charter consultant, Harrington.

13

**Hire Payment Status**

44.     CME was due to make a hire payment under the Charter in the amount of $408,157.03 on Monday, September 16, 2013.  A true copy of Gretchen's hire invoice is annexed as Exhibit 8.

45.     CME was due to make a hire payment under the Charter in the amount of $408,157.03 on Monday, September 30, 2013.  A true copy of Gretchen's hire invoice is annexed as Exhibit 9.

46.     Under Additional Clause 25 of the Charter, if CME does not transmit its hire payments strictly on time, Kyma/Gretchen can draw on the Citibank Letter of Credit to obtain payment of the hire due.


I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of October, 2013 in Nassau, Bahamas.


_____
                    Tyrone Serrao

14

.

# SERRAO
# DECLARATION
# EXHIBIT 1

 JONES LANG
LASALLE

Jones Lang LaSalle, Americas Inc.
601 Brickell Key Drive Suite 101  Miami Florida 33131
tel +1 305 358 1603  fax +1 305 358 1626

February 24, 2012

Tyrone Serrao
President
Lubercy Investments, Inc.
501 Brickell Key Drive, Suite 506
Miami, FL 33131

**RE:** Courvoisier Centre I / Lubercy Investments, Inc. – 1st Amendment to Office Lease

Dear WWE,

*For your records, enclosed is one (1) original executed Lease Agreement as referenced above.*

Regards,

Ronald Smidley
Property Administrator
Jones Lang LaSalle Americas, Inc.

Enclosure

# FIRST AMENDMENT OF LEASE AGREEMENT

THIS FIRST AMENDMENT OF LEASE AGREEMENT ("First Amendment") is made on 13 FEBRUARY, 2012, between BRICKELL KEY CENTER, L.P, a Delaware limited partnership ("Landlord") and LUBERCY INVESTMENTS, INC., a Florida corporation ("Tenant").

## RECITALS

This First Amendment is based upon the following recitals:

A.       Landlord and Tenant entered into a Lease dated December 3, 2008 ("Lease"), for the premises known as Suite 502 ("Original Premises") of Courvoisier Centre I, located at 501 Brickell Key Drive ("Building"), Miami, Florida 33131.

B.       Landlord and Tenant desire to amend the Lease to relocate the Original Premises and otherwise amend the Lease accordingly.

THEREFORE, in consideration of the mutual covenants and agreements stated in the Lease and below, and for other sufficient consideration received and acknowledged by each party, Landlord and Tenant agree to amend the Lease as follows:

1.       RECITALS; CAPITALIZED TERMS. All Recitals are fully incorporated. Except for those terms expressly defined in this First Amendment, all initially capitalized terms will have the meanings ascribed to them in the Lease. References to Articles or Sections shall refer to the applicable Article or Section of the Lease and references to Paragraphs shall refer to paragraphs of this First Amendment.

2.       RELOCATED PREMISES. Effective as of January 1, 2012 ("Relocation Commencement Date") the current premises have been relocated to Suite 506 ("Relocated Premises), deemed to contain 1,489 rentable square feet, on the Fifth Floor of the Building, as shown hatched on Exhibit A attached and incorporated, which shall become the "Premises" under the Lease. As of the Relocation Commencement Date, Tenant's right to possession of the Original Premises has ceased and will be of no further force and effect, and Tenant shall surrender the Original Premises to Landlord pursuant to Section 18.1 of the Lease within ten days after the date of this First Amendment.

3.       RELOCATED PREMISES LEASE TERM. The Lease Term as it pertains to the Relocation Premises shall commence on January 1, 2012 and shall expire on February 28, 2014.

4.       FIXED RENT, TENANT'S TAX PAYMENT AND TENANT'S OPERATING PAYMENT. Effective January 1, 2012 and for the duration of the Lease Term, Fixed Rent, Tenant's Tax Payment and Tenant's Operating Payment shall be paid as follows:

(a)       The Fixed Rent due for the Relocated Premises Lease Term shall be payable in monthly installments as follows:

| Period | Amount of Annual Fixed Rent | Amount of Fixed Rent Payable Per Month |
|---|---|---|
| 01/01/12 – 02/29/12 | ▮ | ▮ |
| 03/01/12 – 02/28/13 | | |
| 03/01/13 – 02/28/14 | | |

(b)    Tenant's Tax Payment and Tenant's Operating Payment shall be payable according to Article 7 of the Lease; the "Tenant's Proportionate Share" shall change to 1.4446 percent (1.4446%); and the "Base Expense Year" shall remain calendar year 2009.

5.    ACCEPTANCE OF PREMISES.  Tenant acknowledges that (a) it is currently occupying the Premises and accepts same in "as-is" condition, (b) as of the date of this First Amendment, the Premises are in good order and satisfactory condition, and (c) no promises to alter, remodel or improve the Premises or Building and no representations concerning the condition of the Premises or Building have been made by Landlord to Tenant other than as may be expressly stated in the Lease.

6.    FURNITURE RENTAL REIMBURSEMENT.  Tenant agrees that it will pay to Landlord the sum of $500.00 per month ("Furniture Rental Reimbursement") to reimburse Landlord for a portion its cost for renting the furniture as more particularly described on Exhibit B attached hereto and by this reference made a part hereof ("Furniture").  Said payment will be billed and paid at the same as Fixed Rent is billed and paid. Failure to make such payments will be treated in the same manner as failure to pay Fixed Rent under the terms of the Lease as herein amended. The Furniture will be returned to Landlord at the end of the Term in the same condition as the Furniture was delivered to Tenant, normal wear and tear excepted. The first payment of the Furniture Rental Reimbursement will made no later than January 31, 2012 with subsequent payments being due and payable on the first day of each month as set forth above.

7.    LIMITATION OF LIABILITY.  Notwithstanding anything appearing to the contrary in the Lease, the liability of Landlord for Landlord's obligations under the Lease shall be limited to Landlord's interest in the Building and Tenant shall not look to any other property or assets of Landlord or the property or assets of any partner, member, manager, shareholder, director, officer, affiliate, beneficiary, trustee, principal, employee or agent of Landlord (or any direct or indirect member, shareholder, partner or other owner of any such member, shareholder, partner, manager, director, officer, agent, affiliate or employee of such other party, or any director, officer, employee, agent, manager or trustee of any of the foregoing) [collectively, the "Parties"] in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations; and none of the Parties shall be personally liable for the performance of Landlord's obligations under the Lease.

8.    TAX STATUS OF BENEFICIAL OWNER.  Tenant recognizes and acknowledges that Landlord and/or certain beneficial owners of Landlord may from time to time qualify as real estate investment trusts pursuant to Sections 856 et seq. of the Code and that avoiding (a) the loss of such status, (b) the receipt of any income derived under any provision of this Lease that does not constitute "rents from real property" (in the case of real estate investment trusts), and (c) the imposition of income, penalty or similar taxes (each an "Adverse Event") is of material concern to Landlord and such beneficial owners. In the event that this Lease or any document contemplated hereby could, in the opinion of counsel to Landlord, result in or cause an Adverse Event, Tenant agrees to cooperate with Landlord in negotiating an amendment or modification thereof and shall at the request of Landlord execute and deliver such documents reasonably required to effect such amendment or modification. Any amendment or modification pursuant to this Section shall be structured so that the economic results to Landlord and Tenant shall be substantially similar to those set forth in this Lease without regard to such amendment or modification. Without limiting any of Landlord's other rights under this Section, Landlord may waive the receipt of any amount payable to Landlord hereunder and such waiver shall constitute an amendment or modification of this Lease with respect to such payment. Tenant expressly covenants and agrees not to enter into any sublease or assignment which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the property leased, used, occupied, or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such purported sublease or assignment shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy, or utilization of any part of the Premises.   .

9.      CONFLICTING PROVISIONS.  If any provisions of this First Amendment conflict with any of those of the Lease, then the provisions of this First Amendment shall govern.

10.      REMAINING LEASE PROVISIONS.  Except as stated in this First Amendment, all other viable and applicable provisions of the Lease shall remain unchanged and continue in full force and effect throughout the Lease Term.

11.      BINDING EFFECT.  Landlord and Tenant ratify and confirm the Lease and agree that this First Amendment shall bind and inure to the benefit of the parties, and their respective successors, assigns and representatives as of the date first stated.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

AFFIRMING THE ABOVE, the parties have executed this FIRST AMENDMENT OF LEASE AGREEMENT on the date first stated.

WITNESSES:

LANDLORD:
BRICKELL KEY CENTER, L.P., a Delaware limited partnership
    By:  BRICKELL KEY CENTER GP, L.L.C., a Delaware limited liability company, as its sole general partner

CARLOS SUAREZ

By: _____

Name: ~~Steven R. Wechsler~~
        Senior Managing Director

Title: _____

            OK *MS*

TENANT:
LUBERCY INVESTMENTS, INC., a Florida corporation

By: _____

Name:  TYRONE SERRAO

Title:   PRESIDENT

LISA SHERRIEP

**EXHIBIT A**
**SUITE 506**

# COURVOISIER CENTRE I

### 501 BRICKELL KEY DRIVE

Suite 506





**EXHIBIT B**

**FURNITURE**
**COURVOISIER CENTRE I, SUITE 506**

- 1 Small glass coffee table

- 2 Leather cream color sofa-chairs

- 8 High back desk chairs with wheels

- 6 Silver/black desk chairs without wheels

- 1 Small refrigerator-white

- 1 Hand towel holder-white

- 1 Stainless steel credenza in conference room

- 4 Computer monitors/keyboards, and mouse stands

- 1 Blue trash tin with lid

- 1 Blue trash bin without lid

- 1 Grey trash bin with lid

- 3 Light color oak workstation/desk

- 1 White reception desk

- 1 Conference Room table-white

## 2013 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P00000020175

**Entity Name:** LUBERCY INVESTMENTS, INC.

**FILED**
**Feb 15, 2013**
**Secretary of State**

**Current Principal Place of Business:**

501 BRICKELL KEY DRIVE
SUITE 506
MIAMI, FL 33131

**Current Mailing Address:**

501 BRICKELL KEY DRIVE
SUITE 506
MIAMI, FL 33131 US

**FEI Number:** 65-0986656                          **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

PEDRO M. GALLINAR & ASSOCIATES, P.A.
6701 SUNSET DRIVE
SUITE 100
MIAMI, FL 33143 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   PEDRO GALLINAR                                        02/15/2013

_____Electronic Signature of Registered Agent_____                     Date

**Officer/Director Detail Detail :**

| | |
|---|---|
| Title | DPS |
| Name | SERRAO, TYRONE |
| Address | 501 BRICKELL KEY DR. SUITE 506 |
| City-State-Zip: | MIAMI FL 33131 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath, that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: TYRONE SERRAO                          DIRECTOR             02/15/2013

_____Electronic Signature of Signing Officer/Director Detail_____                 Date

# SERRAO
# DECLARATION
# EXHIBIT 2

Issued 1909 - Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen

| 1.  Shipbroker | BIMCO UNIFORM TIME-CHARTER (AS REVISED 2001) CODE NAME: "BALTIME 1939" |
|---|---|
| | PART I |
| | 2.  Place and date of Charter<br>MIAMI, FLORIDA 01/25/2010 |
| 3.  Owners/Place of business<br>GRETCHEN SHIPPING INC., LIBERIA | 4.  Charterers/Place of business<br>COMMODITIES & MINERALS ENTERPRISE, LTD, BVI |
| 5.  Vessel's Name<br>CHRISTOFFER OLDENDORFF<br>T.B.R. GENERAL PIAR | 6.  GT/NT<br>37,959 / 16,736 |
| 7.  Class<br>LLOYD'S REGISTER | 8.  Indicated brake horse power (bhp)<br>15,400 |
| 9.  Total tons d. w. (abt.) on summer freeboard<br>62,694 | 10. Cubic feet grain/bale capacity<br>59,703.6 CBM / 57,899.8 CBM |
| 11. Permanent bunkers (abt.) | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of<br>13.5 KNOTS |
| 13. Present position<br>TRADING | 14. Period of hire (Cl. 1)<br>60 MONTHS FROM DATE OF DELIVERY EXCLUDING DRYDOCKING AND/OR ANNUAL MAINTENANCE PERIODS, AND OFF-HIRE PERIOD |
| 15. Port of delivery (Cl. 1)<br>MILE MARKER 178 RIO ORINOCO | 16. Time of delivery (Cl. 1)<br>BETWEEN 02/10/2010 - 02/14/2010 UNLESS OTHERWISE AGREED |
| 17. (a) Trade limits (Cl. 2)<br>PUERTO ORDAZ, PALUA, MATANZAS, CHINA,  BOCA GRANDE, UNLESS OTHERWISE AGREED<br><br>(b) Cargo exclusions specially agreed<br>NO USE OF GRABS | |
| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5)<br>NO MAXIMUM<br>40 TONS MDO,  100 TONS IFO - MIN | 19. Charter hire (Cl. 6)<br>USD 25,641.03 PER DAY, INCREASING BY 2% PER ANNUM, COMMENCING ONE YEAR AFTER DATE OF DELIVERY |
| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)<br>IN U.S.DOLLARS BY SWIFT TRANSFER. HIRE TO BE PAID PUNCTUALLY AND REGULARLY, STRICTLY ON TIME AND WITHOUT ANY DELAY, FREE OF ANY DEDUCTIONS OR BANK CHARGES, INTO OWNERS' BANK ACCOUNT.........................................<br>IN FAVOR OF  GRETCHEN SHIPPING INC. THROUGHOUT THE CHARTER PERIOD. | |
| 21. Place or range of re-delivery (Cl. 7)<br>BOCA GRANDE II OR ANY OTHER PORT MUTUALLY AGREED | 22. Cancelling date (Cl. 21)<br>TO BE AGREED |
| 23. Dispute resolution (state 22(A), 22(B) or 22(C); if 22(C) agreed Place of Arbitration must be stated) (Cl. 22)<br>22 (B) | 24. Brokerage commission and to whom payable (Cl. 24)<br><br>V & H VENTURES, LTD.  2.5% |
| 25. Numbers of additional clauses covering special provisions, if agreed<br>25 - 69 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| (continued) | "BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER | PART I |
|---|---|---|
| Signature (Owners)  _Secretary_  1-25-10  _Gretchen Shipping Inc._ | Signature (Charterers)  1-25-10 | |

This document is a computer generated VOLCOA form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document

**PART II**
**"BALTIME 1939" Uniform Time-Charter (as revised 2001)**

It is agreed between the party mentioned in Box 3 as Owners 1
of the Vessel named in Box 5 of the gross/net tonnage 2
indicated in Box 6, classed as stated in Box 7 and of indicated 3
brake horse power (bhp) as stated in Box 8, carrying about 4
the number of tons deadweight indicated in Box 9 on 5
summer freeboard inclusive of bunkers, stores and 6
provisions having as per builder's plan a cubic-feet grain/ 7
bale capacity as stated in Box 10 exclusive of permanent 8
bunkers, which contain about the number of tons stated in 9
Box 11, and fully loaded capable of steaming about the 10
number of knots indicated in Box 12 in good weather and 11
smooth water on a consumption of about the number of 12
tons fuel oil stated in Box 13, now in position as stated in 13
Box 13 and the party mentioned as Charterers in Box 4, as 14
follows 15

**1. Period/Port of Delivery/Time of Delivery** 16
The Owners let, and the Charterers hire the Vessel for a 17
period of the number of calendar months indicated in 18
Box 14 from the time of her arrival at M 178 station at the port 19
of vessel s delivery any time of day or night Sundays,
Saturdays and Holidays included (not a Sunday or a legal
Holiday
unless taken over) the Vessel is delivered and placed at 20
the disposal of the Charterers between 9 a.m. and 6 21
p.m. or between 9 a.m. and 2 p.m. if on Saturday, at the 22
port stated in Box 16 in such available berth where she 23
can safely lie always afloat, as the Charterers may direct 24
the Vessel being in every way fitted for ordinary cargo 25
service  The Vessel shall be delivered at the time 26
indicated in Box 16 27

**2. Trade** 28
The Vessel shall be employed in lawful trades for the 29
carriage of lawful dry bulk cargo merchandise only between 30
safe ports
or places where the Vessel can safely lie always afloat 31
within the limits stated in Box 17  No live stock nor 32
injurious, inflammable or dangerous goods (such as 33
acids, explosives, calcium carbide, ferro silicon, 34
naphtha, motor spirit, tar, or any of their products) shall 35
be shipped 36

**3. Owners' Obligations** 37
The Owners shall provide and pay for all provisions and 38
Wages, for ordinary H+M and P+I insurance of the Vessel, 39
for all deck and
Engine-room stores and maintain her in a thoroughly 40
efficient state in hull and machinery during service  The 41
Owners shall provide watchmen or other qualified shoremen
for loading/discharging operations of the ship and suitable
ship's fenders for ship to ship transfers  The vessel shall be
fitted with special self unloading machinery for discharging
bulk cargo.
Owners shall provide watchmen from the crew to 42
operate the Vessel s cargo handling gear, unless the 43
crew s employment conditions or local union or port 44
regulations prohibit this, in which case qualified shore 45
watchmen shall be provided and paid for by the 46
Charterers. 47

**4. Charterers' Obligations** 48
The Charterers shall provide and pay for all fuel oil, port 49
charges, pilotages (whether compulsory or not), canal 50
steersmen, boatage, lights, tug assistance, consular 51
charges (except those pertaining to the Master  officers 52
and crew), canal, dock and other dues and charges, 53
including any foreign general municipality or state taxes 54
also all dock, harbour and tonnage dues at the ports of 55
delivery and re delivery (unless incurred through cargo 56
carried before delivery or after re-delivery), agencies 57
commissions  also shall arrange and pay for loading, 58

trimming, stowing (including dunnage and shifting 59
boards, excepting any already on board), unloading, 60
weighing, tallying and delivery of cargoes, surveys on 61
hatches, meals supplied to officials and men at their 62
service and all other charges and expenses whatsoever 63
including detention and expenses through quarantine 64
(including cost of fumigation and disinfection)  All ropes 65
slings and special runners actually used for loading 66
and discharging and any special gear, including special 67
ropes and chains required by the custom of the port for 68
mooring shall be for the Charterers' account. The Vessel 69
shall be fitted with winches, derricks, wheels and or- 70
dinary runners capable of handling lifts up to 2 tons. 71

**5. Bunkers** 72
The Charterers at port of delivery and the Owners at port 73
of re delivery shall take over and pay for all fuel oil 74
remaining in the Vessel's bunkers as per last invoice per ton 75
with accompanied proof of payment, at current price at the
respective ports. The Vessel shall be re-delivered with 76
not less than the number of tons and not exceeding the 77
number of tons of fuel oil in the Vessel s bunkers stated 78
in Box 18 79

**6. Hire** 80
The Charterers shall pay as hire the rate stated in Box 81
19 per 15 30 days  commencing in accordance with Clause 82
1 until her re delivery to the Owners 83
Payment of hire shall be made in cash, in the currency 84
stated in Box 20, without discount, every 15 30 days  in 85
advance, and in the manner prescribed in Box 20  In 86
default of payment the Owners shall have the right of 87
withdrawing the Vessel from the service of the Charterers 88
without noting any protest and without interference by 89
any court or any other formality whatsoever and without 90
prejudice to any claim the Owners may otherwise have 91
on the Charterers under the Charter 92

**7. Re-delivery** 93
The Vessel shall be re-delivered on the expiration of the 94
Charter in the same good order as when delivered to 95
the Charterers (fair wear and tear excepted) at an ice- 96
free port in the Charterers' option at the place or within 97
the range stated in Box 21, at any time day or night 98
Saturdays  Sundays and Holidays included between 9 a.m.
and 6 p.m.
and 9 a.m. and 2 p.m. on Saturday, but the day of re- 99
delivery shall not be a Sunday or legal Holiday. 100
The Charterers shall give the Owners not less than thirty 101
(30) ten
days' notice at which port and on about which day the 102
Vessel will be re delivered. Should the Vessel be ordered 103
on a voyage by which the Charter period will be exceeded 104
the Charterers shall have the use of the Vessel to enable 105
them to complete the voyage, provided it could be 106
reasonably calculated that the voyage would allow 107
redelivery about the time fixed for the termination of the 108
Charter, but for any time exceeding the termination date 109
the Charterers shall pay the market rate if higher than 110
the rate stipulated herein 111

**8. Cargo Space** 112
The whole reach and burthen of the Vessel, including 113
lawful deck-capacity shall be at the Charterers' disposal, 114
reserving proper and sufficient space for the Vessel s 115
Master, officers, crew, tackle, apparel, furniture, 116
provisions and stores. 117

**9  Master** 118
The Master shall prosecute all voyages with the utmost 119
dispatch and shall render customary assistance with 120
the Vessel s crew  The Master shall be under the orders 121

This document is a computer generated BALTIME 1939 revised 2001) form printed by authority of BIMCO  Any insertion or deletion to the form must be clearly visible  In event of any modification being made to the pre-printed text of this document which is not clearly visible the text of the original BIMCO approved document shall apply  BIMCO assumes no responsibility for any loss  damage or expense caused as a result of discrepancies between the original BIMCO approved document and the computer generated document

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

of the Charterers as regards employment, agency, or other arrangements. The Charterers shall indemnify the Owners against all consequences or liabilities arising from the Master, officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods. The Owners shall not be responsible for shortage, mixture, marks, nor for Number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise. If the Charterers have reason to be dissatisfied with the conduct of the Master or any officer, the Owners, on receiving particulars of the complaint, promptly to investigate the matter, and, if necessary and practicable, to make a change in the appointments. 122-136

**10. Directions and Logs**
The Charterers shall furnish the Master with all instructions and sailing directions and the Master shall keep full and correct logs accessible to the Charterers or their Agents. 137-141

**11. Suspension of Hire etc.**
(A) In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than twenty-four consecutive hours, no hire shall be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance shall be adjusted accordingly.
(B) In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account, even if such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants. 142-161

**12. Responsibility and Exemption**
The Owners only shall be responsible for delay in delivery of the Vessel or for delay during the currency of the Charter and for loss or damage to goods onboard, if such delay or loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. The Owners shall not be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their servants. The Owners shall not be liable for loss or damage arising or resulting from strikes, lock-outs or stoppage or restraint of labour (including the Master, officers or crew) whether partial or general. The Charterers shall be responsible for loss or damage caused to the Vessel or to the Owners by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing or discharging of goods or any other improper or negligent act on their part or that of their servants. 162-182

**13. Advances**
The Charterers or their Agents shall advance to the Master, if required, necessary funds for ordinary disbursements for the Vessel's account at any port charging only interest at 6.3 (three) per cent. p.a., such advances 183-187

shall be deducted from hire. 188

**14. Excluded Ports**
The Vessel shall not be ordered to nor bound to enter:
(A) any place where fever or epidemics are prevalent or to which the Master, officers and crew by law are not bound to follow the Vessel;
(B) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel shall not be obliged to force ice, nor on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Unforeseen detention through any of above causes shall be for the Charterers' account. 189-206

**15. Loss of Vessel**
Should the Vessel be lost or missing, hire shall cease from the date when she was lost. If the date of loss cannot be ascertained half hire shall be paid from the date the Vessel was last reported until the calculated date of arrival at the destination. Any hire paid in advance shall be adjusted accordingly. 207-213

**16. Overtime**
The Vessel shall work day and night if required. Charter hire includes officers and crew overtime. The Charterers shall refund the Owners their outlays for all overtime paid to officers and crew according to the hours and rates stated in the Vessel's articles. 214-218

**17. Lien**
The Owners shall have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers shall have a lien on the Vessel for all moneys paid in advance and not earned. 219-224

**18. Salvage**
All salvage and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's, officers' and crew's proportion and all legal and other expenses including hire paid under the charter for time lost in the salvage, also repairs of damage and fuel oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount. 225-233

**19. Sublet**
The Charterers shall have the option of subletting the Vessel, subject to Owners' approval, not to be unreasonably withheld, giving due notice to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter. 234-238

**20. War ("Conwartime 1993")**
(A) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or 239-250

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. 251–258

(B) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it. 259–270

(C) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation. 271–278

(D) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account. 279–284

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due. 285–293

Charterers acknowledge that Venezuela is an additional premium area. So any extra insurance premium of any nature whatsoever to be paid for by the Charterers upon their being presented with Owners' insurers official vouchers.

(E) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due. 294–300

(F) The Vessel shall have liberty:- 301

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions; 302–311

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 312–315

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 316–323

(iv) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; 324–326

(v) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions. 327–330

(G) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. 331–341

(H) If in compliance with any of the provisions of sub-clauses (B) to (G) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter 342–345

**21. Cancelling** 346

Should the Vessel not be delivered by the date indicated in Box 22, the Charterers shall have the option of cancelling. If the Vessel cannot be delivered by the cancelling date, the Charterers, if required, shall declare within 48 hours after receiving notice thereof whether they cancel or will take delivery of the Vessel 347–352

**22. Dispute Resolution** 353

1) (A) This Charter shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Charter shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause. 354–360

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. 361–364

The reference shall be to three arbitrators.—A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement. 365–381

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the 382–383

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and the computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

| | |
|---|---|
| appointment of a sole arbitrator | 384 |
| In cases where neither the claim nor any counterclaim | 385 |
| exceeds the sum of US$50 000 (or such other sum as | 386 |
| the parties may agree) the arbitration shall be conducted | 387 |
| in accordance with the LMAA Small Claims Procedure | 388 |
| current at the time when the arbitration proceedings are | 389 |
| commenced | 390 |
| (B) This Charter shall be governed by and construed in | 391 |
| accordance with Title 9 of the United States Code and | 392 |
| the Maritime Law of the United States and any dispute | 393 |
| arising out of or in connection with this Contract shall | 394 |
| be referred to three persons at New York one to be | 395 |
| appointed by each of the parties hereto and the third by | 396 |
| the two so chosen their decision or that of any two of | 397 |
| them shall be final and for the purposes of enforcing | 398 |
| any award, judgement may be entered on an award by | 399 |
| any court of competent jurisdiction The proceedings | 400 |
| shall be conducted in accordance with the rules of the | 401 |
| Society of Maritime Arbitrators Inc | 402 |
| In cases where neither the claim nor any counterclaim | 403 |
| exceeds the sum of US$50 000 (or such other sum as | 404 |
| the parties may agree) the arbitration shall be conducted | 405 |
| in accordance with the Shortened Arbitration Procedure | 406 |
| of the Society of Maritime Arbitrators Inc current at the | 407 |
| time when the arbitration proceedings are commenced | 408 |
| (C) This Charter shall be governed by and construed in | 409 |
| accordance with the laws of the place mutually agreed | 410 |
| by the parties and any dispute arising out of or in | 411 |
| connection with this Charter shall be referred to | 412 |
| arbitration at a mutually agreed place, subject to the | 413 |
| procedures applicable there | 414 |
| (D) Notwithstanding (A), (B) or (C) above the parties | 415 |
| may agree at any time to refer to mediation any difference | 416 |
| and/or dispute arising out of or in connection with this | 417 |
| Charter | 418 |
| In the case of a dispute in respect of which arbitration | 419 |
| has been commenced under (A), (B) or (C) above the | 420 |
| following shall apply | 421 |
| (i) Either party may at any time and from time to time | 422 |
| elect to refer the dispute or part of the dispute to | 423 |
| mediation by service on the other party of a written notice | 424 |
| (the "Mediation Notice") calling on the other party to agree | 425 |
| to mediation | 426 |
| (ii) The other party shall thereupon within 14 calendar | 427 |
| days of receipt of the Mediation Notice confirm that they | 428 |
| agree to mediation in which case the parties shall | 429 |
| thereafter agree a mediator within a further 14 calendar | 430 |
| days failing which on the application of either party a | 431 |
| mediator will be appointed promptly by the Arbitration | 432 |
| Tribunal ("the Tribunal") or such person as the Tribunal | 433 |
| may designate for that purpose The mediation shall | 434 |

| | |
|---|---|
| be conducted in such place and in accordance with such | 435 |
| procedure and on such terms as the parties may agree | 436 |
| or in the event of disagreement as may be set by the | 437 |
| mediator | 438 |
| (iii) If the other party does not agree to mediate that fact | 439 |
| may be brought to the attention of the Tribunal and may | 440 |
| be taken into account by the Tribunal when allocating | 441 |
| the costs of the arbitration as between the parties | 442 |
| (iv) The mediation shall not affect the right of either party | 443 |
| to seek such relief or take such steps as it considers | 444 |
| necessary to protect its interest | 445 |
| (v) Either party may advise the Tribunal that they have | 446 |
| agreed to mediation The arbitration procedure shall | 447 |
| continue during the conduct of the mediation but the | 448 |
| Tribunal may take the mediation timetable into account | 449 |
| when setting the timetable for steps in the arbitration | 450 |
| (vi) Unless otherwise agreed or specified in the | 451 |
| mediation terms each party shall bear its own costs | 452 |
| incurred in the mediation and the parties shall share | 453 |
| equally the mediator's costs and expenses | 454 |
| (vii) The mediation process shall be without prejudice | 455 |
| and confidential and no information or documents | 456 |
| disclosed during it shall be revealed to the Tribunal | 457 |
| except to the extent that they are disclosable under the | 458 |
| law and procedure governing the arbitration | 459 |
| (Note The parties should be aware that the mediation | 460 |
| process may not necessarily interrupt time limits ) | 461 |
| (E) If Box 23 in Part I is not appropriately filled in sub- | 462 |
| clause (A) of this Clause shall apply Sub-clause (D) | 463 |
| shall apply in all cases | 464 |
| (A) (B) and (C) are alternatives indicate alternative | 465 |
| agreed in Box 23 | 466 |
| | |
| **23 General Average** | 467 |
| General Average shall be settled according to York/ | 468 |
| Antwerp Rules 1994 and any subsequent modification | 469 |
| thereof Hire shall not contribute to General Average | 470 |
| | |
| **24 Commission** | 471 |
| The Owners shall pay a commission at the rate stated | 472 |
| in Box 24 to the party mentioned in Box 24 on any hire | 473 |
| paid under the Charter but in no case less than is | 474 |
| necessary to cover the actual expenses of the Brokers | 475 |
| and a reasonable fee for their work If the full hire is not | 476 |
| paid owing to breach of Charter by either of the parties | 477 |
| the party liable therefor shall indemnify the Brokers | 478 |
| against their loss of commission Should the parties | 479 |
| agree to cancel the Charter the Owners shall indemnify | 480 |
| the Brokers against any loss of commission but in such | 481 |
| case the commission not to exceed the brokerage | 482 |
| on one year's hire | 483 |

<u>ADDITIONAL CLAUSES NO 25 THROUGH TO NO 69, BOTH
INCLUSIVE, FORM PART OF THIS C/P AND FULLY APPLY</u>

FOR THE OWNERS                    FOR THE CHARTERERS

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO Any insertion or deletion to the form must be clearly visible In event of any modification being made to the preprinted text of the document which is not clearly visible the text of the original BIMCO approved document shall apply BIMCO assumes no responsibility for any loss damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document

# SERRAO
# DECLARATION
# EXHIBIT 3

## LETTER of INTENT

**THE UNDERSIGNED:**

1. **Commodities and Minerals Enterprise Ltd.,** a corporation organised and existing under the laws of The British Virgin Islands, with registered office at OMC Chambers, P O Box 3152, Road Town, Tortola, British Virgin Islands, Certificate of Incorporation No 67450, hereafter referred to as: "**CME**"

2. **Kyma Ship Management Inc.,** a corporation organised and existing under the laws of Panama with registered office at Arias, Fabrega & Fabrega, Plaza 2000, 16th Floor, 50th Street, P.O. Box 0816-01098, Panama, Republic of Panama, or its assigned nominee, hereafter referred to as: "**KYMA**"

"CME" and "KYMA" are hereinafter jointly referred to as: "Parties" and any of them as a "Party"

**A. WHEREAS:**

1. KYMA or its nominee, intends to purchase and upgrade a self-unloading vessel, hereinafter referred to as the "Vessel", for the sole purpose of shipping iron ore material provided by CME from Puerto Ordaz Venezuela to the transfer station M/V Boca Grande II; and

2. The Vessel shall be MV Christofer Oldendorff;

3. The Parties intend to enter into a time charter (the "Charter") for the purpose of transporting iron ore from Puerto Ordaz, Venezuela to the Boca Grande II transfer station.

**B. IN CONSIDERATION OF THE ABOVE, THE PARTIES NOW HEREBY AGREE AS FOLLOWS:**

1. The Parties shall work mutually to consummate the "Charter" which will include the conditions stipulated herein  and any other terms and conditions mutually agreed.

2. The term of the Charter shall be for no less than 5 years starting as soon as the purchase of the vessel is completed and the vessel arrives at Mile 178 in the Orinoco River, Puerto Ordaz, Venezuela.

3. The daily charter hire for the above-mentioned Vessel shall be USD 25,000.00 (twenty five thousand U.S. dollars), plus an annual increase of 2%.

4. CME shall arrange an irrevocable standby letter of credit to secure its obligations to pay charter hire, in the amount of USD 4,500,000.00.

5. KYMA shall be responsible for all costs and expenses related to Deck & Engine crew and welfare, Repair & Maintenance and Insurance and all other expenses customarily borne by the owners of vessel under Time Charter.

6. CME shall be responsible for all costs and expenses related to Bunkering, Ports and any other expenses customarily borne by the Time Charterers .

7. All other terms and conditions as per BIMCO's GENTIME  charter party

8. The Parties herewith agree that this LOI is binding both parties until it is replaced by a signed, all-inclusive Time Charter Party.

9. Neither Party may at any time disclose or use any information concerning the negotiations between the Parties or (the existence of) this agreement.  Disclosure to a selected number of employees or any of the professional advisors of either of the Parties shall not be a breach of the confidentiality but shall only be made subject to a duty of confidentiality.

10. Each Party shall cover its own costs in connection with the preparation, negotiation and signing of this Agreement, the Charter or any agreement resulting thereof or relating hereto.

This LETTER OF INTENT has been signed in two counterparts, each of equal value and validity on the 4th day of December 2009

For and on behalf of
"CME"

Tyrone Serrao
_____
Name

President
_____
Title

For and on behalf of
"KYMA"

_____
Name

_____
Title

`

# SERRAO

# DECLARATION

# EXHIBIT 4

# REDACTED

**From:** Paris Katsoufis <pkatsoufis@mac.com>
**Subject: Re: m.v Christoffer Oldendorff visit I2/9/09**
**Date:** December 11, 2009 11:43:10 AM EST
**To:** Stefanos Skyriotis <sskyriotis@kymaship.com>, George Katsoufis
<gkatsoufis@kymaship.com>, Mark Davis <mdavis@kymaship.com>, Lambros Katsoufis
<lkatsoufis@kymaship.com>
**Cc:** Arturo Contreras <ac@cmeltd.com>, Tyrone Serrao <ts@cmeltd.com>


Dear All,

On Dec 9,2009 Arturo and I visited the captioned vessel,lying at the Blount Island marine terminal of the port of Jacksonville.

The vessel was unloading abt 40,000 tons of coal from Colombia.
We followed the discharging operation steps throughout the vessel with the guidance of Ch.Mate capt. Ravil Aksyanov( a very well versed to the operation  Russian officer) who  answered all our questions.
This is a very well thought design which enables the vessel to discharge abt 4,500 M/T iron ore or 4,400 M/T of coal per hour.The operation was seamless and fast without almost any trace of dust or spill over.
This is  a vessel  inside the old vessel which has 222 hydraulic basket gates feeding 3 hold conveyors of 1500 MT max handling capacity each per hour.The three conveyors feed the boom conveyor capable of unloading the quantities mentioned  above. The bottom of  of the holds is constructed wavy like a hopper, therefore the cargo slides down to the conveyors. In the unlikely event that moisture will stick the cargo not allowing it  to slide down easily, they have added 151 hydraulic vibrators attached to the under side of  the hopper-like bottom of the holds,guaranteeing the complete discharge of the cargo.

1

The vessel's characteristics and her vital statistics are as attached.

The condition of the vessel was much better than her age implies. The engine room was very clean ,her bilges were very clean,probably the cleanest bilges  of any ship I have seen. The reason for such a condition should be sought to the fact that the owners are a German company,the vessel visits very often the United States  and therefore is" under the gun" of U.S. Coast Guard and more importantly the crew is serving onboard for many years.the Chief Engineer Mr.Marek Golanko from Poland is with the company for 15 years.He is proud of his engines and takes special care of them and it shows.

The vessel is equipped with 5 generators that are used for both the vessel and the self unloading system. The F.O for the M.E is 380 CST while the generators are consuming Marine Diesel. The consumption for the M.E at Sea is abt 37 tons HFO and 3,3 MT D.O, while in port, with  the whole system  fully operative the consumption 7,5 MT.

The incinerator is capable of burning sludge and therefore they do not need to unload anything ashore including garbage.

The fresh water generator is of the vacuum type using the jacket cooling water. Its capacity is not more than 16 tons a day. The C.E when asked what he would need to have in this ship he said another water evaporator or reverse Osmosis since the quantity produced is not enough to take care of all the requirements. They wash the conveyors and the boom with fresh water whenever they change cargo as this time they may load salt.

The vessel is equipped with a KAMEWA bow thruster of 1400 BHP,which makes the berthing operation safer, easier and less expensive.

The Engine room is of  the unmanned configuration but the C.E has a motorman at night on watch for safety reasons. They had probably an accident and decided to be at the safe side.

The C.E did not report any problem in the  Engine room,which I find rather strange considering the age of the vessel.He may be telling the truth.

The upper deck is well painted and seems to be well maintained for a vessel of 27 years of age. to the contrary,the condition of the inner spaces, holds, conveyors ,Hydraulic basket gates,hold stair cases etc  needs better maintenance.

The vessel has a crew or 35 crew members since at least 10 crew members are involved in the operation and maintenance of the unloading system. Recently they  released the Chief Mate of watch duties and they have added a 2nd officer for the Chief mates watch.
The hatch covers are side sliding hydraulically.

The vessel was, last year, in drydock or wet dock for 3 months or so the Captain advised us. The reason,  of this long out of service period,was the age of the vessel and the sensitivity of the authorities to overaged vessels.One LLoyd's surveyor was onboard for the whole duration indicating continuously areas of concern and required repairs.
This is the reason that I am of the opinion to try and buy her" as is" and take her to the dry dock to complete her special survey which is due in March latest,or all the items of the Continuous Machinery survey which are due either in Feb or Sept.2010 .
The Master,Capt Sergiy Rulevsky ,a Ukranian, was very knowledgeable of his business but he denied to work for us in case we were to buy this vessel.

I believe that this is a good tool under the circumstances.

2

The high amount of insurance premium quoted  is of concern but we hope that the underwriters after they inspect the vessel they will reaffirm my opinion on vessel's condition and they will reduce their demands swayed in a way by our good record.

Additionally ,of concern is the state of affairs in Venezuela and the unilateral decisions of its government. I plan to discuss this with our charterers and take a common course of action.


Best Regards
Paris Katsoufis



| | **Vessel's Particulars**<br>Reference: ER-Part-09 | | **Oldendorff Carriers** |
|---|---|---|---|

| Name of Vessel | Official No. | Call Sign | IMO Number |
|---|---|---|---|
| CHRISTOFFER OLDENDORFF | 90340 | ELXC8 | 8011782 |

| Flag | Port of Registry | Classification | Classification Number |
|---|---|---|---|
| LIBERIA | MONROVIA | LLOYD'S REGISTER OF SHIPPING | 8011782 |

| Owner | Manager/ Operator | Character of Class | |
|---|---|---|---|
| | | Hull | Machinery |
| OLDENDORFF CARRIERS GmbH & Co. KG | CSL INTERNATIONAL / ARUBA MARITIME INC. | + 100A1 ESP LI | + LMC UMS |

| Type of Vessel | Year, Number of Built | Yard of Built |
|---|---|---|
| SELF-UNLOADING BULK CARRIER | 1982/NO. 253 1988 (CONVERTED) | GOVAN SHIPBUILDERS LTD. GLASGOW SCOTLAND VEROLME ESTALEIROS REUNIDOS RIO DE JANEIRO BRAZIL |

| Length o.a. | Length b.p. | Beam | Depth moulded | max. Draft |
|---|---|---|---|---|
| 227.73 m (747'02") | 214.50 m (703'09") | 32.23 m (105'09") | 19247 m (63'02") | 13.488 m summer (44'03") |

| Freeboard | Masthead Height z. Keel | Gross Tonnage | Net Tonnage |
|---|---|---|---|
| 5.759 m (summer) | 48.7 m (159'09")above BL | 37,959 MT | 16,733 MT |

| Deadweight | Light Ship | Displacement | Holds | Crew |
|---|---|---|---|---|
| 62,594 mt (summer) | 16,348 mt | 76,942 mt (summer) | 7 | 36 |

| | Container | | Loading Capacity | |
|---|---|---|---|---|
| Below Deck | On Deck | Reefer | Grain | Bale |
| N/A TEU | N/A TEU | N/A TEU | 59,703.6 cbm (2,108,412 cft) | 57,899.8 Cbm (2,044,712 cft) |

| Main Engines | | Aux. Generator Diesels | |
|---|---|---|---|
| Number, Output | Type | Number, Output | Type |
| (1) Engine  15,400 BHP (11,400 Kw) | B & W 5l 80GFCA | 3 X 880 Kw<br>2 X 625 Kw | ALLEN S12F-HBC YANMAR 6GL-UT |

| Propeller | | Shaft Generator | |
|---|---|---|---|
| Number, Type | Diameter | Number, Output | Type |
| NIKALIUM FIXED 4 BLADE RIGHT HANDED | DIAMETER6.80 m PITCH 4.62 m | N/A | N/A |

| Bow Thruster | | Speed | |
|---|---|---|---|
| Number, Output | Type | Service | Maximum |
| 1,400 BHP | KAMEWA TT 2000 F/BMS-CP | 13.5 kn | 14.5 kn |

**Nautical Equipment**

| | |
|---|---|
| 1 X- BAND RADAR TOKIMEC BR-340 MA-X27 | 2 VHF  Sailor  C403 |
| 1 S- BAND RADAR TOKIMEC BR-3440 MA-S314 | 2 VHF Sailor  RM 2048 |
| 1 GYRO COMPASS SPERRY MK-37 / AUTO PILOT | 2 VHF DSC Sailor 2042 |
| 1 MAGNET COMPASS SESTREL 90624 | 1 HF SSB/ DSC Station Furuno FS2571-C |
| 1 GPS FURUNO GP-90 | 1 RADIO TELEX TERMINAL Furuno IB583 |
| 1 GPS FURUNO GP- 80 | 1 INMARSAT –C  TERMINAL SAILOR |
| 1 AIS UNIT Furuno FA- 100 | 1 INMARSAT- B Terminal Nera ( Saturn B ) |
| 1 SPEED LOG FURUNO DS-80 | 1 GYRO DIGITAL REPEATER  AD converter AD 100 |
| 1 WEATHER FACSIMILE FURUNO FAX-207 | 1 CHARTCO |
| 1 NAVTEX-2 LO-KATA | 1 SVDR Rutter Canada |
| 1 COURSE RECORDER TOKIMEC CR - 2 |      MMSI  636090340 |
| 1 CHRONOMETER KELVIN HUGHES | Mini-C Sailor TT-3000LRIT |
| 1 ECHO SOUNDER SIMRAD ED 161 | Inmarsat C: Telex: 4636 37010, |
| | C- email: 463637010@stratosmobile.net |
| | Inmarsat B: Tel.: + 3636 17410,  3636 17411 |
| | Fax: + 3636 17420 |
| | E-mail: christoffer.oldendorff@gtships.com |



| | **Vessel's Particulars**<br>Reference: ER-Part-09 | **Oldendorff Carriers** |
|---|---|---|

---

### Miscellaneous
e.g. Grain Capacity cbm, Reefer Capacity cbf, Dangerous Goods, Elevators, Shell Doors, Cargo Gear, Cranes, Selfunloader, Fork Lifts.

### Self-unloading Bulk Carrier

1. Hydraulic Basket Gates- 222 pcs. Under hoper openings 630X1900mm

2. Hydraulic Vibrators –151 pcs. Max.centrifugal force: 1,360 kp,4,200 r/m

3. Hold Conveyors: max handling capacity 1500 MT(iron ore) or 1,500 cu. M. (coal) each belt-width 2,200 mm, conveyor length169 m,lifting height 4200 mm, min./max. belt speed 0.32/ 1.77 m/s, power req.: on pulley shaft 62.5 kW.

4. 2 Cross Conveyors: max. Handling Capacity 1,500 MT (iron Ore) Or 1,500 Cu. M. (coal) each belt –width 1,800 mm, conveyor length 5.4 m. min. / max. belt speed 0.4 / 2.1 m/s, power req.: on pulley shaft 4.3 kW.

5. 2 Flexo-Lift Inner Conveyors: max. handling capacity 2,250 MT (iron ore) or 2,200 cu. M. (coal) each belt –width 2,000 mm., effective carry width 1,200 mm, height sidewalls 500 mm lifting height 31.7 m, min. / max. belt speed 2.0/3.5 m/s, power req.: on pulley shaft 262.62 kW.

6. 1 Inboard and 1 Outboard Boom Conveyor: max. handling capacity 4,500 MT (iron ore) or 4,400 cu. m. (coal), conveyor length: Inboard boom 46.2 m, Outboard Boom 31.8 m, Luffing range:18deg. Min /max belt speed 2.5 / 4.8 m/s, Luffing speed:18 deg/10 min. Inboard Boom and 18deg./5 min Outboard Boom.,power req.: on Pulley shaft 210.5 kW Inboard Boom and 158.8 kW Outboard Boom.

### Cargo Hold Capacity

| | Hold and Hatches | | Holds | |
|---|---|---|---|---|
| Hold #1 | 7,333.7 cu. m. | 259,001 cu. ft. | 7,123.8 cu. m. | 251,588 cu. ft |
| Hold #2 | 9,517.7 cu. m. | 336,133 cu. ft. | 9,223.7 cu. m. | 325,750 cu. ft. |
| Hold #3 | 9,571.4 cu. m. | 338,029 cu. ft. | 9,277.3 cu. m. | 327,643 cu. ft. |
| Hold #4 | 9,314.8 cu. m. | 328,967 cu. ft. | 9,020.7 cu. m. | 318,580 cu. ft. |
| Hold #5 | 9,235.7 cu. m. | 328,174 cu. ft. | 8,941.6 cu. m. | 315,787 cu. ft. |
| Hold #6 | 9,517.7 cu. m. | 336,133 cu. ft. | 9,223.6 cu. m. | 325,746 cu. ft. |
| Hold #7 | 5,212.6 cu. m. | 184,091 cu. ft. | 5,139.1 cu. m. | 181,496 cu. ft |
| Total: | 59,703.6 cu. m. | 2,108,528 cu. ft | 57,949.8 cu. m. | 2,046,590 cu. ft. |

### Class Notification:

+100A1    Bulk Carrier
           Self-Unloading
           Strengthened for heavy cargoes,
           Nos. 1,3,5 and 7 holds or Nos. 2,4 and 6 holds may be empty at a draft not exceeding 10.4 meters.
           Cargo in Holds 1,2,3,4,5,6 and 7 not to exceed 9,100/11,600/11,600/11,300/ 11,200/11,600 and 7,500 tonnes respectively.
           ESP LI
      +LMC UMS

This information provided in this QSE form is believed to be correct but we do not guarantee its completeness or accuracy.

| Date:<br>08.12.2009 | Signature Master: | M.V. Christoffer Oldendorff<br>Aruba Maritime Inc.<br>Monrovia/Liberia |
|---|---|---|

# REDACTED

**De:** Paris Katsoufis <pkatsoufis@me.com>
**Asunto: Re: Inspeccion de Buque de Acarreo - l: Report veloce Cristoffer oldendorf**
**Fecha:** 21 de diciembre de 2009 1:38:26 p.m. GMT-05:00
**Para:** Tyrone Serrao <ts@cmeltd.com>
**Cc:** Arturo Contreras <ac@cmeltd.com>, Gerardo Vasquez <gv@gvazquez.com>, George Katsoufis
<gkatsoufis@kymaship.com>, Stefanos Skyriotis <sskyriotis@kymaship.com>, Lambros Katsoufis
<lkatsoufis@kymaship.com>

Dear Tyrone:
Many thanks for your today's message.
I have requested our office in Greece to properly translate this report which is in italian.
From what I can understand with my poor italian the writer is reporting points that appear in vessel's Lloyds latest condition
report,which we had acquired from the Captain on our latest visit in Jacksonville  and we had seen ourselves judging from the
photos submitted..
We know almost exactly the condition since we have discussed with Lloyds and we have seen vessel's complete records.
Subject to further surveys and thickness determination to be taken before delivery of the vessel ,we plan to take the vessel in
Dry-dock and deal with all conditions as needed.I have in mind to have the vessel at your disposal after dry dock  complying
with all the present and 2010 Lloyds memoranda cleared.
If everything is as it appears in the records,I expect that the vessel will be at your disposal mid to end February. I do not want
after we start to have stoppages for emergency repairs or imminent class requirements.
Is this unacceptable to you?
We hope latest to day to send you the draft  Time Charter.
Best regards
Paris Katsoufis
Kyma Ship Management Inc
(as Agents)

1

On Dec 21, 2009, at 12:30 PM, Tyrone Serrao wrote:


Dear Paris,
We have made some additional investigation and found a report and some pictures taken to MV Cristoffer Oldendorf, during a recent inspection.
Please have a look at it and revert with your opinion.

Please handle this information in a confidential way.

Based on our discussions being carried on, and you can manage to get over the circumstances mentioned in the report, we shall require this vsl for shuttle operation as soon as possible.

Best regards


Tyrone Serrao
President


<pastedGraphic.tiff>

**Commodities & Minerals Enterprise LTD**
501 Brickell Key Drive
Suite 502
Miami Fl 33131
Office +1 305.375.0632
GSM USA +1 305.450.4782
GSM VZLA +58 4143860759
E-Mail ts@cmeltd.com
http://www.cmeltd.com



Subject:   report veloce Cristoffer oldendorf

la nave ha delle raccomandazioni, fatte dai lloyd, dove ci sono delle zone sospette, che bisogna controllare ogni anno con tickness.
Io ho visitato ganone prua,gavone poppa, 1 sinistra e 6 dritta.Un po di ferro si deve fare solo nel gavone, ma non molto.
Fino ad oggi, penso che ai lavori, hanno spesso cambiato ferro, ma non hanno mai messo mano ala struttura del sistema di discarica.
Come vedi da foto, la nave nella stiva ha tanti imbuti, che attraverso una apertura idraulica di una flap, scarica su un nastro, localizzato sotto la stiva, in un tunnel.
ogni stiva ha tre file di imbuti , una centrale, una laterale dritta, una laterale sinistra, con conseguente tre belt da trasporto nel tunnel una centrale,
una laterale dritta e una laterale sinistra.
Sia le flap, sia la parte bassa dell'imbuto, sia i pistoni idraulici che comandano apertura e chiusura flap imbuto, sia la base del pistone idraulico , in molti
ma dico molti imbuti e da tagliare, rinnovare ,o insertare, in piu al momento parecchi rulli trasportatori non girano, cosi come anche dei supporti dei rulli , sono marci e bisogna insertare . Su tutte le flap che scaricano sul nastro nel tunnel, la chiusura di sicurezza manuale e completamente off, bisogna solo tagliare e ripristinare.vedi foto.
Questo mi sembra un lavoro lungo e costoso da fare.La nave ultimo bacino fatto dic.2008, e' stata tre mesi e mezzo ai lavori.

2

La nave e' composta di un equipaggio di 35 persone, durante la discarica, due persone devono stare nel tunnel, due persone in coperta tra scala e cavi,
un ufficiale sta nella cargo contro room, per fare zavorra e scaricazione.
Il sistema e' controllato dal direttore di macchina e un elettricista, che stanno su questa nave da piu di tre anni, facendo tre mesi on tre off(incluso comandante)
che prima faceva 1 uff.le su questa nave, e due operai coperta, che lavorano come manutenzionatori del sistema.
La nave ha 5 generatori a gasolio, (tre per il sistema e due per la nave)
In porto ne usano 4 di generatori, quando scaricano , con consumo di 7,5 ton.di gasolio
In navigazione due generatori , con cosumo totale di 3.3 di gasolio , piu 34 tonnellato di Fuel
Il primo ufficiale, mi dice che tutte le volte che vanno a caricare all'ancora , , quando mettono il braccio fuori lateralmente, per poter aprire le stive senza problema,
lo rizzano con 4 cavi di ormeggio, due da un lato e due dall'altro , in quanto le rollate possono danneggiare il sistema girevole del braccio.Questo fatto mi insospettisce sempre di piu , al riguardo di dove scaricare se si rolla . Io domani mi faccio dare copia istruzioni, e vedo. un po se dice qualche cosa.
Al momento oltre al fatto che ha una botticina di poppa,(vedi foto) non ho altro.
Saluti

Al momento questo e tutto, domani, do sguardo alle stive che oggi erano piene, e ai certificati

Le tue foto online: crea il tuo album e tagga gli amici(See attached file: SurveyReport2411090732118011782[1].pdf)(See attached file: imbuti nella stiva.JPG)(See attached file: fondo imbuto nel tunnel.JPG)(See attached file: imbuto aperto che sta scaricando.JPG)(See attached file: marciume sotto imbuto.JPG)(See attached file: stopper a imbuto che non si puo pi mettere, tutto arruginito.JPG)
(See attached file: pistone.JPG)(See attached file: pistone con base marcia.JPG)(See attached file: chiusura non stagna dell'imbuto nel tunnel,stiva gia scaricata.JPG)(See attached file: braccio parte iniziale.JPG)(See attached file: braccio parte finale.JPG)(See attached file: mariume sotto imbuto in tunnel 1.JPG)(See attached file: IMGP3182.JPG)

CONFIDENTIALITY AND DISCLAIMER NOTICE

The information in this e-mail (including all attachments) is confidential and may be legally privileged. It is intended only for the use of the addressee and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.
If you have received this e-mail in error, please notify us immediately by return e-mail to the original sender and delete this e-mail and all attachments from your system. Any views or opinions presented are solely those of the sender and do not represent those of Duferco unless otherwise specifically stated. Duferco does not accept either legal responsibility for the contents of this message or responsibility for any changes made after being sent. You are advised to carry out a virus check before opening any attachment, Duferco does not accept liability for any damage sustained as a result of any software viruses. Please be aware that Duferco reserves the right to read all incoming and outgoing e-mails.

<imbuti nella stiva.JPG>
<fondo imbuto nel tunnel.JPG>
<imbuto aperto che sta scaricando.JPG>

<marciume sotto imbuto.JPG>
<stopper a imbuto che non si puo pi mettere, tutto arruginito.JPG>
<pistone.JPG>
<pistone con base marcia.JPG>
<chiusura non stagna dell'imbuto nel tunnel,stiva gia scaricata.JPG>
<braccio parte iniziale.JPG>
<braccio parte finale.JPG>
<mariume sotto imbuto in tunnel 1.JPG>
<IMGP3182.JPG>
<SurveyReport2411090732118011782[1].pdf>

.

# SERRAO
# DECLARATION
# EXHIBIT 5

Mark Davis <mdavis@kymaship.com> 📎                    16 September 2013 10:01
To: Lisa  Sherriff <lisa@cmeltd.com>
Fwd: Gretchen Shipping Inc. - Charter Hire Invoice No. 112

                                                        1 Attachment, 11 KB

Hi Lisa,

Kindly reminding you of the charter hire payment due on September 15th.

Best regards,
Mark

Mark S. Davis
Sr. V. P. & CFO
Kyma Ship Management, Inc.


Begin forwarded message:

**From:** Mark Davis <mdavis@kymaship.com>
**Date:** September 6, 2013 10:17:11 AM EDT
**To:** Lisa Sherriff <lisa@cmeltd.com>
**Cc:** Tyrone Serrao <ts@cmeltd.com>, Arturo Contreras <ac@cmeltd.com>, Carlos Suarez
<cjss@cmeltd.com>, Paris Katsoufis <pkatsoufis@kymaship.com>, Lambros Katsoufis
<lkatsoufis@kymaship.com>, George Katsoufis <gkatsoufis@kymaship.com>, Farid Galla
<fgalla@kymaship.com>, "Soraya Martinez, " <smartinez@kymaship.com>
**Subject: Gretchen Shipping Inc. - Charter Hire Invoice No. 112**

Dear Lisa,

Attached please find our Charter Hire Invoice No. 112. This covers the period from U.T.
20:42 on September 15, 2013 until U.T. 20:42 on September 30, 2013.

Please pay as per the details on the Invoice.

With kind regards,
Mark

Mark S. Davis
Sr. V. P. & CFO
Kyma Ship Management, Inc.

# Gretchen Shipping Inc.

**INVOICE**

C/o Kyma Ship Management, Inc.
1801 SW 3rd AVE. Suite # 200
Miami, FL 33129
TEL: (305) 376-8600 FAX: (305) 376-4375
email: mdavis@kymaship.com

| | |
|---|---|
| **INVOICE NUMBER** | 112 |
| **INVOICE DATE** | September 6, 2013 |
| **TERMS** | Due on receipt |
| **DUE DATE** | September 15, 2013 |

**Bill To:**
Commodities & Minerals Enterprise LTD
501 Brickell Key Drive
Suite 502
Miami, FL 33131

| Total Days | Description | Rate | Amount USD |
|---|---|---|---|
| 15 | "General Piar" Charter Hire, from U.T. 20.42 on September 15/13 until U.T. 20:42 on September 30/13. | 27,210.47 | $408,157.03 |

Please note our Banking details:
Beneficiary: Gretchen Shipping Inc.
Bank: Bank of America
     7760 West Flagler Street, 2nd Fl
     Miami, Florida 33144
ABA: 026009593
Swift: BOFAUS3N
Account #: 898048639580

| | | **TOTAL USD** | $     408,157.03 |
|---|---|---|---|

# SERRAO
# DECLARATION
# EXHIBIT 6

Contact name: Mark Davis
Transaction date: Jun. 25, 2012



**business solutions**
Custom House (USA) Ltd

**Kyma Ship Management Inc**
1015 North America Way, Suite- 128
Miami, FL 33132
UNITED STATES

Tel: 305-376-8600
Fax: 305-376-4375

702 - US Trading Office
330 Bay Street, Suite 300
Toronto, ON M5H 2S8
CANADA

Tel: 1-866-344-4583
Fax: 1-877-442-2481

IMPORTANT: Please make your payments payable to Custom House and include Order ID 34678108 as the reference for your payment.

## Order summary

**Order ID: 34678108**

| Beneficiary name | FX Currency | FX amount | Contract ID | Rate | Settlement amount | S/C | Total amount |
|---|---|---|---|---|---|---|---|
| ~~Argosy Environmental Inc~~ | USD | 451,224.11 | | 1.0000 | 451,224.11 | 7.50 | 451,231.61 |
| | | 451,224.11 | Spot | 1.0000 | | | 451,224.11 |
| SULEID GIRALDO HERRERA | USD | 11,047.46 | | 1.0000 | 11,047.46 | 7.50 | 11,054.96 |
| | | 11,047.46 | Spot | 1.0000 | | | 11,047.46 |
| VIPSEN CORP | USD | 791.03 | | 1.0000 | 791.03 | 7.50 | 798.53 |
| | | 791.03 | Spot | 1.0000 | | | - 791.03 |
| GERARDO A VAZQUEZ, P A D/B/A VAZQUEZ & ASSOCIATES | USD | 791.03 | | 1.0000 | 791.03 | 7.50 | 798.53 |
| | | 791.03 | Spot | 1.0000 | | | 791.03 |
| Scardana Corporation | USD | 9,442.10 | | 1.0000 | 9,442.10 | 7.50 | 9,449.60 |
| | | 9,442.10 | Spot | 1.0000 | | | 9,442.10 |
| Triadafilos Kalkanis | USD | 22,810.63 | | 1.0000 | 22,810.63 | 7.50 | 22,818.13 |
| | | 22,810.63 | Spot | 1.0000 | | | 22,810.63 |
| Taylor Wessing | EUR | 1,122.60 | | 1.2625 | 1,417.28 | 0.00 | 1,417.28 |
| | | 1,122.60 | Spot | 1.2625 | | | 1,417.28 |
| Skandiaverken Ltd | EUR | 3,140.23 | | 1.2625 | 3,964.54 | 0.00 | 3,964.54 |
| | | 3,140.23 | Spot | 1.2625 | | | 3,964.54 |
| | Totals (USD): | | | | 501,488.18 | 45.00 | 501,533.18 |

STPH

JUL - 3 2012

## Item summary

| Item ID | Direction | Currency | Method | FX amount | Beneficiary details |
|---|---|---|---|---|---|

GSI000281

Contact name: Farid Galia
Transaction date: Sep. 07, 2012



**WESTERN UNION**

**business solutions**
Custom House (USA) Ltd

**Kyma Ship Management Inc**
1015 North America Way, Suite- 128
Miami, FL 33132
UNITED STATES

702 - US Trading Office
330 Bay Street, Suite 300
Toronto, ON M5H 2S8
CANADA

Tel: 305-376-8600
Fax: 305-376-4375

Tel: 1-866-344-4583
Fax: 1-877-442-2481

**IMPORTANT: Please make your payments payable to Custom House and include Order ID 36447019 as the reference for your payment.**

## Order summary

**Order ID: 36447019**

| Beneficiary name | FX Currency | FX amount | Contract ID | Rate | Settlement amount | S/C | Total amount |
|---|---|---|---|---|---|---|---|
| Kyma Ship Management, Inc | USD | 30,000.00 | | 1.0000 | 30,000.00 | 7.50 | 30,007.50 |
| | | 30,000.00 | Spot | 1.0000 | | | 30,000.00 |
| VIPSEN CORP | USD | 4,986.92 | | 1.0000 | 4,986.92 | 7.50 | 4,994.42 |
| | | 4,986.92 | Spot | 1.0000 | | | 4,986.92 |
| GERARDO A. VAZQUEZ, P.A. D/B/A VAZQUEZ & ASSOCIATES | USD | 4,986.92 | | 1.0000 | 4,986.92 | 7.50 | 4,994.42 |
| | | 4,986.92 | Spot | 1.0000 | | | 4,986.92 |
| Brazis Energy Agents LLC | USD | 94,136.00 | | 1.0000 | 94,136.00 | 7.50 | 94,143.50 |
| | | 94,136.00 | Spot | 1.0000 | | | 94,136.00 |
| **Totals (USD):** | | | | | **134,109.84** | **30.00** | **134,139.84** |

+ $925.93
$ 140,065.77

## Item summary

| Item ID | Direction | Currency | Method | FX amount | Beneficiary details |
|---|---|---|---|---|---|
| 36447021 | Buy | USD | Wire | 30,000.00 | Kyma Ship Management, Inc |

Address: 1801 SW 3rd Ave., Suite 200, MIAMI, FL 33129, UNITED STATES
Bank name: Northern Trust National Bank
Bank address: 700 Brickell Ave., Miami, FL 33129, UNITED STATES
Swift code: CNORUS3M
Bank code: 066009650
Account No: 1016037781
Reference: Kyma Ship Management Inc

# SERRAO
# DECLARATION
# EXHIBIT 7

# Florida Companies

Florida Companies

Search Keywords

Companies   VIPSEN CORP

# VIPSEN CORP.

### LLC in 3 Easy Steps

www LegalZoom com/LLC

(1) Sign Up (2) Fill in Online Form (3) Launch Your New Business!

Remove this company from out database



Business Summary for VIPSEN CORP.

VIPSEN CORP is an Domestic for Profit business incorporated in Florida, USA on August 26, 2009  Their business is recorded as Active  It is not part of a group  The company was incorporated 4 years ago

Information for VIPSEN CORP

| | |
|---|---|
| Name | VIPSEN CORP |
| Identification number | P09000072254 |



| | |
|---|---|
| Business Type | Domestic for Profit |
| Company Status | Active |
| Incorporation date | 08/26/2009 |
| Last statement | |
| Business Address | 4550 BAY POINT RD<br>MIAMI |
| Mailing Address | 4550 BAY POINT RD<br>MIAMI |
| State | FL |
| FEI/EIN Number | 270823301 |
| Officer detail | Director HARRINGTON STEPHEN<br>4550 BAY POINT RD<br>MIAMI FL<br><br>Director HARRINGTON VIBEKE<br>4550 BAY POINT RD<br>MIAMI FL |
| Agent | HARRINGTON STEPHEN<br>4550 BAY POINT RD<br>MIAMI FL 33137 |

*Our website contains only public informations on companies from Florida  USA

Incorporations

Domestic corporations are those formed in Florida itself  While there is no residency requirement for directors or officers of Florida corporations  a registered agent (who can also be a corporate officer) must have a physical address in Florida along with regular business hours  Eligibility Requirements   The registered agent must be either (1) an individual who resides in Florida and whose business office is the same as the registered office or (2) a corporation with a business office that is the same as the registered office  They have to be available to take phone calls and respond to legal matters  Hiring a Registered Agent will protect your privacy and meet the requirements of incorporation in Florida

**Florida companies**

KENMORE OPERATING COMPANY
KENWOOD CONSTRUCTION AND DEVELOPMENT
CORPORATION INTERNATIONAL
LCL TRADING INC
KOO KOO LOUNGE  INC
KINDERGARTEN CONSULTANTS INC
MUSYA S EUROPEAN HEALTH CARE CENTER
INC
LEXSTAR (BARCLAY), INC
LINCOLN B 1023 HOLDINGS  INC
LEGASPI COMPANY, S A
KLINGER S  INC
KILWINS OF ST  ARMANDS, INC
KEY BISCAYNE PROFESSIONAL BUILDING INC
LEO BROOKMAN & ASSOCIATES  INC
JPK DESIGN, INC
LAVIN ENTERPRISES  INC
THE GROUP MORTGAGE INVESTORS  INC
LITTLE PAWS MINI SHELTER  INC
THINK VIDEO CORPORATION
J J N  TRADING CORP
REYNO PHARMACY INC

Related companies

KRYSTALINE GEMS, INC  Details
L P A QUARTERBACK CLUB INC Details
L'ESTELL INTERNATIONAL  INC  Details
LAWSON CAREERS, INC  Details
KUE & KAROM BILLIARDS, INC  Details

LEDBETTER MASONRY & CONSTRUCTION, INC  Details
LIGNIN INVESTMENTS, LTD  Details
KING CRAB CORPORATION Details
KESMEN FLORIDA, INC  Details

Key Financials

Key Financials are not available as VIPSEN CORP  has not filed accounts  Accounts are required to be filed on or before 20/09/2013

Company Documents

Date Filed                              Document Type



Directors and Secretaries of VIPSEN CORP.

VIPSEN CORP  on the Map

Google

Disclaimer

The information provided on florida-companies-info com is amalgamated from a variety of sources  We aim to provide the most comprehensive data , however this is dependant on the
level of information filed in the public domain  Our company checks are provided as a guideline  We advise our visitors to express caution if in doubt, and to seek professional advice
before commencing legal action, based on any information contained herein  florida companies-info com sources data in good faith that the content is accurate, and therefore cannot
take any responsibility for the consequences of inaccuracies

Florida Companies , USA     About Us     Prices     Disclaimer     Contact
© Copyright USA Florida Companies

# SERRAO
# DECLARATION
# EXHIBIT 8

# Gretchen Shipping Inc.

# INVOICE

C/o Kyma Ship Management, Inc.
1801 SW 3rd AVE. Suite # 200
Miami, FL 33129
TEL: (305) 376-8600 FAX: (305) 376-4375
email: mdavis@kymaship.com

| | |
|---|---|
| INVOICE NUMBER | 112 |
| INVOICE DATE | September 6, 2013 |
| TERMS | Due on receipt |
| DUE DATE | September 15, 2013 |

**Bill To:**
Commodities & Minerals Enterprise LTD
501 Brickell Key Drive
Suite 502
Miami, FL 33131

| Total Days | Description | Rate | Amount USD |
|---|---|---|---|
| 15 | "General Piar" Charter Hire, from U.T. 20:42 on September 15/13 until U.T. 20:42 on September 30/13. | 27,210.47 | $408,157.03 |

Please note our Banking details:

Beneficiary: Gretchen Shipping Inc.

Bank: Bank of America

    7760 West Flagler Street, 2nd Fl

    Miami, Florida 33144

ABA: 026009593

Swift: BOFAUS3N

Account #: 898048639580

| | | | |
|---|---|---|---|
| | | **TOTAL USD** | **$        408,157.03** |

# SERRAO
# DECLARATION
# EXHIBIT 9

# Gretchen Shipping Inc.

**INVOICE**

C/o Kyma Ship Management, Inc.
1801 SW 3rd AVE. Suite # 200
Miami, FL 33129
TEL: (305) 376-8600 FAX: (305) 376-4375
email: mdavis@kymaship.com

| INVOICE NUMBER | 113 |
|---|---|
| INVOICE DATE | September 30, 2013 |
| TERMS | Due on receipt |
| DUE DATE | September 30, 2013 |

<u>Bill To:</u>
Commodities & Minerals Enterprise LTD
501 Brickell Key Drive
Suite 502
Miami, FL 33131

| Total Days | Description | Rate | Amount USD |
|---|---|---|---|
| 15 | "General Piar" Charter Hire, from U.T. 20:42 on September 30/13 until U.T. 20:42 on Otober 15/13. | 27,210.47 | $408,157.03 |

Please note our Banking details:

Beneficiary: Gretchen Shipping Inc.

Bank: Bank of America

　　　7760 West Flagler Street, 2nd Fl

　　　Miami, Florida 33144

ABA: 026009593

Swift: BOFAUS3N

Account #: 898048639580

| | | **TOTAL USD** | **$** | **408,157.03** |
|---|---|---|---|---|